UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

JULIO NEGRON,                                 :

                         Plaintiff,      :      **COMPLAINT**

        - against -             :      No. 18-6645

THE CITY OF NEW YORK, PATRICK      :
O'CONNOR, in his individual and official
capacities, and ROBERT MOSCOSO, in his    :      Jury Trial Demanded
individual and official capacities,

                                   :

                     Defendants.
--------------------------------------------------------x

Plaintiff JULIO NEGRON, by his attorneys, the LAW OFFICES OF JOEL B.

RUDIN, P.C., respectfully alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.      This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, and New

York State law, seeking monetary damages for the Plaintiff, JULIO NEGRON, due to his

unlawful criminal prosecution and conviction for attempted murder in Queens, New

York, and imprisonment of almost 10 years.

2.      Negron, a school custodian for more than 15 years, was arrested on

February 6, 2005, for the shooting of Mervin Fevrier, near Negron's girlfriend's home,

after a traffic dispute.  The evidence known to police proved overwhelmingly that Negron

was *not* the shooter.

3.     One eyewitness, who told police she knew the shooter from the area, viewed Negron in a holding cell and told police he was *not* the shooter.  Three other eyewitnesses viewed a lineup containing Negron and did not recognize Negron as the shooter.  The final eyewitness, shooting victim Fevrier, viewed the lineup and could not make a positive identification.  Following the lineup, Defendant Patrick O'Connor, an assistant district attorney ("ADA"), told Negron's attorney that Negron would be released.

4.     However, rather than release Negron, O'Connor, together with two police investigators, Defendant Robert Moscoso and Sgt. Michael Ryan, all acting in concert in an investigatory capacity, then manufactured "probable cause" to prosecute Negron.[1] Excluding Negron's counsel, whom Negron was entitled to have witness the lineup, they took Fevrier into a closed room and spoke with him for 15 to 20 minutes, after which Fevrier, for the first time, claimed to be able to identify Negron positively as the shooter. This became the evidence upon which Negron's entire prosecution was based.

5.     Having participated in improperly influencing this identification, ADA O'Connor, now wearing his prosecutorial hat, then misled the grand jury into indicting Negron.  He presented testimony that Fevrier had "positively" identified Negron without revealing that, until Fevrier was improperly taken into the closed room for a talking-to, Fevrier had not been able to make such an identification.  He withheld that four other witnesses had either said Negron was not the shooter or failed to recognize him as such.

---

[1] Sgt. Ryan is deceased.

And he withheld numerous additional items of exculpatory evidence, including evidence pointing to another likely culprit.

6.     At Negron's trial, Fevrier, having been influenced by the defendants into believing Negron was the shooter, identified Negron to the jury.  Meanwhile, ADA O'Connor convinced the trial judge to disallow Negron's defense that another person was the shooter, on the ground of insufficient evidence in support of that theory, while withholding from the court and the defense additional evidence in his possession tending to prove that defense.  He also engaged in rampant misconduct in his summation. Negron was convicted.

7.     After fighting for 10 years, up and down the state and federal court systems, Negron finally succeeded, on November 23, 2015, in convincing the New York Court of Appeals to overturn his conviction and grant him a new trial.  The Court of Appeals concluded that O'Connor had "actively misle[d] the [trial] court as to the potential merit of defendant's third-party culpability defense" and withheld evidence about the third party that was "plainly favorable to the defense," in violation of Negron's constitutional right to a fair trial.

8.     After almost 10 years behind bars, Negron was released, but the Queens County District Attorney's Office wasn't finished with him.  It announced an intention to retry him.

9.     The trial court, denouncing ADA O'Connor's misconduct in the grand jury, wouldn't allow it.  It found that O'Connor had withheld "a plethora of exculpatory evidence" from the grand jury and presented the lineup identification in an "utterly

misleading manner." O'Connor, the court found, was "aware that there was significantly more evidence pointing away from the defendant's identity as the perpetrator of the crimes than there was pointing towards it," but he "failed to present any of this exculpatory evidence." The court concluded that O'Connor's "deception" of the grand jury was "indisputably deliberate." It dismissed the case.

10. This lawsuit seeks to hold the individual defendants liable for malicious prosecution and for causing Plaintiff to be convicted, in violation of his constitutional right to a fair trial, based upon manufactured identification testimony. In addition, it seeks to hold the Defendant City of New York responsible because the individual defendants' unlawful actions foreseeably resulted from the deliberate indifference of policymakers for the New York City Police Department ("NYPD") and the Queens County District Attorney's Office ("D.A.'s Office" or "QCDAO")—both New York City agencies—to patterns of similar constitutional violations, committed over many years, by their employees. Absent a finding of such liability, the type of misconduct that occurred in this case will continue to flourish.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

11. This action arises under 42 U.S.C. §§ 1983 and 1988 and under the common law of the State of New York.

12. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 and under the principles of pendent jurisdiction.

13. Venue is proper under 28 U.S.C. § 1391.

4

14. This action has been commenced within the applicable period for each claim.

15. On or about December 1, 2017, Plaintiff served the City of New York timely notice of the present claims, in accordance with N.Y. Gen. Mun. Law § 50-e.

16. On May 16, 2018, a hearing was held, in accordance with N.Y. Gen. Mun. Law § 50-h.

17. Plaintiff has duly complied with all conditions precedent to the commencement of this action.

## THE PARTIES

18. Plaintiff JULIO NEGRON is a citizen and resident of the State of New York and of the United States. He resides within the Eastern District of New York.

19. Defendant PATRICK O'CONNOR was at all relevant times an assistant district attorney employed by the D.A.'s Office, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

20. Defendant ROBERT MOSCOSO, shield no. 7539, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

21. Defendant CITY OF NEW YORK ("City") is a municipal corporation of the State of New York and is a resident of the Eastern District of New York.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Shooting and Investigation

22.     Just before 4 a.m. on February 6, 2005, Mervin Fevrier was driving a car down Woodward Avenue in Queens, New York.

23.     His friend Elliot Miley was in the front passenger seat.

24.     Around the intersection of Woodward Avenue and Menahan Street, Fevrier and the driver of another car got into a traffic-related dispute.

25.     Fevrier and Miley got out of their car and the other driver got out of his.

26.     The other driver shot Fevrier in the leg.

27.     Fevrier and Miley returned to their car and drove away from the scene.

28.     Shortly thereafter, they flagged down a police car.

29.     Witnesses described the shooter as:

    a.     a Hispanic man;

    b.     with a beard and mustache;

    c.     who drove a dark blue, four-door sedan.

30.     Accordingly, a contemporaneous NYPD radio run described the shooter as having a mustache and driving a dark blue four-door sedan.

31.     Police officers recovered three spent .45-caliber shell casings at the scene of the shooting.

32.     The shooting happened near the apartment of Plaintiff Julio Negron's girlfriend, at 583 Woodward Avenue.

33.     Negron was in bed asleep in this apartment when the shooting occurred.

34. Negron, while Hispanic, had no facial hair at the time of the shooting.

35. He didn't drive a dark blue, four-door sedan but rather a green, two-door coupe.

36. Later the morning of the shooting, NYPD detectives, including Defendant Moscoso, rang the doorbell to Negron's girlfriend's apartment.

37. Negron answered the door.

38. Moscoso and the other detectives took Negron to the local precinct.

39. At the precinct, Moscoso and the other detectives locked Negron in a caged detention area.

40. Moscoso and the other detectives did not have probable cause to detain or arrest Negron.

41. Moscoso and the other detectives asked Negron for his consent to search his car.

42. From his cell, Negron gave Moscoso and the other detectives permission to search his car and handed them his car keys.

43. Police searched Negron's car and found no incriminating evidence.

44. Moscoso and the other detectives also asked Negron for his consent to search his girlfriend's apartment.

45. From his cell, Negron gave Moscoso and the other detectives permission to search his girlfriend's apartment.

46. Police searched the apartment and found no incriminating evidence.

47. The same day, the police brought Zoryana Ivaniv to the precinct.

48. Ivaniv had been sitting in a parked car on the block where the shooting happened and had witnessed the shooting.

49. Ivaniv lived near the area of the shooting and told police that she had recognized the shooter from seeing him on previous occasions.

50. Moscoso brought Ivaniv to Negron's holding cell and displayed Negron to Ivaniv.

51. This stationhouse "showup" procedure was so inherently suggestive that it was banned by New York State law.

52. Nevertheless, Ivaniv told Moscoso that Negron was *not* the shooter.

53. The next day, February 7, Moscoso, still holding Negron in custody and still investigating for evidence to tie Negron to the shooting, prepared a lineup containing Negron and five fillers.

54. He was assisted in the lineup process by Sgt. Ryan and Defendant O'Connor.

55. Moscoso picked up shooting victim Fevrier and brought him to the precinct to view the lineup.

56. At Moscoso's direction, three other eyewitnesses were also brought to the precinct to view the lineup: Miley, Dmitriy Khavko, and Andriy Vintonyak.

57. Khavko and Vintonyak had been in the parked car with Ivaniv and had witnessed the shooting.

58.     Negron's defense lawyer was present for the lineup, and Negron had the constitutional right to have him observe the lineup to help ensure it was conducted fairly and without improper suggestion.

59.     The first eyewitness to view the lineup, shooting victim Fevrier, was unable to positively identify Negron.

60.     The second witness, Miley, did not recognize Negron as the shooter but instead selected a filler.

61.     The third witness, Vintonyak, did not recognize Negron as the shooter either and made no identification.

62.     The final witness to view the lineup, Khavko, did not recognize Negron as the shooter but instead selected a filler.

63.     The filler Khavko selected had a mustache, which was consistent with the eyewitness descriptions of a shooter with facial hair.

64.     Negron and the other fillers did not have facial hair at the time of the lineup.

65.     Recognizing there was no probable cause to arrest or prosecute Negron, O'Connor told Negron's counsel he was going to authorize Negron's release.

66.     However, O'Connor, Moscoso, and Ryan then took Fevrier into a private room and talked to him for approximately 15 to 20 minutes.

67.     They improperly excluded Negron's attorney from the room.

68.     When O'Connor emerged from the room, he told Negron's attorney that he was not going to authorize Negron's release after all but, rather, Negron's arrest.

69.     O'Connor, Moscoso, and Ryan had improperly influenced Fevrier, during the closed-door meeting, to positively identify Negron.

70.     But for the misconduct of Defendants O'Connor and Moscoso, as well as Sgt. Ryan, in leading Fevrier to make a "positive" identification that he did not make while viewing the lineup, there would have been no "probable cause" for Negron's arrest.

## The Arrest of Fernando Caban

71.     At the time of the shooting, Negron's girlfriend lived in the second-floor apartment of 583 Woodward Avenue.

72.     At about 8 p.m. on the day of the shooting, NYPD officers gathered outside 583 Woodward Avenue to search Negron's girlfriend's apartment, having obtained Negron's consent to do so.

73.     Before police entered the building, a neighbor living in a connected building two doors down alerted the officers that a man and a woman carrying multiple large plastic bags had just forced their way into her apartment, directed her to lock her door, demanded access to the roof, directed her to leave the door to the roof unlocked, and, when she locked the roof door anyway, banged on the door to be let back inside.

74.     This neighbor later identified the two people who had entered her apartment as Fernando Caban and Monica Guartan.

75.     Caban and Guartan lived below Negron's girlfriend on the first floor of 583 Woodward Avenue.

76. Caban's physical appearance at the time was similar to Negron's, except Caban, more closely matching the description given by eyewitnesses of the shooter, wore facial hair, whereas Negron did not.

77. After the neighbor notified the police, officers searched the roof of her building.

78. There they found numerous plastic trash bags filled with weapons, armor, ammunition, counterfeit money, and identification cards with Caban's photograph on them.

79. A closer examination of the contents of the bags revealed, among other items, fifty rounds of .45-caliber ammunition.

80. These were similar to the .45-caliber shell casings recovered from the scene of the shooting.

81. Evidently, Caban had thought the police investigating the shooting were at 583 Woodward Avenue to search or arrest him.

82. Caban was subsequently arrested and charged with several crimes based on the contents of the trash bags.

## The Grand Jury

83. O'Connor presented the shooting case against Negron to a grand jury.

84. O'Connor elicited testimony from Fevrier that Fevrier had viewed a lineup and positively identified person number five as the shooter.

85.     O'Connor then elicited testimony from Moscoso that Negron was person number five in the lineup.

86.     However, O'Connor and Moscoso withheld from the grand jury that Fevrier initially failed to positively identify Negron and did so only after they and Ryan had met privately with Fevrier for 15 to 20 minutes.

87.     Both O'Connor and Moscoso further withheld that four other witnesses had viewed Negron, singly or in the six-person lineup, and failed to identify him as the shooter.

88.     Indeed, Moscoso, questioned by O'Connor, misled the grand jury by testifying that only Fevrier had viewed the lineup.

89.     Negron exercised his right to testify before the grand jury.

90.     He attempted to explain that Defendant O'Connor had initially authorized his release because none of the witnesses who viewed the lineup could positively identify him.

91.     However, O'Connor stopped Negron and refused to let him give such testimony.

92.     A grand juror asked Negron whether the police had found anything in his apartment when they searched it.

93.     O'Connor refused to let Negron answer this question.

94.     Knowing that the police had found nothing incriminating in the apartment, O'Connor did not present this evidence to the grand jury in any form.

95.     Defendants O'Connor and Moscoso further withheld from the grand jury:

a.      the circumstances of Caban's flight, jettisoning of incriminating evidence, and arrest;

b.      the eyewitness descriptions of the shooter as a Hispanic man with facial hair, a description that better fit Caban than Negron; and

c.      witness descriptions of the car used by the shooter as a blue four-door sedan, while Negron's car was a green two-door coupe.

96.     Based on this false, fraudulent, and misleading presentation of evidence, the grand jury indicted Negron on one count each of attempted murder in the second degree, assault in the first degree, reckless endangerment in the first degree, and criminal possession of a weapon in the second degree, and two counts of criminal possession of a weapon in the third degree.

### The Trial

97.     Before Fevrier testified at trial, Defendant O'Connor took him into the courtroom and allowed him to view Negron sitting at the defense table.

98.     Fevrier then made an in-court identification of Negron as the shooter.

99.     Fevrier testified that the shooter had driven a four-door sedan.

100.    Ivaniv testified that she had viewed Negron in a show-up at the police precinct and told police he was not the shooter.

101.    Khavko and Miley testified that they had picked fillers out of the lineup containing Negron.

102.    Vintonyak testified that he had not recognized anyone in the lineup.

103.    Negron's attorney sought the court's permission to introduce evidence that Fernando Caban was guilty of the shooting.

104.     Negron's attorney knew only that Caban resembled the physical description of the shooter, that Caban lived in the same building as Negron's girlfriend, and that Caban had been arrested for possession of a cache of weapons found on a rooftop connected to that building.

105.     Negron's attorney did not know:

    a.    that Caban had attempted to hide or discard his weapons cache as police investigating the shooting gathered outside his building, thereby revealing an apparent consciousness of his own guilt; and

    b.    that the items Caban had disposed of included .45-caliber ammunition, the same type of ammunition used in the shooting of Fevrier.

106.     Defendant O'Connor not only was Negron's prosecutor but also was in charge of Caban's prosecution.

107.     O'Connor knew all the information that Negron's attorney did not.

108.     Nevertheless, O'Connor withheld this information from the defense and from the court.

109.     While withholding the evidence further linking Caban to the shooting case, O'Connor argued that Caban's connection to the shooting was too "tenuous" to allow the admission of evidence of Caban's possible culpability.

110.     As a result of O'Connor's misleading argument, the court precluded the defense from introducing any evidence of Caban's possible culpability.

111.     In summation, O'Connor exploited his success in keeping this evidence hidden.

112.    He argued that it would be unreasonable for the jury to believe someone else had committed the shooting, saying:

> The person who comes out of the car just happens to look like the defendant.  The person who comes out of this car, that man just happens to go into the defendant's house.  Does that make any sense to you?  Does that sound like a reasonable coincidence, or does it sound completely and utterly unreasonable and not worthy of belief?

113.    O'Connor made this argument even though he knew that Caban lived in the same house as Negron, that Caban more closely resembled the shooter than Negron did, and that Caban, on the same day as the shooting, had acted in a manner suggesting he knew he was guilty of the shooting.

114.    O'Connor also falsely told the jury that "everything was done by the book with this case, nothing is being hidden from you."

115.    In reality, as O'Connor well knew, he had hidden from the jury the evidence of Caban's culpability and also had inappropriately influenced Fevrier's in-court identification testimony using a highly irregular, suggestive procedure that was anything but "by the book."

116.    Indeed, O'Connor exploited his success in manufacturing Fevrier's lineup identification of Negron.

117.    O'Connor asked the jury rhetorically:  "[D]o you think for a moment that Mervin [Fevrier] would forget ever, ever in his life what this person looks like[?] . . .  I submit to you that that is completely unreasonable to believe, and if something is unreasonable to believe, it cannot be the basis for a reasonable doubt."

118.    O'Connor argued this even though he knew the truth was that Fevrier had originally been unable to positively identify Negron.

119.    In addition, O'Connor, violating fundamental rules of advocacy and due process, improperly argued facts not in evidence and personally vouched for the credibility of the prosecution's witnesses.

120.    Discussing Fevrier, O'Connor said, "*I am sure*, beyond a reasonable doubt he got an excellent view of the defendant's face, excellent enough to identify him" (emphasis added).

121.    Discussing Miley, he said, "He is a graduate student, he is very articulate and he came across very articulate, *I believe*, to you" (emphasis added).

122.    After the defense objected to this remark, the court instructed O'Connor, "Don't vouch for your witness," but O'Connor, disregarding the court's ruling, continued to vouch, saying, "The evidence shows, *I believe, I believe*, he came across very articulate, very educated.  He is a smart man" (emphasis added).

123.    Finally, O'Connor, again in violation of fundamental rules of advocacy and due process, made an improper attack on Negron's character and purported criminal "propensity."

124.    Characterizing Negron's trial testimony as "adversarial" toward O'Connor, O'Connor said:  "What does that tell you about him *as a person*? . . .  What does it tell you about his *propensity to commit this crime*? . . .  Didn't he seem like *the kind of person* who would do something like this[?]" (emphasis added).

125.     The jury convicted Negron of one count each of attempted murder in the second degree, assault in the first degree, reckless endangerment in the first degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree.

126.     Negron was sentenced to twelve years in prison.

## Plaintiff's Post-Conviction Efforts and the Eventual Reversal of His Conviction

127.     The Appellate Division affirmed Negron's conviction and sentence on June 26, 2007, *People v. Negron*, 41 A.D.3d 865 (2d Dep't 2007), and the Court of Appeals denied leave to appeal on September 24, 2007, *People v. Negron*, 9 N.Y.3d 924 (2007).

128.     In June 2008, Negron filed a request under New York's Freedom of Information Law ("FOIL") for information about the QCDAO's prosecution of Caban.

129.     On December 1, 2008, Negron filed a *pro se* motion to vacate his conviction under N.Y. Crim. Proc. Law § 440.10.

130.     Negron argued, among other things, that the prosecution had suppressed evidence pointing to Caban as the person who shot Mervin Fevrier, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

131.     The D.A.'s Office opposed Negron's motion.

132.     With respect to Negron's *Brady* argument, the D.A.'s Office argued that there was no violation, since "the People made defendant aware of the arrest of Mr. Caban, his neighbor, for possessing a stash of firearms."

133.    The D.A.'s Office made no mention of the additional information inculpating Caban that Defendant O'Connor had failed to disclose to the court and to Negron at trial.

134.    The court denied Negron's § 440.10 motion on March 17, 2009, without a hearing.

135.    On April 30, 2009, Negron filed a *pro se* motion for reconsideration of his § 440.10 motion.

136.    Meanwhile, on September 10, 2009, the Appellate Division denied Negron leave to appeal the denial of his § 440.10 motion.

137.    On September 15, 2009, Negron filed a *pro se* habeas corpus petition in the United States District Court for the Eastern District of New York.

138.    The D.A.'s Office opposed this petition.

139.    On July 16, 2010, Negron, after more than two years, finally received a response to his FOIL request.

140.    Among the documents he received were a transcript of a pretrial hearing from the prosecution of Caban and a sworn affirmation opposing Caban's motion to dismiss the indictment against him.

141.    Defendant O'Connor was the ADA who conducted the hearing and swore out the affirmation.

142.    From the transcript and the affirmation, Negron learned, for the first time, of Caban's frantic efforts to dispose of the trash bags and that the bags contained the same type of ammunition used to shoot Fevrier.

143.    On January 27, 2011, Negron presented this evidence in another *pro se* motion for the state court to reconsider his § 440.10 motion.

144.    While that motion was pending, Eastern District Judge Dora Irizarry appointed *pro bono* counsel for Negron, then stayed proceedings in the Eastern District so that the state courts could consider Negron's new evidence regarding Caban.

145.    On April 20, 2012, Negron, now represented by counsel, presented his new evidence in another § 440.10 motion.

146.    The D.A.'s Office opposed this motion.

147.    The court denied the motion on September 26, 2012.

148.    The Appellate Division affirmed this decision on December 11, 2013. *People v. Negron*, 112 A.D.3d 741 (2d Dep't 2013).

149.    However, the Court of Appeals granted leave to further appeal.

150.    On November 23, 2015, the Court of Appeals vacated Negron's conviction. *See People v. Negron*, 26 N.Y.3d 262 (2015).

151.    The Court agreed with Negron that Defendant O'Connor had "actively misle[d] the court as to the potential merit of defendant's third-party culpability defense." *Id.* at 267.

152.    The Court found that O'Connor "was quite familiar with the circumstances of [Caban's] arrest," yet had withheld evidence about Caban that was "plainly favorable to the defense." *Id.* at 269.

153.    The Court further found that O'Connor compounded this misconduct when, "in addressing defendant's third-party culpability application [he] characterized Caban's arrest as 'irrelevant' and his connection with the shooting as 'tenuous at best.'" *Id.*

154.    The Court concluded that O'Connor's misconduct had deprived Negron of a fair trial and ordered a new trial. *Id.* at 270.

155.    The QCDAO's opposition to Negron's January 2011 motion presenting the Caban documents prolonged Negron's imprisonment by nearly five years.

156.    Before the Court of Appeals vacated Negron's conviction, Negron was already scheduled to be released from prison on December 29, 2015, based on allowances he had received for good time and limited-credit time.

157.    After the Court vacated Negron's conviction, he was transferred from state prison to the custody of the New York City Department of Correction.

158.    On January 5, 2016, the trial court released Negron on his own recognizance.

159.    However, the D.A.'s Office announced that it would retry Negron.

160.    Negron's counsel moved to dismiss the indictment against Negron in September 2016.

161.    The D.A.'s Office opposed this motion, denying that QCDAO prosecutors had done anything wrong.

162.    On September 6, 2017, the State Supreme Court, Queens County (Lasak, J.S.C.), granted Negron's motion.

163. The court held that Defendant O'Connor had impaired the integrity of the grand jury by omitting "a plethora of exculpatory evidence" and by "the utterly misleading manner in which Mr. Fevrier's identification was submitted."

164. The court detailed how O'Connor had presented Fevrier's identification of Negron as unequivocal when, in fact, "a positive identification was made only after *he himself* [i.e., O'Connor] took the complainant out of the lineup room and, along with detectives, had a 15 minute conversation with the complainant outside the presence of defense counsel" (emphasis in original).

165. The court found that O'Connor's "deception" was "indisputably deliberate" and was "merely the tip of the iceberg."

166. The court went on to explain how O'Connor had "violated his obligation of fair dealing to the accused" by failing to inform the grand jury that:

   a.   A witness who "lived on the same block as" Negron and "recognized the shooter from prior occasions" had "stated that [Negron] was not the perpetrator"; and

   b.   The three other witnesses to view the lineup had either identified a filler as the shooter or not recognized anyone as the shooter.

167. The court concluded:

   When the prosecutor put this case in the Grand Jury, he was aware that there was significantly more evidence pointing away from the defendant's identity as the perpetrator of the crimes than there was pointing towards it. In spite of that, he not only failed to present any of this exculpatory evidence, but he chose to present the only piece of evidence that he did have to connect the defendant to the crime in an incomplete way, which created the impression that the complainant's identification of the defendant was stronger than it actually was.

## FIRST CAUSE OF ACTION

**State-law malicious prosecution. Defendants O'Connor and Moscoso.**

168. Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

169. Defendants O'Connor and Moscoso (collectively, the "Individual Defendants") and Sgt. Ryan, individually and in concert, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Plaintiff without probable cause.

170. The proceedings terminated in Plaintiff's favor.

171. Defendant City of New York is liable for Plaintiff's malicious prosecution under the principle of *respondeat superior*.

## SECOND CAUSE OF ACTION

**42 U.S.C. § 1983. Malicious prosecution in violation of the Fourth, Fifth, and Fourteenth Amendments. Defendants O'Connor and Moscoso.**

172. Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

173. The Individual Defendants and Sgt. Ryan, individually and in concert, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Plaintiff without probable cause and to deprive him of his liberty, in violation of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

174.    The proceedings terminated in Plaintiff's favor.

175.    The Individual Defendants are liable for their violation of Plaintiff's constitutional rights and for compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

### THIRD CAUSE OF ACTION

**Denial of Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments. Defendants O'Connor and Moscoso.**

176.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

177.    The Individual Defendants and Sgt. Ryan, individually and in concert, acted deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, to cause the manufacturing of Fevrier's lineup identification of Plaintiff.

178.    They did so for the purpose of causing criminal proceedings to be initiated and continued against Plaintiff.

179.    The Individual Defendants and Sgt. Ryan forwarded Fevrier's manufactured lineup identification to prosecutors for use against Plaintiff.

180.    The Individual Defendants and Sgt. Ryan knew that Fevrier's manufactured lineup identification would be likely to influence a jury's decision at trial.

181.    As a result of the Individual Defendants and Sgt. Ryan's forwarding of Fevrier's manufactured lineup identification to prosecutors, the D.A.'s Office initiated a prosecution of Plaintiff and his liberty was infringed or curtailed.

182. The Individual Defendants and Sgt. Ryan's misconduct violated Plaintiff's rights to procedural and substantive due process and to a fair trial as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

183. Alternatively, each of the Individual Defendants and Sgt. Ryan had an affirmative duty to Plaintiff to protect his above-mentioned constitutional rights from infringement by other government officials.

184. Each of the Individual Defendants and Sgt. Ryan knew that Plaintiff's constitutional rights would be violated if the other government officials present at the lineup were to influence Fevrier to positively identify Plaintiff after Fevrier had been unable to do so.

185. Each of the Individual Defendants and Sgt. Ryan had reasonable opportunities to intervene to prevent such infringement of Plaintiff's constitutional rights.

186. Nevertheless, each of the Individual Defendants and Sgt. Ryan deliberately, willfully, recklessly, and/or with deliberate indifference to the truth failed to take reasonable steps to intervene.

187. As a result of the Individual Defendants and Sgt. Ryan's failure to intervene, the false identification evidence was manufactured and forwarded to prosecutors, the D.A.'s Office initiated a prosecution of Plaintiff, and Plaintiff's liberty was infringed or curtailed.

188. In failing to intervene, the Individual Defendants and Sgt. Ryan proximately caused the violation of Plaintiff's rights to procedural and substantive due

process and to a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and his resulting injuries.

189.    The above misconduct by the Individual Defendants and Sgt. Ryan was outrageous and shocking to the conscience.

190.    By virtue of the foregoing, the Individual Defendants are liable to Plaintiff for compensatory and punitive damages under 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983.  Denial of Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments. Defendants O'Connor and Moscoso.  Post-conviction damages.**

191.    Plaintiff repeats and realleges each allegation contained in ¶¶ 1-175 as if fully set forth herein.

192.    The Individual Defendants and Sgt. Ryan, individually and in concert, acted deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, to influence Fevrier to falsely conclude that Plaintiff was the person who had shot him.

193.    The Individual Defendants and Sgt. Ryan forwarded Fevrier's manufactured identification of Plaintiff to prosecutors.

194.    The Individual Defendants and Sgt. Ryan knew that their influencing of Fevrier's identification of Plaintiff as the shooter would be likely to result in Fevrier making a false or unreliable identification of Plaintiff at trial and to influence the jury's verdict.

195.    But for the Individual Defendants and Sgt. Ryan's deliberate corruption of Fevrier's recollection, Fevrier would not have positively identified Plaintiff as the shooter at trial and Plaintiff would not have been convicted.

196.    Fevrier's corrupted and false identification of Plaintiff was a substantial, foreseeable, and proximate cause of Plaintiff's conviction and the damages he suffered as a result.

197.    Alternatively, each of the Individual Defendants and Sgt. Ryan had an affirmative duty to Plaintiff to protect his above-mentioned constitutional rights from infringement by other government officials.

198.    Each of the Individual Defendants and Sgt. Ryan knew that Plaintiff's constitutional rights would be violated if the other government officials present at the lineup were to influence Fevrier to believe that Plaintiff was the person who shot him after Fevrier had been unable to identify him.

199.    Each of the Individual Defendants and Sgt. Ryan had reasonable opportunities to intervene to prevent such infringement of Plaintiff's constitutional rights.

200.    Nevertheless, each of the Individual Defendants and Sgt. Ryan deliberately, willfully, recklessly, and/or with deliberate indifference to the truth failed to take reasonable steps to intervene.

201.    As a result of the Individual Defendants and Sgt. Ryan's failure to intervene, Fevrier falsely identified Negron at trial and Negron was convicted and imprisoned for almost 10 years.

202.     The Individual Defendants and Sgt. Ryan proximately caused the violation of Plaintiff's rights to procedural and substantive due process and to a fair trial as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and his resulting injuries.

203.     The above misconduct by the Individual Defendants and Sgt. Ryan was outrageous and shocking to the conscience.

204.     By virtue of the foregoing, the Individual Defendants are liable to Plaintiff for compensatory and punitive damages under 42 U.S.C. § 1983.

### FIFTH CAUSE OF ACTION

**42 U.S.C. § 1983 and *Monell*.  Municipal liability for the conduct of employees of the NYPD.  Defendant City of New York.**

205.     Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

206.     The Police Commissioner and police officers employed by the NYPD are agents and employees of Defendant City of New York.

207.     Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner or his authorized delegates, during all times relevant to this Complaint, had final responsibility for training, instructing, supervising, and disciplining police officers and other employees of the NYPD with respect to the investigation and prosecution of criminal matters, including but not limited to requirements governing:

a. the constitutional obligation not to fabricate evidence, including false lineup identifications, for use against criminal suspects and defendants in criminal trials and other proceedings;

b. the constitutional obligation not to give false or misleading testimony; and

c. the constitutional obligation not to initiate or continue a prosecution without probable cause.

208. During all times material to this complaint, the City, through its policymaking officials in the NYPD, owed a duty to the public at large and to Plaintiff to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates that would result in the violation of the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

209. These policymakers knowingly and intentionally breached, or were deliberately indifferent to, this duty.

210. At the same time as NYPD policymaking officials were deliberately indifferent to constitutional violations by their employees, these officials created substantial incentives for their employees to commit such constitutional violations, by pressuring police officers to "close" cases through arrests, indictments, and convictions.

211. The aforesaid deliberate or de facto policies, procedures, regulations, practices, and/or customs (including the failure to properly instruct, train, supervise, and/or discipline employees) were implemented or tolerated by policymaking officials for Defendant City—including but not limited to the Police Commissioner—who knew, or should have known:

28

a. to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation of criminal cases;

b. that such issues present NYPD employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

c. that NYPD employees facing such issues have strong incentives to make the wrong choices, especially given the pressure placed on NYPD employees to make arrests, close cases, and secure indictments and convictions;

d. that the wrong choice by NYPD employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused person and cause him constitutional injury; and

e. that NYPD employees had a history of making wrong choices in such matters.

212. At the time of Plaintiff's arrest and prosecution, NYPD policymaking officials were on notice of the risk of misconduct by NYPD employees that would violate the constitutional obligations identified in ¶ 207.

213. Policymaking officials were on notice based in part on numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division discussing the difficult issues that regularly arise for police officers during lineup procedures and other phases of criminal investigations.

214. Policymaking officials were also on notice based on the inherent obviousness of the need to train, supervise, and discipline police officers with respect to their constitutional obligations to counteract the pressure on such officers to "close" cases and to obtain arrests and convictions.

215.     Policymaking officials were further on notice based on numerous credible allegations that NYPD officers had manufactured false or unreliable identification evidence, witness statements, or other evidence, and/or knowingly given false or misleading testimony, in violation of the constitutional obligations identified in ¶ 207.

216.     These illegal practices were documented in July 1994, following highly publicized hearings, by the Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department—more commonly known as the "Mollen Commission Report."[2]

217.     The Mollen Commission "interviewed scores of former and current police officers and supervisors."  Mollen Commission Report at 36.  It found that

> [o]fficers . . . commit falsification to serve what they perceive to be "legitimate" law enforcement ends—and for ends that many honest and corrupt officers alike stubbornly defend as correct.  In their view, regardless of the legality of the arrest, the defendant is in fact guilty and ought to be arrested.  Officers reported a litany of manufactured tales.
>
> . . . .
>
> . . . Frustrated by what they perceive to be unrealistic rules of law and by their own inability to stem the crime in their precincts through legal means, officers take the law into their own hands.  And police falsification is the result.

*Id.* at 38.

---

[2] City of New York, Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department, *Commission Report*, July 7, 1994, https://ia902701.us.archive.org/20/items/MollenCommissionNYPD/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

218.    The report noted: "Several officers . . . told us that the practice of police falsification . . . is so common in certain precincts that it has spawned its own word: 'testilying.'" *Id.* at 36.

219.    In one NYPD unit, the Commission found that "the unit's commanding officer not only tolerated, but encouraged, th[e] unlawful practice" of "falsif[ying] documents" and "committ[ing] testimonial perjury." *Id.* at 39.

220.    The Commission concluded that there existed

> a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. . . . This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

*Id.* at 41.

221.    The Commission also noted that

> the Department's top commanders must share the blame. . . . We are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch.
>
> Nor do we know of a single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification. . . . Internal Affairs over the last decade had no record of the number of falsification allegations brought against officers throughout the Department or in a particular precinct or command. There is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police Commissioners and Internal Affairs chiefs, *who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics.*

*Id.* at 41-42 (emphasis added).

222. Two detectives whose repeated misconduct NYPD policymaking officials repeatedly turned a blind eye to were Louis Scarcella and Stephen Chmil.

223. In 1988, in the murder prosecution of James Jenkins, Brooklyn Supreme Court Justice Francis X. Egitto, following a hearing, found that the "pretrial identification procedures employed by [Scarcella] were unduly suggestive and prejudicial to defendant."

224. The decision detailed how Scarcella, in violation of police practice and constitutional requirements, had shown a single photo of Jenkins to two witnesses instead of a photo array.

225. It also detailed how, upon Jenkins's arrest, Scarcella had brought five witnesses to the precinct and conducted the following improper identification procedure:

> The witnesses were not separated prior to viewing defendant. Indeed, they were individually and collectively told by Detective Scarcella that "we arrested the man we believe was responsible for the death of the deceased; I would like you to take a look at him." After each witness individually viewed the defendant through a two-way mirror, that witness was returned to the room where his fellow witnesses waited. No effort was made to keep the witnesses from discussing their viewing of defendant who was observed, alone, in a room.

226. The court concluded:

> The practices here utilized represent *a classic illustration of what not to do in conducting pretrial identification procedures*. It was unnecessary to display to the witnesses a single photo; no exigent circumstances justified a showup; and no argument can be advanced to support Detective Scarcella's telling the witnesses that the police had "arrested the man we believe was responsible for the death of the deceased." Based upon this *abysmal showing, and the Police's*

*patent disregard for accepted identification procedures*, the court is left no choice but to exclude from trial all mention of such practices [emphasis added].

227.     In 1990, David Ranta was charged with murder in the high-profile shooting death of a beloved Orthodox rabbi earlier that year.

228.     Scarcella and his frequent partner Chmil were assigned to investigate the killing.

229.     At a pretrial hearing, Scarcella testified that several months after the shooting, he spoke to a man named Alan Bloom, who had been arrested near the shooting location.

230.     Bloom was facing numerous robbery charges and many years in prison and was incarcerated at Rikers Island.

231.     Scarcella testified that Bloom had implicated men by the names of David and Steve but did not give last names.

232.     Scarcella testified that he then located photos of David Ranta and Steve Sicar, placed them in a photo array or photo arrays, and showed them to Bloom, who identified both men as having participated in the shooting.

233.     At the hearing, Justice Egitto expressed his incredulity:

> I'm still interested when a person gets arrested, when we have a police officer who tells us the name Steve comes up and he goes ahead to the Catch Unit and picks out a picture of Ranta and Steve when nobody told him Steve's last name. I don't know if he's a medium of some kind. He also picked out the name of Ranta before anyone told him Ranta's last name. From what I gather he heard the name David. Lo[] and behold they are the right people.

It stretches the credulity of the court in how these pictures are obtained.

234.    Scarcella and Chmil also manufactured at least one lineup identification of Ranta by blatantly suggesting to a witness whom he should pick.

235.    When an audio recording of the lineup came to light at trial, the defense alleged on the record that the recording established the detectives' misconduct during the lineup.

236.    Justice Egitto again admonished Scarcella, and now Chmil too, on the record:

> The more I hear this the more I am disillusioned with the work of the detectives.
>
> Here a young man of 14, 15 years of age says specifically I *think* it is number three. The cop, probably Scarcella or Chmil, says, okay, number three. From there on in the kid goes along with the number three . . . .
>
> He said, I *think* it is number three, which is not identifying any one [emphasis added].

237.    This witness later revealed that a detective had told him to "pick the guy with the big nose."

238.    Justice Egitto made the following additional remarks about Scarcella's and Chmil's conduct during the Ranta investigation:

> I think what they have done in this case, in my opinion, is decide that Mr. Ranta was the person, the guilty party, and then they went out of their way to make sure it tied up neatly in a package.
>
> . . . .
>
> [T]hey decide the case and that is the reason why a lot of our cases are being blown out when the People only have the police

officers to rely upon for their statements, such as narcotics cases and gun cases. The detectives have to be taught here in New York State, unlike a lot of other places, we have a constitution. And they have to live up to it. . . . I think it is ridiculous the way cops take it upon themselves to be judge, jury, and partial executioner.

. . . .

I tell you this. In my opinion throughout this case the two detectives did all they could to tie it up in a neat package. . . . I don't think what they did and the manner in which they did it was, shall we say, absolutely fair.

239. As a result of Scarcella's and Chmil's misconduct, Ranta was convicted.

240. Despite Justice Egitto's comments, the NYPD conducted no meaningful investigation of their misconduct and took no meaningful action to discipline them.

241. The Kings County District Attorney's Office ("KCDAO") itself moved to vacate Ranta's conviction in 2013, based on the extensive misconduct by Scarcella and Chmil that had caused Ranta's wrongful conviction.

242. It was also known or should have been known to NYPD policymakers that in six different homicide prosecutions, Scarcella had used the false and inherently unbelievable "eyewitness" identifications of suspects by a single witness, Teresa Gomez.

243. Scarcella knew Gomez was addicted to crack and engaged in prostitution.

244. Using Gomez's statements and testimony that she just happened to have witnessed six murders, Scarcella made himself a hero in "solving" these homicide cases.

245. Scarcella regularly gave Gomez money and food when he needed her to help him "solve" cases.

246.     Gomez testified that she had witnessed, among other homicides, the September 1985 killing of Ronnie Durant, the December 1986 killing of Bruce Siblings, and the January 1987 killing of Donald Manboardes.

247.     Gomez claimed to have seen Robert Hill shoot both Siblings and Manboardes, each on a separate occasion.  Gomez claimed to have seen Alvena Jennette and Darryl Austin shoot Ronnie Durant.

248.     The first of these three cases that came to trial involved the killing of Siblings.

249.     Gomez testified in that trial in 1988, saying that she had been hiding in the closet of a crack den and, looking through a keyhole in the closet door, witnessed Hill shoot Siblings.

250.     After a defense investigator testified that the closet door had no keyhole, Hill was acquitted in that case.

251.     Based upon this trial, the NYPD knew that Gomez was an untruthful and unreliable witness.

252.     Nevertheless, Scarcella presented Gomez as an eyewitness in the killings of Manboardes and Durant.

253.     At the Manboardes trial, in which Robert Hill again was a defendant, Gomez admitted she had lied at the previous trial.

254.     In addition, her testimony was contradicted by the forensic evidence.

255.     Nevertheless, Hill was convicted of the killing of Manboardes.

256.    Gomez, still in 1988, testified that she had witnessed Jennette and Austin shoot Durant.

257.    Jennette and Austin were convicted of Durant's murder.

258.    Another of the homicide cases in which Scarcella secured Gomez's testimony was dismissed during trial after Gomez failed to appear for her cross-examination.

259.    The prosecutor who conducted Hill's two trials and used Hill's testimony knew that, as he later admitted, Gomez was "ravaged from head to toe by the scourge of crack cocaine," and opined that "[i]t was near folly to even think that anyone would believe Gomez about anything, let alone the fact that she witnessed the same guy kill two different people."

260.    Yet after obtaining Hill's conviction based upon Gomez's testimony, Scarcella and this prosecutor celebrated together by smoking Scarcella's expensive cigars.

261.    Scarcella was open about his attitude, saying:  "Are there rules when it comes to homicide?  No.  No, there are none.  I lie to them.  I will use deception.  The bad guys don't play by the rules when they kill Ma and Pop, shoot them in the head, ruin the lives of their family.  I don't play by the rules."

262.    The KCDAO voluntarily vacated the convictions of Hill, Jennette, and Austin in 2014, after finally conceding that Gomez was an unreliable witness.

263.    In 1992, Rosean Hargrove and John Bunn were convicted of murder in a case developed by Scarcella and Chmil.

264.    The detectives' "investigation" of the underlying shooting should have raised red flags immediately based upon discrepancies in the evidence about how they came to focus on the suspects and the procedures they used to obtain identification evidence.

265.    Hargrove's and Bunn's convictions were vacated in 2015 and 2016, respectively, based largely on evidence of Scarcella's history of unlawful behavior.

266.    Upon vacating Hargrove's conviction, the hearing court summarized Scarcella's pattern of misconduct:

> The findings of this court are that *the assigned Detective, Louis Scarcella, was at the time of the investigation [in 1991] engaged in false and misleading practices*.  The cases of David Ranta, Derrick Hamilton, Robert Hill, Alvena Jennette and Darryl Austin that were investigated by Scarcella and prosecuted contemporaneously with this case in the early nineties demonstrate this *pattern and practice*. [This decision was issued before several more cases involving Scarcella were overturned.]  The *pattern and practice of Scarcella's conduct which manifest a disregard for rules, law and the truth* undermines our judicial system and gives cause for a new review of the evidence.

*People v. Hargrove*, 49 Misc.3d 1208(A), at *8 (N.Y. Sup. Ct. Kings Cty. 2015) (emphasis added), *aff'd*, 162 A.D.3d 25 (2d Dep't 2018).

267.    In or about 1992, Sharon Valdez, after testifying against murder defendant Ronald Pondexter, told Pondexter's lawyer that Scarcella had coerced her into falsely implicating Pondexter by threatening to cause her to lose custody of her baby.

268.    These allegations came out in court.

269.    Valdez retook the stand but invoked the Fifth Amendment rather than recant her identification.

270. In 1996, the Court of Appeals ordered a new trial on the ground that the trial court had not adequately considered whether to strike Valdez's testimony in light of her recantation to Pondexter's attorney.

271. In 1993, Jewel Smith said in a sworn statement that she had identified Derrick Hamilton at his murder trial only after Scarcella secretly threatened to jail her and cause her children to be taken away if she didn't inculpate Hamilton.

272. In 2015, the KCDAO voluntarily reversed Hamilton's conviction after concluding that Smith's identification of Hamilton, procured by Scarcella, was "incredible" and "untruthful."

273. Detective Chmil produced a witness named Jeffrey Campbell in at least one murder prosecution and by his own admission "dealt with [Campbell] a few times."

274. Like Gomez, Campbell was addicted to crack cocaine. According to Chmil, Campbell was "a lot like" Gomez, and "[s]ometimes [Campbell would] tell you the truth, sometimes he wouldn't."

275. In 1994, Campbell said in a sworn statement that Chmil had given him a script on which to base his testimony in the 1987 murder trial of Valance Cole.

276. Campbell admitted giving false testimony because, after Chmil introduced him to prosecutors, Chmil promised to drop pending criminal charges against him if he testified.

277. At his March 1997 murder trial, Jabbar Washington testified that he had falsely confessed to murder only after Scarcella physically abused him and fed him the details of the crime.

278.    Washington was convicted based on this confession and on Scarcella's testimony that an eyewitness had identified Washington in a lineup.

279.    In 2013, the KCDAO voluntarily overturned Washington's conviction after it was discovered that the eyewitness had told a prosecutor, contrary to Scarcella's testimony, that she had not identified Washington in the lineup.  The KCDAO noted that Scarcella's false testimony with regard to the lineup cast doubt on his denials about having coerced Washington's confession.

280.    Also in March 1997, Sundhe Moses testified at his murder trial that he had falsely confessed to a shooting only after Scarcella physically coerced him into doing so. He was convicted based on this confession.

281.    In 2018, a state court vacated Moses's conviction based largely on the unreliability of Moses's confession in light of Scarcella's pattern of misconduct.

282.    Roger Logan was convicted in 1997 based upon eyewitness testimony developed by Scarcella that could not have been true because the eyewitness was in jail at the time—a fact that was withheld from the defense at trial.

283.    In 2014, the KCDAO voluntarily reversed Logan's conviction after concluding based on a reinvestigation that the witness's testimony "was in fact false."

284.    At her February 1998 trial, Vanessa Gathers testified that Scarcella and Chmil had intimidated her, threatened her, and fed her the details that she included in her false confession.

285. In 2016, the KCDAO voluntarily vacated Gathers's conviction based on the unreliability of her confession, noting that her statements reflected "an acquiescence to various scenarios that were put to her" by Scarcella.

286. Based on the above pervasive misconduct by Scarcella and Chmil, NYPD policymaking officials knew or should have known that the detectives were coercing confessions, manufacturing false or unreliable identification evidence, intentionally securing testimony that they knew to be false, giving false testimony themselves, and suppressing evidence favorable to criminal defendants which they knew they were obligated to disclose.

287. Yet these policymaking officials failed to take meaningful steps to supervise or discipline Scarcella or Chmil to ensure that such misconduct did not continue.

288. Instead, the NYPD treated Scarcella and Chmil as heroes for obtaining arrests and convictions at a blistering rate, thus sending a clear message to the entire NYPD police force that such misconduct would be not just tolerated but celebrated.

289. Another of the many homicide detectives who engaged in repeated misconduct to which NYPD policymakers were deliberately indifferent was Michael Race.

290. Race admitted that he investigated 750 murder cases but only one was "done the correct way, from A to Z."

291. An NYPD colleague testified that Race

had a reputation among detectives for feeding informants and witnesses details about crimes [and] that Race had a reputation of referring informants and witnesses to the TIPS hotline so they could collect rewards for information, which is a violation of police procedure because of the risk of kickbacks.

*Blake v. Race*, 487 F. Supp. 2d 187, 204 (E.D.N.Y. 2007).

292.    Race caused both Jeffrey Blake and Ruben Ortega to be arrested and convicted on the word of a single informant produced by Race, Dana Garner.

293.    Race fed Garner the details that Garner then provided in testimony against the two men.

294.    In 1990, Garner told police he had seen Ortega murder a man; during the same meeting with police, he said he had seen Blake murder two men a week earlier.

295.    Ortega was convicted of murder in 1991 based on Garner's testimony and sentenced to 25 years to life.

296.    Blake was also convicted of murder in 1991 based on Garner's testimony and sentenced to 36 years to life.

297.    During Blake's prosecution, Garner told police that Garner's girlfriend had also witnessed Blake commit the double murder, but the police either never attempted to corroborate this or failed to disclose that the girlfriend denied having witnessed the murders.

298.    At trial, Garner tried to recant his story, but after prosecutors threatened him, he retook the stand and testified against Blake.

299.    A cousin of Garner's testified that Garner had not been in New York at the time of the double murder.

42

300.     Two years later, Garner signed a sworn statement saying that he had not witnessed the killings for which Blake was convicted, but he then refused to testify to this in court.

301.     Through it all, neither Race nor any other NYPD officers further investigated Garner's obviously questionable stories about the crimes he had testified to witnessing, and no NYPD policymaking officials investigated Race's obviously questionable handling of Garner as a witness.

302.     Eventually, Blake's lawyers located Garner's girlfriend, who denied having witnessed the killings.

303.     In 1998, the KCDAO conceded that Garner was an unreliable witness and consented to vacating Blake's conviction.

304.     In 1999, Garner signed a sworn statement recanting his accusations against Ortega and against another man, Timothy Crosby, whom Garner had previously accused of kidnapping him, resulting in Crosby's conviction and sentence of 10 years to life.

305.     That same year, a state judge vacated Crosby's conviction after finding Garner to be "a completely unreliable witness."

306.     In 2003, the Second Circuit vacated Ortega's conviction based on the unreliability of Garner's testimony.

307.     During civil litigation following the vacatur of Blake's conviction, Garner testified that Race had fed him the details that he repeated in his allegations and eventual testimony in the Blake and Ortega cases.  He also testified that Race had threatened to charge him with crimes if he didn't implicate Blake and Ortega.

308.     Garner further testified that, during a lineup in the Blake case, a detective—he claimed he could not remember which one but knew that Race was at least present at the lineup—had told him to "just point out Jeffrey Blake."  When Garner hesitated, the detective said, "I know you see him, just go ahead and point him out," and claimed Garner was "looking in [Blake's] direction . . . leaning in his direction."

309.     Despite Garner's evident unreliability as a witness and Race's reputation among his NYPD colleagues for feeding witnesses details about crimes, NYPD policymaking officials made no meaningful efforts to scrutinize Race's conduct in these investigations.

310.     Another case that illustrates the pattern of misconduct to which NYPD policymaking officials were deliberately indifferent is that of Zaher Zahrey.

311.     From 1994 to 1996, various senior detectives from the NYPD's Internal Affairs Bureau ("IAB") tried to frame Zahrey, an NYPD detective whom they suspected of being corrupt, for drug-related crimes including murder.

312.     The initially-assigned detective, Sgt. Robert Boyce, tape-recorded himself encouraging a state prisoner whom he knew to be serial robber and murderer addicted to crack, Sidney Quick, to adopt a false story Boyce suggested to him implicating Zahrey in a series of murders, robberies, and drug deals.

313.     Boyce knew the story was false because it contradicted Quick's prior statements as well as independent police investigation.

314.    Boyce improperly promised Quick a "very, very, very sweet deal" and to "drive [Quick] home" if, contrary to his prior statements, he'd "nail Zack to a cross" by accusing Zahrey of being present for and participating in these crimes.

315.    Later, when other IAB detectives could not corroborate Quick's manufactured claims, they convinced the United States Attorney's Office in Brooklyn to take over the case by concealing the Quick tape from it.

316.    While Quick was refusing to cooperate with the federal authorities, the assigned IAB detective worked with a prosecutor from the KCDAO, Teresa Corrigan, to use secret coercion and under-the-table promises to induce Quick into agreeing to testify.

317.    Zahrey ultimately was acquitted, but not until he had spent nearly nine months in jail on the false charges.

318.    Zahrey also was acquitted by an NYPD administrative judge who found that Boyce had led Quick to manufacture false allegations, a finding that was ratified by the Police Commissioner.

319.    Rather than be disciplined for his misconduct in the Zahrey case, Boyce was continually promoted until he became city-wide Chief of Detectives.

320.    None of the other IAB personnel involved in the Zahrey case were disciplined.

321.    NYPD detectives also committed misconduct to obtain a corrupt murder conviction in 1995 in the Jabbar Collins case.

322.    The assigned homicide detective, Vincent Gerecitano, refused to accept the denial of a witness, Edwin Oliva, who had just been arrested for an unrelated robbery, that he knew anything about the murder in question.

323.    Gerecitano detained Oliva, who was addicted to heroin, while he was going through withdrawal and was drooling, crying, exhausted, and desperate.

324.    Gerecitano coerced Oliva into signing a sworn written statement implicating Collins by refusing to summon medical assistance for Oliva while simultaneously promising him that he would assist Oliva in obtaining leniency from the KCDAO.

325.    Gerecitano omitted all these circumstances from his written report.

326.    Later, before trial, Oliva recanted his coerced written statement, but prosecutors, evidently unaware of how Gerecitano had coerced Oliva's original sworn written statement, brought in Gerecitano to pressure Oliva to recant his recantation.

327.    Ultimately, in 2010, after Collins had spent 16 years in prison, prosecutors revealed the recantation, a federal judge ordered Collins's release, and all charges were dismissed.

328.    At the time of Plaintiff's prosecution, NYPD policymaking officials were on notice of numerous instances, in addition to the aforementioned cases, in which detectives improperly manufactured false or unreliable identifications.

329.    After the arrest of Kareem Bellamy in 1994 for a stabbing death, NYPD Detective John Gillen conducted a lineup that included Bellamy.

330.    The only known eyewitness could not positively identify Bellamy.

331.     As in Plaintiff's case, the detective took the witness into a private room for an improper, private meeting, after which the witness suddenly claimed to be certain that Bellamy was the perpetrator.

332.     The witness's identification of Bellamy was a significant cause of Bellamy's conviction at trial.  He was incarcerated for 14 years before his conviction was overturned and the charges against him dismissed.

333.     In 1996, the same Detective Gillen conducted a lineup in the investigation of Emmett Wheaton for a robbery.

334.     At the lineup, Wheaton heard Gillen saying to the witness, "Is it number four?  Is it number four?  Is it number four?"

335.     The witness picked out Wheaton (no. 4) and he was arrested and charged.

336.     Wheaton was acquitted at trial, but only after spending almost a year in jail.

337.     In 1999, NYPD detectives brought Jason Chambers, who had witnessed a murder, to view a lineup containing suspect Pierre Jenkins.  Chambers picked Jenkins.

338.     The next year at a pretrial hearing, Chambers testified that he had picked Jenkins only after the detectives had told him:  "you got to pick somebody.  It was like, you got to get him.  Pick somebody."

339.     Chambers then recanted his identification of Jenkins.

340.     Asked why he had picked Jenkins originally, Chambers said:  "Because the detectives were, like, you had to pick somebody.  I just wanted to go home and they were just, like, forcing me to pick somebody."

341.     After Chambers's recantation, prosecutors dropped the murder charges against Jenkins.

342.     In 1999, NYPD detectives investigating a 1999 deadly shooting conducted a lineup containing suspect Ronald Ambrose.

343.     Witness Edgar Rivera had, within an hour of the shooting, identified another man as the perpetrator.

344.     Rivera viewed the lineup containing Ambrose and did not identify Ambrose.

345.     Detective Jose Rosario then took Rivera into an office at the police precinct. Approximately 20 minutes later, Rosario and Rivera returned, and Rivera positively identified Ambrose as one of the shooters.

346.     After this identification, Ambrose was indicted for murder.

347.     Based on independent exculpatory evidence, Ambrose was acquitted at trial, but only after having served over two years in pretrial detention.

348.     These allegations were known to the NYPD by 2004 at the latest, when Ambrose filed a federal lawsuit against Rosario, other detectives, and the City of New York.

349.     In 2009, Ricardo Benitez, a parolee, was arrested on suspicion of robbing a Radio Shack store.

350.     NYPD officers Raul Lopez and Frank Libretto deliberately prepared a highly suggestive lineup to ensure that Benitez was identified. Benitez appeared to be 15 to 20 years older than the fillers in the lineup, had much darker skin, was noticeably

thinner, and was sickly-looking, unshaven, and disheveled, whereas the fillers all were hale and clean-cut police officers.

351.    A Queens ADA, Tino Grillo, who was present to supervise the lineup, told Detectives Lopez and Libretto that it was improperly suggestive and requested that they select new fillers, but the detectives refused.

352.    Based on this identification, a grand jury, which was not informed of the suggestiveness of the lineup, indicted Benitez.

353.    Benitez was convicted and spent almost six years in prison before his conviction was reversed and he was acquitted on retrial.

354.    Upon information and belief, NYPD employees caused numerous additional false arrests, prosecutions, and convictions by improperly manufacturing false or unreliable identifications.

355.    In none of the numerous instances of misconduct by NYPD employees listed above did NYPD policymaking officials meaningfully supervise or discipline the NYPD employees in question.

356.    Evidence from recent years shows that the NYPD's deliberate indifference to constitutional violations by police officers persists.

357.    In 2014, a court dismissed attempted murder charges against Tyrone Brown after an eyewitness who had viewed a lineup revealed that she had first picked out a filler, but then, after one of the NYPD detectives conducting the lineup sighed and told her to take her time, changed her answer and picked the defendant, which elicited a nod from the two detectives in the room.

358.    The witness revealed that, in fact, she still believed that the original person she picked was the shooter.[3]

359.    The problem of "testilying" documented by the Mollen Commission Report has been permitted, during the ensuing years, to continue to fester, as the *New York Times* recently documented.[4]

360.    The *Times* reported that there were "more than 25 occasions since January 2015" in which "judges or prosecutors determined that a key aspect of a New York City police officer's testimony was probably untrue." The article noted that these cases represented "almost certainly only a fraction" of the actual instances of testilying, since "a vast majority of cases end in plea deals before an officer is ever required to take the witness stand."

361.    The article highlighted two cases where "officers appear to have given false accounts about witness identifications."

362.    A current 10-year veteran of the NYPD, when interviewed by the *Times*, stated: "'There's no fear of being caught . . . . You're not going to go to trial and nobody is going to be cross-examined.'"

---

[3] Post-incident evidence is relevant to a claim of municipal liability as it may "shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989); *see also Henry v. Cty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ("[W]e reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry.").

[4] *See* Joseph Goldstein, *'Testilying' by Police: A Stubborn Problem*, N.Y. Times, Mar. 18, 2018, https://www.nytimes.com/2018/03/18/nyregion/testilying-police-perjury-new-york.html.

363.     The *Times* reported that "[s]everal uniformed patrol officers said they have long suspected that the track record of plainclothes anti-crime teams for making weapons and drug arrests was bolstered by illegal searches and a tolerance for lying about them."

364.     In a follow-up article, the *Times* reported that, out of 81 cases in which the Civilian Complaint Review Board ("CCRB") had found that an NYPD officer had made a false statement and the NYPD had reported some response to the finding, NYPD policymaking officials had disciplined officers in only two of the cases.[5]

365.     The CCRB told the reporter that, in addition to these 81 cases, the CCRB had made findings of false statements in "dozens of other" cases, but the NYPD never even responded to these findings.

366.     Also this year, *BuzzFeed* reported that it had obtained NYPD files revealing that "from 2011 to 2015 at least 319 New York Police Department employees who committed offenses serious enough to merit firing were allowed to keep their jobs."[6]

367.     At least 50 of these instances of misconduct involved officers making misleading or "inaccurate" statements in official records or to grand juries, district attorneys, or internal affairs investigators.

---

[5] *See* Joseph Goldstein, *Promotions, Not Punishments, for Officers Accused of Lying*, N.Y. Times, Mar. 19, 2018, https://www.nytimes.com/2018/03/19/nyregion/new-york-police-perjury -promotions.html.

[6] Kendall Taggart & Mike Hayes, *Secret NYPD Files: Officers Who Lie And Brutally Beat People Can Keep Their Jobs*, BuzzFeed, Mar. 5, 2018, https://www.buzzfeednews.com/article /kendalltaggart/secret-nypd-files-hundreds-of-officers-committed-serious.

368.    In every instance, NYPD policymaking officials who had "final authority in disciplinary decisions, assigned these officers to 'dismissal probation,' a penalty with few practical consequences."

369.    Further, NYPD policymaking officials have withheld records of such misconduct from the City's District Attorneys' Offices.[7]

370.    Based on the above, NYPD policymaking officials knew or should have known, at the time of Plaintiff's prosecution, that NYPD employees were manufacturing false evidence, including false or unreliable lineup identifications, for the purpose of creating false grounds for establishing probable cause to arrest and prosecute suspects and to influence juries to return convictions.

371.    With deliberate indifference to such misconduct, NYPD policymaking officials failed to take adequate steps to train, supervise, or discipline NYPD employees to prevent or deter such constitutional violations from occurring.

372.    This policy of deliberate indifference directly, foreseeably, proximately, and substantially caused the violations of Plaintiff's federal constitutional rights in this case and his resulting injuries.

373.    By virtue of the foregoing, Defendant City of New York is liable for Plaintiff's wrongful prosecution and conviction and all resultant damages.

---

[7] *See* James C. McKinley Jr., *Manhattan District Attorney Demands Access to Police Records*, N.Y. Times, July 8, 2018, https://www.nytimes.com/2018/07/08/nyregion/manhattan -district-attorney-police-records.html.

## SIXTH CAUSE OF ACTION

**State-law negligent hiring, training, and supervision. Defendant City of New York based on misconduct by employees of the NYPD.**

374.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

375.    During all times material to this Complaint, Defendant City of New York, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

376.    Defendant City of New York is liable to Plaintiff because of its negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees employed by the NYPD with regard to their aforementioned duties, and because such negligence was a substantial and foreseeable cause of the injuries Plaintiff suffered.

## SEVENTH CAUSE OF ACTION

**42 U.S.C. § 1983 and *Monell*.  Municipal liability for the conduct of prosecutors in the D.A.'s Office.  Defendant City of New York.**

377.    Plaintiff repeats and realleges each allegation contained in ¶¶ 1-204 as if fully set forth herein.

378.	Before and during Plaintiff's trial, Defendant O'Connor knew that the defense wanted to show that Fernando Caban was likely the actual shooter of Mervin Fevrier.

379.	As set forth above, O'Connor knew of evidence that pointed to Caban as the actual shooter but failed to disclose this information to Plaintiff or his attorney despite an obligation to do so under *Brady*.  *See* ¶¶ 104-108, *supra*.

380.	Knowing of this additional evidence that he had withheld, O'Connor misled the court into ruling that there was insufficient proof to support a third-party culpability defense.  *See* ¶¶ 109-110, *supra*.

381.	O'Connor's withholding of crucial evidence pointing to Caban's guilt and his misleading of the court violated Plaintiff's rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

382.	In addition to this violation, O'Connor further infringed Plaintiff's constitutional rights to due process and a fair trial by:

a.	improperly influencing Fevrier to falsely identify Plaintiff following the lineup, in the grand jury, and at trial, *see* ¶¶ 53-70, 97-98, 172-204, *supra*;

b.	using false and misleading testimony to deceive the grand jury to indict Plaintiff, *see* ¶¶ 83-96, *supra*; and

c.	during his summation, making false or misleading arguments, arguing "facts" not in evidence, improperly vouching for the prosecution's case, improperly attacking Plaintiff's character and alleged criminal propensity, and violating other fundamental rules of conduct intended to ensure the fairness of the trial, *see* ¶¶ 111-124, *supra*.

383.    Following Plaintiff's unlawful conviction, O'Connor and other prosecutors continued to suppress the evidence pointing to Caban despite Plaintiff's numerous efforts to obtain it and consistently resisted Plaintiff's efforts to overturn his conviction, resulting in his serving almost ten years in prison.

384.    Individually and collectively, the violations by O'Connor and other D.A.'s Office personnel of Plaintiff's constitutional rights and their prolonging of Plaintiff's injuries were directly, foreseeably, proximately, and/or substantially caused by conduct chargeable to Defendant City of New York amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to investigation and prosecution by the D.A.'s Office under the leadership of the Queens County District Attorney ("D.A.").

385.    The D.A. and his authorized delegates at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the management of personnel employed by or assigned to the D.A.'s Office.

386.    The County of Queens is a subdivision of Defendant City of New York.

387.    The D.A., at all relevant times, was and is an elected officer of Queens County, and the D.A.'s Office was and is funded out of the City's budget.

388.    The D.A. was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2.

389.    The D.A. and his assistant district attorneys are agents and employees of Defendant City of New York.

390.    The State of New York has provided by statute that Defendant City's constituent counties (including Queens County), and hence Defendant City itself, are liable for torts committed by County officers and employees, such as the D.A. and his assistants. *See* N.Y. County Law §§ 53, 941.

391.    The City represents such officers and employees in judicial proceedings and indemnifies them because they are City officials.

392.    Under the principles of municipal liability for federal civil rights violations, the D.A. or his authorized delegates have final managerial responsibility for training, instructing, supervising, and disciplining attorneys and other employees of the D.A.'s Office regarding their conduct in the prosecution of criminal matters, including, but not limited to:

       a.     their constitutional obligation not to create or to otherwise use false, misleading, or unreliable evidence, testimony, statements, or argument during criminal proceedings, including but not limited to manufactured lineup identifications and in-court identification testimony;

       b.     their constitutional obligation to correct evidence, testimony, statements, and argument that they know or should know is false, inaccurate, incomplete, misleading, or unreliable, when it is presented or thereafter; and

       c.     their continuing constitutional obligation to timely and fully disclose material evidence and information favorable to the defense as set forth in *Brady*, *Giglio*, and their progeny.

393.    The D.A. or his authorized delegates maintained a policy, custom, or practice of deliberate indifference to past violations by QCDAO employees of these constitutional obligations, to the risk of future such violations by QCDAO employees,

and to the obvious need to train, supervise, and discipline QCDAO employees with respect to these obligations.

394.     The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs, including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto, were implemented or tolerated by policymaking officials for Defendant City, including, but not limited to, the D.A. and his delegates, who knew:

       a.    to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

       b.    that such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

       c.    that employees facing such issues have strong incentives to make the wrong choices, especially given the pressure the D.A.'s Office places on prosecutors to win convictions at any cost;

       d.    that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of the accused and cause him constitutional injury; and

       e.    that employees of the D.A.'s Office had a history of making wrong choices in such matters.

395.     The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon:

       a.    numerous credible allegations, many substantiated by judicial decisions (some of which are listed in Exhibit A, which is incorporated herein by reference) that Queens County ADAs had:

            i.    participated in the manufacturing of false testimony or evidence, including identification evidence;

ii.    presented or failed to correct false or misleading testimony and argument;

iii.    failed to disclose information favorable to the defense that was required to be disclosed by the constitutions and the laws of the United States and of the State of New York; and

iv.    made arguments at trial that were so false, misleading, or otherwise improper that they deprived the defendant of due process and a fair trial; and

b.    the inherent obviousness of the need to train, supervise, and/or discipline ADAs in the aforementioned constitutional obligations to counteract the pressure that the D.A.'s Office applied to prosecutors to obtain convictions.

396.    During all times material to this complaint, the City, through its policymaker, the D.A., owed a duty to the public at large and to Plaintiff to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by subordinates that violate the constitutional rights of criminal suspects or defendants and of other members of the public.

397.    However, the D.A. and his designees, as policymakers for the City, knowingly and intentionally breached, or were deliberately indifferent to, this duty.

398.    Current Queens D.A. Richard Brown served as a justice of the Appellate Division, Second Department, from March 1981 until 1991, when he became D.A.

399.    There were numerous decisions by the Appellate Division during the period preceding his initial term as D.A., when Brown was a justice of the same court, excoriating ADAs for violating the aforementioned fair trial rights of criminal defendants.

400.    Thirty-three of these decisions, from the period 1985 through 1990, are listed in Exhibit A, which is incorporated herein by reference.

401.    These decisions were so numerous and so strongly worded that they suggested the existence of an anything-goes culture and practice aimed at obtaining convictions no matter the cost to criminal defendants' constitutional rights.

402.    Nevertheless, upon becoming D.A. himself in 1991, Brown, through his deliberate indifference, permitted this culture to continue.

403.    He did so by failing to conduct internal disciplinary investigations or to discipline the prosecutors who were known to commit such violations, failing to refer such individuals for possible discipline by the Appellate Division's Disciplinary or Grievance Committees, and failing to ensure they were properly trained and supervised.

404.    Instead of disciplining prosecutors who were found to have violated the constitutional right of criminal defendants to a fair trial, the D.A.'s policy, custom, or practice was to give these prosecutors raises, promotions, and commendations, based in part on their record of winning at trial and extracting guilty pleas, even in weak cases, while ignoring or discounting judicial findings of misconduct by these prosecutors.

405.    Exhibit A lists and summarizes 84 court decisions (numbers 34-117) that have been handed down during Mr. Brown's tenure as D.A.

406.    These decisions found that Queens prosecutors, as in Plaintiff's case, had wrongfully withheld favorable information from the defense, used or failed to correct false or misleading evidence or argument, or engaged in misconduct, often pervasive, during summations.

59

407. Upon information and belief, none of the prosecutors responsible for the wrongdoing that occurred in these cases were meaningfully disciplined, if they were disciplined at all, by the D.A. or his designees.

408. The D.A.'s failure to take any reasonable measures to discipline prosecutors responsible for such constitutional violations incentivized them and their colleagues to continue to violate the constitutional rights of criminal defendants.

409. Prosecutors knew they were likely to be rewarded for winning but would suffer no negative personal consequence in the unlikely event their misconduct was exposed.

410. Further encouraging prosecutors to win at any cost, including violating the constitutional rights of the accused, was their knowledge that the D.A., due to his indifference, had not promulgated or published any employee handbook or other office-wide publication setting forth either rules of behavior for prosecutors in handling criminal investigations or prosecutions, or procedures for disciplining prosecutors who violated established rules of behavior.

411. The D.A.'s indifference to compliance with *Brady* disclosure obligations was further communicated to line prosecutors by the QCDAO's establishment of its self-styled "Chinese Wall" policy, which flagrantly violated constitutional requirements.

412. Under the United States and New York State Constitutions, it was clearly established that the D.A.'s Office as an entity had the obligation to disclose evidence favorable to the defense, without regard to the individual knowledge or intent of any individual prosecutor.

413.    Nevertheless, under the "Chinese Wall" policy, prosecutors assigned to try criminal cases were kept in the dark, and encouraged not to inquire, about promises or benefits that their cooperating witnesses received from other prosecutorial personnel to induce them to testify favorably for the D.A.'s Office.

414.    The predictable result of this policy was that the defense and the jury wouldn't learn about circumstances known to the D.A.'s Office that potentially affected such witnesses' truthfulness and that false testimony by such witnesses denying receipt of promises and benefits would go uncorrected.

415.    Prosecutors were trained in this policy, and D.A. Brown permitted it to continue long after a trial judge, the New York Appellate Division, and then the New York Court of Appeals each condemned it as a flagrant violation of the constitutional rights of the accused.

416.    At the joint trial of co-defendants Gary Steadman and Raymond Blair in 1990, a key prosecution witness, Tony Malloy, testified to certain benefits he had received from the D.A.'s Office but denied that prosecutors had promised him leniency with respect to several pending felonies that could result in a lengthy period of imprisonment.

417.    Later in the trial, the defense learned that his testimony was false; in fact, a senior prosecutor in the D.A.'s Office had promised Malloy's attorney that, in exchange for favorable testimony, Malloy could avoid prison altogether.

418.    Steadman and Blair were convicted of manslaughter and related offenses.

419. Ruling on the defense's motion for a mistrial or dismissal based on this late revelation of *Brady* material, the trial court found that the deal was "deliberately not communicated from the executive level of the Queens District Attorney's Office to the trial attorneys." The court denounced the "Chinese Wall" policy and directed that it be discontinued:

> [T]his court cannot adequately express in words its disgust that the trial was impacted by a shabbily structured cooperation charade. . . .
>
> Any reasonable interpretation of what happened here must conclude that . . . the executive level of the of the Queens District Attorney's Office improperly attempted to shield a witness from "*Brady*" evidence disclosure . . . . *It is hoped that this . . . will never again be attempted* . . . . [emphasis added]

420. The trial court nevertheless denied the defense motion since the jury had eventually learned of the promises to Malloy.

421. The Appellate Division "share[d] the trial court's condemnation of the tactics employed" by the D.A.'s Office but affirmed the conviction for the same reason. *People v. Blair*, 186 A.D.2d 665, 668 (2d Dep't 1992), *rev'd sub nom. People v. Steadman*, 82 N.Y.2d 1 (1993).

422. The Court of Appeals, however, ordered a new trial, ruling that "the scheme employed by the District Attorney's office," which revealed "a determined effort . . . to avoid" its *Brady* obligations, "undermine[d] the purposes of the *Brady* and [related state] rules" and "cannot be condoned." *Steadman*, 82 N.Y.2d at 6-7.

423.    Two years after the trial court in the Blair and Steadman case excoriated the D.A.'s Office for the "Chinese Wall" policy and expressed its expectation that the practice would be halted, the same policy was still in effect.

424.    At the attempted murder trial of Shih Wei Su in 1992, a crucial prosecution witness falsely denied, under questioning by the prosecutor, that he had received any leniency in exchange for his testimony, the prosecutor failed to correct this false testimony, and the prosecutor falsely vouched for the truthfulness of this testimony in her summation.

425.    This prosecutor, as she later testified under oath, had been trained in the "Chinese Wall" policy.

426.    Years later, a judge, over the D.A.'s vigorous opposition, directed the disclosure of a sealed plea transcript which, as it turned out, showed that the witness had received an explicit deal for leniency in a robbery case in exchange for his cooperation in testifying against Su.

427.    For years, the D.A.'s Office resisted Su's efforts to overturn his fraudulently-obtained conviction.

428.    Finally, after Su had served 12 years in prison, the United States Court of Appeals for the Second Circuit ordered a rare grant of a federal writ of habeas corpus, overturning Su's conviction and directing his retrial or release.

429.    The court condemned Su's prosecutor for having "knowingly elicited false testimony from a crucial witness," *Su v. Filion*, 335 F.3d 119, 121 (2d Cir. 2003), whose

"credibility could not help but be central to the deliberations of any reasonable jury," *id.* at 129, and then "bolster[ing that witness's] credibility" in a false summation, *id.* at 125.

430. Subsequently, the D.A.'s Office, knowing it lacked any witness to testify against Su, threatened him with a retrial and the potential of many more years in prison if he did not plead guilty to a reduced charge.

431. When Su insisted on his right to a new trial, the prosecutor suddenly dismissed the case on the scheduled trial date.

432. Policymakers at the Queens D.A.'s Office were not the least bit disturbed by the prosecutor's behavior or the Second Circuit's condemnation of it.

433. After learning of the Second Circuit's opinion, Su's prosecutor, Linda Rosero, spoke with D.A. Brown's second-in-command, ADA John Ryan, to complain that no one had warned her of the decision.

434. ADA Ryan told her, "you are just going to have a bad day, that's all."

435. Another high-level prosecutor in the office told her, "Don't worry, you're a good attorney. Everything will work out."

436. Petros Bedi was convicted of murder in 2000 after a key alleged eyewitness identified him as the shooter while denying the D.A.'s Office had paid him any financial benefits in exchange for this testimony.

437. It took 12 years before Bedi finally succeeded in compelling the D.A.'s office, through a FOIL lawsuit, and over its resistance, to reveal its witness relocation file for this witness.

438.     Contrary to the witness's false testimony, he had received approximately $23,000 in relocation benefits, including numerous cash payments totaling thousands of dollars, even though his identity hadn't been revealed and there couldn't possibly have been any threat to his safety.

439.     The records showed that, after his identity was revealed at trial and, for the first time, he had a theoretical reason to fear for his safety, the payments stopped—he had literally been secretly bribed.

440.     When Bedi then brought a motion, in August 2012, to vacate his conviction, the D.A.'s Office resisted.

441.     It defended the prosecutor, Debra Lynn Pomodore, on the basis that, under the "Chinese Wall" policy, she did not have actual possession or knowledge of the documents or the payments.

442.     The court, pointing out that this was no defense to Pomodore's violation of the *D.A.'s Office*'s disclosure obligations, vacated the conviction.

443.     Upon information and belief, the D.A.'s Office unlawfully obtained numerous additional convictions through exploitation of its "Chinese Wall" policy.

444.     Another practice followed under D.A. Brown that signaled to ADAs that the QCDAO's leadership was indifferent to *Brady* violations and the manufacturing of false or coerced testimony was the systematic abuse of material witness warrants.

445.     The material witness statute requires that prosecutors bring recalcitrant witnesses arrested on material witness warrants "forthwith" to court where they have the right to be advised by lawyers and to request release from custody.

65

446.    In flagrant violation of the statute and of the limitations in court orders authorizing the arrest of material witnesses, the D.A.'s Office followed a practice of secretly bringing such witnesses to their offices, or to a remote location, instead of to court, where they would be isolated and detained until they agreed to cooperate.

447.    Then, after the witnesses had been unlawfully compelled to testify, the D.A.'s Office would conceal from the defense its use of such coercive tactics to elicit favorable testimony from the witnesses—evidence that *Brady* required to be disclosed.

448.    Further leading to the manufacturing and use of coerced or unreliable evidence was the D.A.'s Office's practice, as in Plaintiff's case, of improperly influencing lineup identifications and knowingly using unlawfully obtained lineup "evidence" in criminal proceedings.

449.    During the 1994 lineup involving a murder suspect, Kareem Bellamy, an eyewitness failed to positively identify Bellamy.

450.    A Queens ADA, Stephen Antignani, was present at the lineup to supervise it and, in theory, to ensure it was conducted fairly.

451.    Knowing that, without a positive identification, there would be an insufficient basis to obtain an indictment, Antignani permitted a detective to take the witness into a private room, where the two talked privately.

452.    After the witness and the detective emerged from the room, the witness suddenly claimed to be able to positively identify Bellamy.

453.    ADA Antignani used this manufactured "identification" in the grand jury to obtain an indictment.

454. He did so, as the prosecutor also did in Plaintiff's case, by misleading the grand jury into believing the eyewitness had made a positive identification while not revealing the witness's initial uncertainty and the process by which an uncertain identification had been transformed into a positive one.

455. Bellamy was convicted, and spent 14 years in prison, before his conviction was overturned based upon newly-discovered evidence of innocence.

456. Similarly, in the Ricardo Benitez case, in 2009, a prosecutor attending a lineup to ensure its fairness, Tina Grillo, knew the lineup was grossly suggestive but allowed it to go forward.

457. While the suspect was in his 50s and appeared gaunt, sickly, and disheveled, the fillers were all clean-cut, lighter-skinned policemen who were 15 to 20 years younger.

458. Even though records of the D.A.'s Office described the lineup as "terrible," a prosecutor still used it to obtain an indictment.

459. The grand jury was informed only of the identification, not of the extraordinarily suggestive and unlawful circumstances by which it was obtained.

460. Thereafter, a prosecutor misled a hearing judge into allowing an in-court identification at trial by introducing untrue testimony from the witness that her initial observation of the suspect had lasted five minutes, when a surveillance video showed it had really lasted a matter of seconds.

461. Benitez was convicted and spent almost six years in prison before his conviction was reversed and he was acquitted at a retrial.

462. Upon information and belief, employees of the D.A.'s Office caused numerous additional false arrests, prosecutions, and convictions by improperly influencing lineup identifications and knowingly using unlawfully obtained lineup "evidence" in criminal proceedings.

463. Further contributing to the anything-goes atmosphere was the knowledge among prosecutors that the D.A.'s Office, rather than discipline ADAs who were found by a court to have engaged in misconduct, instead would personally attack judges who made unfavorable decisions, try to get the judges transferred out of criminal court, or try to block the judges' reappointment.

464. The D.A.'s policy of deliberate indifference to misconduct included a history of indifference to misconduct by Defendant O'Connor himself.

465. Despite his misconduct in the prosecution of Plaintiff, O'Connor was given the QCDAO's Eugene J. Kelly, Jr. Award for Outstanding Assistant District Attorney of the Year during the same year he obtained Negron's conviction.

466. In 2010, O'Connor was the prosecutor in the murder trial of Antoine Singleton and a co-defendant. Both men were convicted.

467. In 2013, the Appellate Division vacated Singleton's conviction based on extensive misconduct by O'Connor. *See People v. Singleton*, 111 A.D.3d 769 (2d Dep't 2013).[8]

---

[8] *See also* Charisma L. Miller, *Brooklyn Appellate Court orders new trial for murder defendant*, Brooklyn Daily Eagle, Nov. 14, 2013, http://www.brooklyneagle.com/articles/brooklyn-appellate-court-orders-new-trial-murder-defendant-2013-11-14-190000.

468.    Before trial, the trial judge ruled that O'Connor must redact a statement by the co-defendant, in accordance with *Bruton v. United States*, 391 U.S. 123 (1968), because Singleton would not be able to cross-examine his co-defendant about it.

469.    However, according to the appellate decision, "during opening statements, [O'Connor] told the jury that, after the nontestifying codefendant was arrested, the police learned of the involvement in the crime of" Singleton, thus "improperly impl[ying] that the codefendant implicated the defendant in the crime," in violation of *Bruton*. *Singleton*, 111 A.D.3d at 769-70.

470.    Although the trial court admonished O'Connor, the Appellate Division noted,

> in summation, the prosecutor again implied that the codefendant had implicated the defendant. Specifically, he unequivocally suggested that the unnamed accomplice referred to . . . was the defendant. Further, the prosecutor projected for the jury, on a video screen, a copy of the codefendant's statement, with the word "we" highlighted in red, and directly suggested that the jury should draw the inference that "we" in the codefendant's statement referred to the codefendant and the defendant. Under the circumstances of this case, this conduct constituted "an unjustifiable circumvention" of the *Bruton* rule . . . , and deliberate defiance of the pretrial order.

*Id.* at 770.

471.    The Appellate Division then admonished O'Connor for additional misconduct at the same trial:

> We further take this opportunity to note that these two examples of the prosecutor's defiance of a court ruling were not isolated in this trial. For example, upon being told by the court to take down the video projection of the codefendant's statement, the prosecutor continued his summation without doing so, requiring further comment from defense counsel. Additionally, during the

69

prosecutor's opening statement, after an objection was sustained to his line of argument that "justice [was] what's on this [i.e., the prosecutor's] side of the room," the prosecutor continued with that line of argument. Similarly, during the prosecutor's closing statement, an objection was sustained to the prosecutor's effective instruction to the jury on the law, but the prosecutor nonetheless persisted in that effective instruction, requiring a second objection by defense counsel.

*Id.* at 770.

472. Upon information and belief, O'Connor was never disciplined for the above misconduct.

473. The D.A.'s policy, custom, and/or practice of approval, ratification of, or deliberate indifference to, violations by Queens prosecutors of their constitutional obligations to afford criminal defendants a fair trial foreseeably encouraged such violations to continue and was a substantial cause of Defendant O'Connor's violations of Plaintiff's constitutional rights before and during Plaintiff's trial, of Plaintiff's wrongful conviction, and of the continuation thereafter of his wrongful imprisonment and prosecution.

474. The aforesaid policies, procedures, regulations, practices, and/or customs of Defendant City were collectively and individually a substantial factor in bringing about the aforesaid violations of Plaintiff's rights under the Constitution and laws of the United States and in causing his damages.

475. By virtue of the foregoing, Defendant City is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

## EIGHTH CAUSE OF ACTION

**State-law negligent hiring, training, and supervision.**
**Defendant City of New York based on misconduct by**
**employees of the D.A.'s Office.**

476.     Plaintiff repeats and realleges each allegation contained in ¶¶ 1-204 and

377-475 as if fully set forth herein.

477.     During all times material to this Complaint, Defendant City of New York,

through its policymakers, owed a duty to the public at large and to Plaintiff, which such

policymakers knowingly and intentionally breached, or to which they were deliberately

indifferent, to implement policies, procedures, customs, and practices sufficient to

prevent, deter, and avoid conduct by their subordinates violating the aforementioned

constitutional rights of criminal suspects or defendants and other members of the public.

478.     Defendant City of New York is liable to Plaintiff because of its negligent

failure to adequately hire, train, supervise, and discipline its agents, servants, and/or

employees of the D.A.'s Office with regard to their aforementioned duties, and because

such negligence was a substantial and foreseeable cause of the injuries Plaintiff suffered.

## DEMAND FOR DAMAGES

479.     At the time of Plaintiff's arrest, he was employed as a custodian engineer

for the New York City Department of Education, earning a substantial salary.

480.     Due to his conviction, Plaintiff was terminated from this position.

481.     As a result of Plaintiff's wrongful arrest, prosecution, and conviction, which

was caused by Defendants, Plaintiff suffered lost wages and permanent diminution of his

earning potential of not less than $2,000,000.

482.  Plaintiff also incurred legal fees of approximately $100,000 for trial and appellate counsel to defend against the false charges.

WHEREFORE, Plaintiff Julio Negron demands judgment against the Defendants as follows:

a.  damages for lost past and future income of not less than $2,000,000;

b.  damages for legal fees of not less than $100,000;

c.  additional compensatory damages of not less than $20,000,000;

d.  punitive damages against Defendants Moscoso and O'Connor of not less than $10,000,000;

e.  reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988 and the inherent powers of this Court;

f.  pre-judgment interest as allowed by law; and

g.  such other and further relief as this Court may deem just and proper.

/s/ Joel B. Rudin
JOEL B. RUDIN
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com

*Attorney for Plaintiff*

Dated:      New York, New York
            November 20, 2018

1.    *People v. Roopchand*, 107 A.D.2d 35 (2d Dep't 1985): Affirming conviction but unequivocally condemning trial prosecutor for making inflammatory summation argument intended to elicit sympathy for the complainant and arouse animosity against the defendant and warning the prosecutor that future infractions may lead to disciplinary action, and that the court expected the Queens County D.A. to issue an appropriate internal admonition.

2.    *People v. Jones*, 108 A.D.2d 824 (2d Dep't 1985): Reversing robbery conviction where, among other things, the prosecutor improperly elicited that the defendant had previously hit a woman with a bat, and then suggested on summation that the jury could never believe a man who had done this.

3.    *People v. Valdivia*, 108 A.D.2d 885 (2d Dep't 1985): Affirming conviction but "strongly condemn[ing]" prosecutor for improperly cross-examining alibi witness regarding his taking an affirmation instead of an oath and revisiting the matter in summation, and for characterizing defendant's testimony as "an out and out series of lies."

4.    *People v. Hooks*, 110 A.D.2d 909 (2d Dep't 1985): Reversing conviction for rape, robbery, and burglary where prosecutor cross-examined defendant on his prior conviction in such a way as to improperly create the inference that because defendant had previously committed a burglary, he had also committed the instant offenses.

5.    *People v. Brown*, 111 A.D.2d 248 (2d Dep't 1985): In reversing conviction on other grounds, reprimanding prosecutor for making comments during summation that characterized defendant as lying while characterizing the prosecution as "on the side of truth," and implying that the jury should convict even if not convinced beyond a reasonable doubt, so long as it believed its verdict represented the "truth."

6.    *People v. Torres*, 111 A.D.2d 885 (2d Dep't 1985): Reversing, in part, because prosecutor repeatedly cross-examined alibi witness on why the witness did not contact the police, improperly implying witness was obligated to come forward, and because prosecutor consistently implied during summation that defense had concocted alibi, and improperly suggested that the jury would be subject to derision if they acquitted defendant.

7.    *People v. Williams,* 112 A.D.2d 177 (2d Dep't 1985): In reversing, reprimanding trial prosecutor for intimating to jury during summation that they were required to find that the complainant had lied in order to acquit defendant, and improperly bolstering by injecting his integrity and the integrity of his office into the case.

8.     *People v. Hines,* 112 A.D.2d 316 (2d Dep't 1985): Reversing in part because the prosecutor, during his summation, made inappropriate comments about the defendant, and emphasized the other "police procedures" which led to the selection of defendant as a suspect, clearly inviting the jury to infer that there was other evidence against defendant, of which they had not been told.

9.     *People v. La Rosa,* 112 A.D.2d 954 (2d Dep't 1985): Reversing conviction where the prosecutor, in summation, improperly vouched for his own case, denigrated the defense, misrepresented material facts, and misquoted testimony.

10.    *People v. Reyes*, 119 A.D.2d 596 (2d Dep't 1986): Affirming conviction but noting that prosecutor improperly told jury that "contrary to what the Defense Counsel would have you believe, a trial is not a search for reasonable doubt. Plainly simply a trial is a search for truth. Not supposed to be sitting here trying to pick reasonable doubt out from everything that goes on [sic]."

11.    *People v. Mercado*, 120 A.D.2d 619, 502 N.Y.S.2d 87 (2d Dep't 1986): Ordering new trial where, among other errors, court allowed prosecutor to admit photograph of defendant posing with handguns for no other purpose than to arouse jurors' emotions, and inflammatory nature of photographs was made worse when prosecutor, in summation, commented on jury having seen defendant in his "Al Capone get-up."

12.    *People v. Pascullo*, 120 A.D.2d 687 (2d Dep't 1986): Reversing conviction in part because prosecutor suggested improper inferences of racial motivation and informed the jury that an acquittal would be a condonation of racism.

13.    *People v. Beaman*, 122 A.D.2d 848 (2d Dep't 1986): Reversing conviction because prosecutor called witness to stand knowing he would refuse to testify, and improperly commenting on this refusal during summation, thereby inviting jury to speculate that witness had been threatened and refused to testify out of fear.

14.    *People v. Ciervo*, 123 A.D.2d 393 (2d Dep't 1986): Reversing conviction in part because of prosecutor's improper summation comments implying that a conviction was warranted based solely upon the defendant's character, and repeated characterizations of the defense case as a "con."

15.    *People v. Roudabush*, 123 A.D.2d 649 (2d Dep't 1986): Affirming conviction but "condemn[ing]" prosecutor's misconduct during summation and noting that court made its position on this misconduct "quite clear" during oral argument.

16.    *People v. Anderson*, 123 A.D.2d 770 (2d Dep't 1986): Reversing conviction because prosecutor re-called witness (who had originally been a codefendant in the case) to the stand, even though prosecutor knew the witness was going to

invoke his privilege against self-incrimination, and improperly commented several times on this invocation of privilege during summation, thus inviting jury to draw an unwarranted inference against the defendant.

17. *People v. Brown*, 125 A.D.2d 321, 510 N.Y.S.2d 135 (2d Dep't 1986): Reversing conviction because prosecutor improperly bolstered victim's testimony by implying that the defendant's stipulation that the victim had been raped and sodomized was a stipulation that the victim had told the truth, and by telling the jury something was "terribly wrong" with them if they did not believe the victim.

18. *People v. Montalvo*, 125 A.D.2d 338 (2d Dep't 1986): Reversing conviction where prosecutor, in his summation, improperly commented upon the defendant's failure to testify and to call witnesses on his own behalf.

19. *People v. Napoli*, 126 A.D.2d 674 (2d Dep't 1987): Affirming conviction but noting that prosecutor "went beyond the four corners of the evidence" in summation.

20. *People v. Faison*, 126 A.D.2d 739 (2d Dep't 1987): Ordering new trial where prosecutor improperly cross-examined accused (1) on his failure to disclose alibi to police after being given *Miranda* warnings, and (2) on his failure to produce records indicating that he was at work at time of robbery, which suggested that defendant bore burden of proving alibi defense.

21. *People v. Memminger*, 126 A.D.2d 752 (2d Dep't 1987): Ordering new trial on various grounds and "admonish[ing]" prosecutor "to remain within the bounds of fair comment during summation and to refrain from inappropriate and inflammatory remarks."

22. *People v. Perez*, 127 A.D.2d 707 (2d Dep't 1987): Ordering new trial where, among other things, prosecutor improperly implied on cross-examination of accused that he was involved in previous criminal activity.

23. *People v. Simms*, 130 A.D.2d 525 (2d Dep't 1987): Ordering new trial because of "numerous instances of prosecutorial misconduct which occurred throughout the course of the trial," including prosecutor's (1) eliciting of testimony that had been suppressed, (2) referring to that same evidence during summation, (3) repeatedly referring to facts not in evidence, (4) calling defendant's summation a "fairy tale," and (5) vouching for witnesses' credibility.

24. *People v. Scoon*, 130 A.D.2d 597 (2d Dep't 1987): Ordering new trial where prosecutor improperly (1) argued in summation that witness was not involved in crimes of dishonesty when he knew that the witness had a youthful-offender adjudication for grand larceny, and (2) repeatedly commented on matters not in

evidence during summation.

25. *People v. Torriente*, 131 A.D.2d 793 (2d Dep't 1987): Ordering new trial where prosecutor improperly (1) cross-examined shooting victim about drug use, (2) cross-examined defendant on whether he had entered country illegally, (3) called police officer to introduce irrelevant testimony about defendant's place of residence, and (4) made prejudicial statements in summation about defense counsel's summation and witnesses' testimony.

26. *People v. Romain*, 137 A.D.2d 848 (2d Dep't 1988): Ordering new trial in part based on prosecutor's "gross distortion" in summation of defendant's testimony, implying that he had admitted guilt when in fact he had not.

27. *People v. Chin*, 138 A.D.2d 389 (2d Dep't 1988): Ordering new trial where prosecutor improperly made unwarranted inferences in summation that defendant accused of rape against young girl planned to commit similar offenses with one of his character witnesses.

28. *People v. Dunlap*, 138 A.D.2d 393 (2d Dep't 1988): Reversing conviction based on prosecutorial misconduct even though proof of defendants' guilt was overwhelming, where prosecutor in summation diverted jury's attention from witnesses' inconsistencies with elaborate depiction of defendants as sharks hunting prey. *See also People v. Williams*, 162 A.D.2d 488 (2d Dep't 1990) (reversing codefendant's conviction on same ground).

29. *People v. Stewart*, 153 A.D.2d 706 (2d Dep't 1989): Vacating conviction where the "trial was marked by the prosecutor's efforts, even over sustained objections, to characterize the defendant as an individual predisposed to commit the crime charged."

30. *People v. Langford*, 153 A.D.2d 908 (2d Dep't 1989): Ordering new trial where prosecutor suggested, with no evidence, that defendant's alibi witness used drugs and was involved in charged robbery, and made several improper remarks in summation, including denigrating defense counsel and defense witnesses, and suggesting to the jury that, in order to acquit, they would have to find that a witness had lied.

31. *People v. Durham*, 154 A.D.2d 615 (2d Dep't 1989): Ordering new trial in part based on prosecutor's misconduct in summation, which included vouching for prosecution witnesses and referring pejoratively to defendant.

32. *People v. Gomez*, 156 A.D.2d 462 (2d Dep't 1989): New trial ordered where prosecutor (1) defied court's order limiting cross-examination of witness on pending criminal case, prompting court to accuse prosecutor of bad faith, (2)

cross-examined witness on his supposed communications with defendant, even though he knew the two were incarcerated and not free to converse, prompting court again to accuse prosecutor of bad faith, and (3) in summation, attempted to inflame the jury, vouched for witnesses' credibility, denigrated the defense, and shifted the burden of proof.

33. *People v. Pinkas*, 156 A.D.2d 485 (2d Dep't 1989): Ordering new trial where court ordered counsel not to commingle discrete allegations, but prosecutor "repeatedly sought to join the two incidents during her summation in spite of the direction by the Trial Judge to desist."

34. *People v. Rivera*, 170 A.D.2d 544 (2d Dep't 1991): Reversing rape conviction because the prosecutor failed to disclose police reports that were "in direct conflict" with the complainant's rape allegation.

35. *People v. Gaskins*, 171 A.D.2d 272 (2d Dep't 1991): Reversing conviction where the prosecutor failed to disclose the videotape of an interview of the alleged child victim.

36. *People v. Stevens*, 174 A.D.2d 640 (2d Dep't 1991): Reversing conviction in part based on prosecutor's statement in summation that "if this defendant wasn't charged with sodomy . . . he should have been."

37. *People v. Delace*, 174 A.D.2d 688 (2d Dep't 1991): Reversing robbery conviction where the prosecutor failed to disclose witness statements.

38. *People v. Gunther*, 175 A.D.2d 262 (2d Dep't 1991): Reversing conviction where prosecutor improperly attempted to show defendant's propensity to commit the charged crime of dealing cocaine by extensively cross-examining him on past convictions for dealing marijuana.

39. *People v. Wilkens*, 177 A.D.2d 678 (2d Dep't 1991): Reversing convictions where, despite court order that defendant's use of aliases could be used only for identification purposes, prosecutor cross-examined defendant on the same topic for impeachment purposes and then argued on summation that defendant was not to be believed because he "hides behind three names."

40. *People v. Parker*, 178 A.D.2d 665 (2d Dep't 1991): Ordering new trial in part based on prosecutor's misconduct in summation, including improperly suggesting that defendant's daughter's unfazed demeanor on witness stand indicated that defendant had exposed her to drug dealing; trying to mislead the jury into finding defendant guilty by association; and announcing in open court that defendant's daughter was wearing T-shirt that court had refused to admit in evidence.

41. *People v. Baba-Ali*, 179 A.D.2d 725 (2d Dep't 1992): Reversing a rape conviction

involving a four-year-old child where, despite a court order, the prosecutor failed until the eve of trial to disclose medical records finding no signs of sexual abuse.

42. *People v. Mack*, 180 A.D.2d 824 (2d Dep't 1992): Reversing conviction where prosecutor failed to turn over notes that could have been used to impeach witness.

43. *People v. Figueroa*, 181 A.D.2d 690 (2d Dep't 1992): Ordering new trial where prosecutor's summation "went well beyond the bounds of fair advocacy" by calling defendant's alibi witness untruthful, by suggesting that defendant was selling drugs on the night of his arrest for a crime he was alleged to have committed on another day, and by suggesting that defendant's alibi was concocted after the witness met with defense counsel.

44. *People v. Clausell*, 182 A.D.2d 132 (2d Dep't 1992): Reversing a narcotics conviction where the prosecutor repeatedly denied the existence of a "buy report," which turned out to include a description of the buyer wholly at odds with the description the arresting officer had said he received and matched to the defendant.

45. *People v. James*, 184 A.D.2d 582 (2d Dep't 1992): Reversing conviction where prosecutor represented that People would not introduce unfairly prejudicial evidence of defendant's prior possession of drugs but then cross-examined police officer extensively on that very evidence and emphasized it in summation.

46. *People v. Andre*, 185 A.D.2d 276 (2d Dep't 1992): Reversing conviction where, among other things, prosecutor in summation improperly called People's key witness a "brave young girl" and asked jury not "to let her down."

47. *People v. Campbell*, 186 A.D.2d 212, 587 N.Y.S.2d 751 (2d Dep't 1992): Reversing a robbery conviction because the prosecutor withheld hospital records which contained statements of the complainant contradicting her trial testimony.

48. *People v. Nieves*, 186 A.D.2d 276 (2d Dep't 1992): Reversing conviction where prosecutor cross-examined accused on psychiatric history and then commented on the matter in summation even though there was no relevance whatsoever to the defendant's psychiatric history or condition.

49. *People v. Odle*, 187 A.D.2d 536 (2d Dep't 1992): New trial ordered where prosecutor repeatedly elicited evidence of uncharged crimes against accused in order to show his criminal propensity and bad character, attempted to paint him as guilty by association, and committed summation misconduct.

50. *People v. Banch*, 80 N.Y.2d 610 (1992): Reversing manslaughter conviction where the prosecutor "mistakenly" gave the defense the wrong police memo book, withheld prior affidavits of a People's witness, and falsely represented that a report by another People's witness contained no information required to be disclosed.

51. *People v. Robinson*, 191 A.D.2d 595 (2d Dep't 1993): Ordering new trial where prosecutor "engaged in a series of improper remarks and tactics," including eliciting testimony about defendant's post-arrest silence and stressing the point in both his opening and summation; eliciting improper expert testimony and mischaracterizing the issue in summation; and, also in summation, referring to defense counsel's summation as a "con job," vouching for the complainant's truthfulness, and "derisive[ly]" commenting on the presumption of innocence and defendant's right to remain silence.

52. *People v. Hill*, 193 A.D.2d 619 (2d Dep't 1993): Ordering new trial where prosecutor cross-examined defendant in a manner intended to improperly to show defendant's criminal propensity and then focused on this line of argument in summation.

53. *People v. Davis*, 196 A.D.2d 597 (2d Dep't 1993): Reversing a rape and robbery conviction where the prosecutor had refused to disclose the basis for the People's expert's conclusion that defendant's DNA matched that found on the victim.

54. *People v. Steadman/Blair*, 82 N.Y.2d 1 (1993): Reversing a defendant's manslaughter conviction where the District Attorney's Office made a "determined effort" to avoid its obligations to disclose exculpatory evidence and to correct false testimony, by employing a "scheme" under which a supervisor in the Office would make a cooperation agreement with a witness's attorney, but not reveal the agreement to the prosecutors handling the defendant's case at trial, and not correct the witness's false testimony denying such an agreement. *See also People v. Blair*, 186 A.D.2d 665 (2d Dep't 1992) (noting that the scheme operated at "the executive level of the District Attorney's Office").

55. *People v. Gaines*, 199 A.D.2d 335 (2d Dep't 1993): Reversing manslaughter conviction where the District Attorney's Office employed the same scheme condemned in *Steadman*, i.e., withholding a cooperation agreement made between the trial assistants' superior and the principal prosecution witness's attorney.

56. *People v. Torres*, 199 A.D.2d 442 (2d Dep't 1993): Ordering new trial based in part on prosecutor's persisting in lines of cross-examination over sustained objections, including questioning a defense witness excessively about his drug use, questioning defendant about irrelevant matter of whether he thought drugs were a problem in schools, and accusing defendant of tailoring his testimony after hearing other witnesses testify.

57. *People v. Fearnot*, 200 A.D.2d 583 (2d Dep't 1994): Reversing robbery conviction where the prosecutor withheld prior statements of the complainant describing the robbery, suggested, without evidentiary support, that the defendant was a prostitute, and tried to inflame the jury by citing the AIDS epidemic.

58.   *People v. Kirchner*, 200 A.D.2d 766 (2d Dep't 1994): Reversing assault conviction where the prosecution failed to disclose witness statements.

59.   *People v. Baxley*, 84 N.Y.2d 208 (1994): Remitting a CPL 440 motion challenging a murder conviction for a hearing to determine the truth and materiality of a witness's affidavit, which stated that before trial he had informed the prosecutor that he and a People's witness had been induced by police to fabricate a jail-house confession, evidence the Court of Appeals deemed "crucial" to the People's case.

60.   *People v. Elder*, 207 A.D.2d 498 (2d Dep't 1994): Reversing conviction in part based on prosecutor's unspecified improper comments in summation regarding two defense witnesses and a prosecution witness.

61.   *People v. Giersz*, 212 A.D.2d 805 (2d Dep't 1995): Reversing conviction where prosecutor's summation "exceeded the broad bounds of rhetorical comment permissible in closing arguments."

62.   *People v. Spinelli*, 214 A.D.2d 135 (2d Dep't 1995): Reversing conviction where prosecutor failed to cross-examine defendant on his post-arrest silence then attacked the defendant's credibility on that ground during summation, thus unfairly depriving defendant of chance to explain the silence.

63.   *People v. Moss*, 215 A.D.2d 594 (2d Dep't 1995): Reversing conviction in part based on prosecutor's disregard of court's *Sandoval* ruling when cross-examining defendant, repeated references to defendant as a violent person, cross-examination questions calculated to compare defendant to Hannibal Lecter in *Silence of the Lambs*, remarks inviting jurors to put themselves in the shoes of victims being threatened by defendant, and waiving of a knife in front of the jury during summation.

64.   *People v. Leuthner*, 216 A.D.2d 327 (2d Dep't 1995): Reversing conviction where prosecutor asked defendant whether the complainant was lying, asked defendant's character witness about her personal knowledge of the facts underlying defendant's past conviction, failed to establish a good-faith basis for questioning about a threat made by the defendant's father, and failed to stay within the four corners of the evidence during summation.

65.   *People v. Scott*, 217 A.D.2d 564 (2d Dep't 1995): Ordering new trial based on "flagrant" and "pervasive" summation misconduct, where prosecutor (1) repeatedly referred to defendant as convicted felon, in an attempt to get the jury to convict defendant based on criminal propensity, (2) denigrated defendant, including by suggesting that defendant thought jurors just "fell off the stupid truck," and (3) attempted to shift the burden of proof.

66.  *People v. James*, 218 A.D.2d 709 (2d Dep't 1995): Ordering new trial on other grounds but noting "some unacceptable practices engaged in by the prosecutor" — namely, the "repeatedly condemned tactic" of suggesting during cross-examination and summation that the complainant, in identifying the defendant, was either correct or lying, and excessive references to the defendant's criminal record.

67.  *People v. Shim*, 218 A.D.2d 757 (2d Dep't 1995): New trial ordered where prosecutor failed to disclose police officer's notes.

68.  *People v. Ferrara*, 220 A.D.2d 612 (2d Dep't 1995): Affirming conviction but noting that prosecutor "committed several instances of misconduct during the course of his summation" by commenting, without proper foundation, on a defense witness's failure to provide the police with information; suggesting that defense counsel's objections had deprived jury of hearing certain testimony; and telling the jury that it should take only 10 to 15 minutes to decide the case.

69.  *People v. Torres*, 223 A.D.2d 741 (2d Dep't 1996): Reversing conviction where prosecutor made personal attacks on defense counsel and argued that there was no evidence that defendant was somewhere other than the scene of the robbery, which improperly shifted the burden of proof to the accused.

70.  *People v. Brown*, 224 A.D.2d 539 (2d Dep't 1996): New trial ordered where prosecutor failed to disclose firearms report that contained substantially different information than that given by People's witness at trial, which prejudiced defense by depriving it of the opportunity "to cross-examine the [witness] and test his credibility."

71.  *People v. Moustakis*, 226 A.D.2d 401 (2d Dep't 1996): Reversing conviction where the prosecutor presented a cooperating witness who "forgot" the details of his past crimes, but withheld 16 pages of interview notes detailing these crimes for the District Attorney's Office.

72.  *People v. May*, 228 A.D.2d 523 (2d Dep't 1996): Reversing a murder conviction where the prosecutor failed to disclose a cooperation agreement with its star witness and failed to correct his false testimony that no such agreement existed.

73.  *People v. Croons*, 231 A.D.2d 585 (2d Dep't 1996): Reversing robbery conviction where the prosecution wrongfully withheld prior statements of a key witness, the complainant.

74.  *People v. Bonnen*, 236 A.D.2d 479 (2d Dep't 1997): Reversing conviction based in part on prosecutor's failure to present evidence he had promised in opening that defendant had shot an additional victim, and then admitting at end of trial that he

had "no information" as to that victim's whereabouts, prompting court to call prosecutor's representation in his opening statement "disingenuous."

75. *People v. Ying*, 236 A.D.2d 630 (2d Dep't 1997): Reversing robbery conviction on other grounds, while condemning the prosecutor's withholding of the terms of a cooperation agreement with a People's witness.

76. *People v. Brown*, 241 A.D.2d 460, 663 N.Y.S.2d 975 (2d Dep't 1997): Ordering new trial where People agreed that prosecution's failure to disclose prior statements of arresting officer was prejudicial and mandated reversal.

77. *People v. Lippolis*, 246 A.D.2d 557 (2d Dep't 1998): Ordering new trial where prosecutor in his opening statement, among other things, improperly called the defendant a "parasite" and told the jury that "citizens like [them]selves indicted this defendant"; during direct examination of the arresting officer, elicited that defendant had remained silent after his arrest; and during summation, again referred to defendant's postarrest silence.

78. *People v. Mackey*, 249 A.D.2d 329 (2d Dep't 1998): Reversing robbery conviction where the prosecutor "deliberately" set a trap for the defense at trial by withholding critical information required to be disclosed earlier.

79. *People v. Walters*, 251 A.D.2d 433 (2d Dep't 1998): Ordering new trial where prosecutor repeatedly made inflammatory remarks designed to appeal to the jury's sympathy, such as commenting that the victim "was probably going to be a brilliant artist"; shifted the burden of proof by noting that the defendant did not call additional witnesses; stated that "the only real evidence is the People's evidence"; accused the defendant of tailoring his testimony after hearing the prosecution witnesses; described the defendant's testimony as "continued lies on top of lies, on top of lies," and "tales and lies, back and forth, back and forth"; gave his personal opinion on the truth and falsity of witnesses' testimony; vouched for the victim's credibility; and, "most egregious[ly]," insinuated that a gun recovered from defendant two weeks after the crime may have been used in the charged shooting, even though the prosecutor knew that a ballistics test had conclusively established otherwise.

80. *People v. Anderson*, 256 A.D.2d 413 (2d Dep't 1998): Ordering new trial where prosecutor (1) brought out only inculpatory portion of statement at trial and, thanks to trial court error, succeeding in blocking defendant's attempt to bring out exculpatory portion, and (2) compounded misconduct by telling jury in summation that accused had not made any exculpatory statement.

81. *People v. Brown*, 256 A.D.2d 414 (2d Dep't 1998): Reversing conviction on evidentiary grounds but noting as independent ground for reversal the prosecutor's

improper comment on defendant's declining to testify, his misstatements of the evidence, and his references to matters not in evidence.

82.  *People v. Rivera*, 259 A.D.2d 570, 684 N.Y.S.2d 896 (2d Dep't 1999): Affirming conviction but "deplor[ing] the continuous failure of the Assistant District Attorney to follow the admonitions of the trial court regarding his improper summation comments."

83.  *People v. Alfaro*, 260 A.D.2d 495 (2d Dep't 1999): Reversing conviction on evidentiary grounds and noting "clear impropriety" of prosecutor's remarks in summation that the presumption of innocence was "gone" or "vanquished"; that while the court would instruct the jury that the defendant had "a lot of rights," they should also consider the victim's rights; and that the jury should infer the defendant's guilt based on his having had a lawyer with him when he surrendered to police.

84.  *People v. Robinson*, 260 A.D.2d 508 (2d Dep't 1999): Ordering new trial based on prosecutor's summation misconduct where prosecutor improperly vouched for complainant's truthfulness, appealed to the jury's sympathies and fears by describing the elderly complainant as a person who would be a "classic victim anywhere in this city," accused the defense of manufacturing evidence and putting on perjurious witnesses who were "more full of crap than a Christmas turkey," said he was "ticked off" that members of defendant's family were in the courtroom when a defense witness testified, and ended by telling jury that "[t]he only way this defendant walks out of the courtroom is if you let him."

85.  *People v. Lewis*, 262 A.D.2d 584 (2d Dep't 1999): Ordering new trial in part based on prosecutor improperly asking a witness whether defense counsel offered him money or drugs in return for his testimony, and admonishing that such misconduct "is not to be repeated at any subsequent trial."

86.  *People v. Washington*, 278 A.D.2d 517 (2d Dep't 2000): Reversing conviction on other grounds but noting impropriety of prosecutor's arguments in summation that defendant's testimony was "a lie" and "a pile of crock," and was "fabricate[d]" after having had "the benefit of counsel," and that the defense's version of events was "patently absurd" and that the jury should not be "fooled" by it.

87.  *Farakesh v. Artuz*, No 99-CV-3945 (JG), 2000 WL 1480896 (E.D.N.Y. Oct. 3, 2000): Granting habeas petition because prosecutor impermissibly elicited extensive testimony from detectives about defendant's post-arrest silence, and repeatedly used this testimony in summation as evidence of defendant's guilty state of mind, and to impeach defendant.

88.  *People v. Smith*, 288 A.D.2d 496 (2d Dep't 2001): Ordering new trial where

prosecutor "repeatedly stated unqualified pronouncements of the defendant's guilt, often inappropriately injecting her personal views," such as the remark, "of course he did it. This isn't an issue of who did it"; vouched for witnesses' credibility; appealed to the sympathy of the jury by commenting that the victim was "courageous" for going to the police and for "coming before you" and that the victim was "ill" but still came to court; referred to evidence as "uncontroverted," which was a veiled (and improper) reference to defendant's declining to testify; and implied that a witness who could not speak and therefore did not testify would have fully corroborated the complaining witness.

89. *People v. Leavy*, 290 A.D.2d 516 (2d Dep't 2002): Prosecutor improperly withheld *Brady* material such as promises of leniency given to cooperating witness, but court upheld conviction because defense had meaningful opportunity to cross-examine witness about it.

90. *People v. Ni*, 293 A.D.2d 552 (2d Dep't 2002): Reversing assault conviction where the prosecutor's flagrantly improper comments during opening and closing statements shifted the burden of proof, inflamed the jury, and denigrated the defense.

91. *Jenkins v. Artuz*, 294 F.3d 284 (2d Cir. 2002): Affirming grant of writ of habeas corpus where first prosecutor caused a mistrial by withholding a crucial witness's cooperation agreement until the day of his testimony, then second prosecutor, on retrial, allowed same witness to falsely deny the existence of the agreement, objected to the defense's efforts to bring it out, reinforced the witness's false denial on redirect, and bolstered the false testimony in summation.

92. *People v. Lauderdale*, 295 A.D.2d 539 (2d Dep't 2002): Ordering new trial based in part on prosecutor's 31 references to defendant's highly prejudicial nickname, "Homicide."

93. *People v. Bhupsingh*, 297 A.D.2d 386 (2d Dep't 2002): Reversing on other grounds, but noting that prosecutor's misconduct could have served as additional basis for reversal, where prosecutor persistently questioned defendant about collateral matters in a manner intended to denigrate him, continually asked leading questions of prosecution witnesses, placed inadmissible hearsay before the jury, improperly elicited evidence of prior consistent statements made by the complainant, and made inflammatory comments in summation that denigrated the defense and appealed to the sympathy of the jury.

94. *People v. Ramashwar*, 299 A.D.2d 496 (2d Dep't 2002): Reversing conviction because prosecutor put her own credibility at issue by seeking to impeach two defense witnesses with their inconsistent prior statements to her, and by commenting upon the inconsistencies in summation.

95. *People v. Jones*, 305 A.D.2d 698 (2d Dep't 2003): Reversing robbery conviction where the prosecutor deliberately elicited police testimony in a manner that created the unfair impression that the codefendant had implicated the defendant to police, and where the trial court erroneously precluded the defense from cross-examining the complainant, who was the sole eyewitness, regarding the length of time it took him to identify the defendant at a lineup.

96. *People v. Jamal*, 307 A.D.2d 267 (2d Dep't 2003): Ordering new trial where prosecutor inappropriately told jury in summation that certain evidence was kept from them for "legal reasons"; argued that indictment was evidence of defendant's guilt; repeatedly gave his personal opinion as to the truth of prosecution witnesses' testimony and as to defendant's guilt; and shifted the burden of proof by referring to the People's evidence as "undisputed" and "[u]ncontroverted," while stating that defendant had "no explanation" and "no rational defense" and asking rhetorically, "[w]hat is the defense, ladies and gentlemen?"

97. *People v. Milligan*, 309 A.D.2d 950 (2d Dep't 2003): Ordering new trial in part based on prosecutor's improper vouching for witnesses' credibility.

98. *Su v. Filion*, 335 F.3d 119 (2d Cir. 2003): Granting habeas corpus relief in a murder case where the prosecutor failed to disclose a crucial witness's cooperation agreement, knowingly presented the witness's perjured testimony denying the existence of such an agreement and lying about his criminal conduct, and improperly bolstered the witness's false testimony on summation.

99. *People v. Thomas*, 8 A.D.3d 303 (2d Dep't 2004): Conviction set aside by trial judge after verdict based on *Brady* violations, but verdict re-instated by Appellate Division because issue was not preserved.

100. *Turner v. Schriver*, 327 F.Supp.2d 174 (E.D.N.Y. 2004): Granting federal habeas corpus relief in a robbery case where the prosecutor failed to investigate and disclose the criminal record of the People's only witness to the crime, elicited false testimony from the witness that he had no record, and gave false summation on the witness' absence of a criminal record to bolster the witness' credibility.

101. *People v. Mitchell*, 14 A.D.3d 579 (2d Dep't 2005): Reversing conviction where prosecution withheld police reports, causing substantial prejudice to the defendant.

102. *People v. Brown*, 30 A.D.3d 609 (2d Dep't 2006): Reversing conviction based on jury-instruction error, but citing as independent ground for reversal misconduct by the prosecutor during cross-examination and summation, including "presenting himself as an unsworn witness at trial, suggesting that the defense counsel did not

believe his own client, making public safety arguments, and implying that certain key evidence had been kept from the jury due to legal technicalities."

103. *People v. Knight*, 18 Misc.3d 1129(A) (Sup. Ct. Queens Cty. 2007): Setting aside verdict after defense discovered that prosecutor failed to disclose significant *Brady* material concerning one of the homicide victims and related to defendant's legitimate self-defense claim.

104. *People v. Bennett*, 40 A.D.3d 653 (2d Dep't 2007): Ordering new trial where prosecutor ambushed defense by representing that he would not call witness and that no *Rosario* existed, but then turning over *Rosario* material and calling witness, and capitalizing on these unfair tactics in summation.

105. *People v. Frantz*, 57 A.D.3d 692 (2d Dep't 2008): Ordering 440 hearing in murder conviction where prosecutor failed to disclose prior inconsistent statements of cooperating witness, who was the only witness to testify that the defendant committed the crime, concerning such witness's alleged observations of the defendant.

106. *People v. Sayers*, 64 A.D.3d 728 (2d Dep't 2009): Ordering new trial in part based on prosecutor's improper comments in opening and summation regarding evidence of defendant's uncharged crimes.

107. *People v. Spann*, 82 A.D.3d 1013 (2d Dep't 2011): Reversing conviction where prosecutor improperly commented on the defendant's medical evidence, presented to explain his perspiration and rapid heartbeat during traffic stop, by referring to it as a "distraction," a "smokescreen," and "smoke and mirrors"; impermissibly shifted the burden of proof by telling jurors that if they did not find the defendant's testimony "reasonable," they could not "form the basis of reasonable doubt"; and stated 14 times that police had recovered a handgun from under the passenger seat of the car, where defendant was sitting, although no evidence was presented at trial to support that claim.

108. *People v. Anderson*, 83 A.D.3d 854 (2d Dep't 2011): Ordering new trial where prosecutor defied court's *Sandoval* ruling to ask "a series of irrelevant and prejudicial questions" concerning defendant's prior narcotics conviction, and in summation vouched for witnesses' credibility, denigrated the defense, and mischaracterized defendant's testimony.

109. *People v. Robinson*, 34 Misc.3d 1217(A) (Crim. Ct. Queens Cty. 2011): Ordering a hearing where prosecutor's delay in *Brady* disclosure was a "clear and unequivocal breach" of that prosecutor's responsibility.

110. *People v. Bedi*, Ind. No. 4107/96 (Sup. Ct. Queens Cty. March 13, 2013) (Griffin,

A.J.S.C.): Setting aside murder conviction where prosecutor violated *Brady* by failing to disclose payments made to a key witness, and by failing to correct witness's false testimony that he did not receive such benefits.

111.  *People v. Joyner*, 126 A.D.3d 1002 (2d Dep't 2015): Reversing weapon possession conviction where prosecutor's summation deprived defendant of a fair trial by accusing him, without evidence, of uncharged crimes, and making statements implying guilt by association.

112.  *People v. Singh*, 128 A.D.3d 860 (2d Dep't 2015): Reversing rape conviction where prosecutor, during summation, acted as an unsworn witness, improperly invited the jury to speculate as to certain matters, denigrated the defense while vouching for the complainant's credibility, and shifted the burden of proof.

113.  *People v. Negron,* 26 N.Y.3d 262 (2015): Setting aside attempted murder conviction where prosecutor failed to disclose evidence pointing to a third party as the alleged shooter and then successfully precluded a third-party culpability defense by arguing lack of such evidence.

114.  *People v. Cantoni*, 140 A.D.3d 782 (2d Dep't 2016): Reversing conviction where prosecutor repeatedly shifted the burden of proof to the defendant, told the jurors that they would have to find the People's witnesses had lied in order to believe the defense, vouched for the credibility of police witnesses, and denigrated the defense.

115.  *People v. Redd*, 141 A.D.3d 546 (2d Dep't 2016): Reversing conviction for "pervasive prosecutorial misconduct" where prosecutor, in opening and summation, misstated the evidence, vouched for the credibility of witnesses, called for speculation by the jury, made inflammatory statements, and improperly denigrated the defense.

116.  *People v. Brisco*, 145 A.D.3d 1028 (2d Dep't 2016): Reversing conviction because prosecutor, in summation, attacked defense counsel's integrity, improperly referenced facts not in evidence, misstated critical witness testimony, and made inflammatory "safe streets" arguments.

117.  *People v. Davis*, 147 A.D.3d 1077 (2d Dep't 2017): Reversing conviction on other grounds but noting that prosecutor "made improper summation comments regarding the failure of the defendant to communicate certain information to the police at the time of his apprehension."