UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------x

JULIO NEGRON,                               :

                      Plaintiff,            :        **AMENDED COMPLAINT**

      - against -                    :        No. 18-cv-6645 (DG) (RLM)

THE CITY OF NEW YORK, PATRICK          :
O'CONNOR, in his individual and official
capacities, and ROBERT MOSCOSO, in his    :        Jury Trial Demanded
individual and official capacities,

                             :

               Defendants.

---------------------------------------------------------x

      Plaintiff JULIO NEGRON, by his attorneys, the LAW OFFICES OF JOEL B.

RUDIN, P.C., respectfully alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

      1.     This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, and New

York State law, seeking monetary damages for the Plaintiff, JULIO NEGRON, due to his

unlawful criminal prosecution and conviction for attempted murder in Queens, New

York, and imprisonment of almost 10 years.

      2.     Negron, a school custodian for more than 15 years, was arrested on

February 6, 2005, for the shooting of Mervin Fevrier, near Negron's girlfriend's home,

after a traffic dispute. The evidence known to police proved overwhelmingly that Negron

was *not* the shooter.

3.     One eyewitness, who told police she knew the shooter from the area, viewed Negron in a holding cell and told police he was *not* the shooter. Three other eyewitnesses viewed a lineup containing Negron and did not recognize Negron as the shooter. The final eyewitness, shooting victim Fevrier, viewed the lineup and failed to make an unequivocal identification. Following the lineup, Defendant Patrick O'Connor, an assistant district attorney ("ADA"), told Negron's attorney that Negron would be released.

4.     However, rather than release Negron, O'Connor, together with two police investigators, Defendant Robert Moscoso and Sgt. Michael Ryan, all acting in concert in an investigatory capacity, then manufactured "probable cause" to prosecute Negron.[1] Excluding Negron's counsel, whom Negron was entitled to have witness the lineup, they took Fevrier into a closed room, spoke with him for 15 to 20 minutes, and pressured him to say he was "sure" that Negron was the shooter. This became the evidence upon which Negron's entire prosecution was based.

5.     Having participated in improperly influencing this identification, ADA O'Connor, now wearing his prosecutorial hat, then misled the grand jury into indicting Negron. He presented testimony that Fevrier had identified Negron without revealing that, until Fevrier was improperly taken into the closed room for a talking-to, Fevrier had not made an unequivocal identification. He withheld that four other witnesses had either said Negron was not the shooter or failed to recognize him as such. And he withheld

---

[1] Sgt. Ryan is deceased.

numerous additional items of exculpatory evidence, including evidence pointing to another likely culprit.

6.      At Negron's trial, Fevrier, having been influenced by the defendants into believing Negron was the shooter, identified Negron to the jury. Meanwhile, ADA O'Connor convinced the trial judge to disallow Negron's defense that another person was the shooter, on the ground of insufficient evidence in support of that theory, while withholding from the court and the defense additional evidence in his possession tending to prove that defense. He also engaged in rampant misconduct in his summation. Negron was convicted.

7.      After fighting for 10 years, up and down the state and federal court systems, Negron finally succeeded, on November 23, 2015, in convincing the New York Court of Appeals to overturn his conviction and grant him a new trial. The Court of Appeals concluded that O'Connor had "actively misle[d] the [trial] court as to the potential merit of defendant's third-party culpability defense" and withheld evidence about the third party that was "plainly favorable to the defense," in violation of Negron's constitutional right to a fair trial.

8.      After almost 10 years behind bars, Negron was released, but the Queens County District Attorney's Office wasn't finished with him. It announced an intention to retry him.

9.      The trial court, denouncing ADA O'Connor's misconduct in the grand jury, wouldn't allow it. It found that O'Connor had withheld "a plethora of exculpatory evidence" from the grand jury and presented the lineup identification in an "utterly

3

misleading manner." O'Connor, the court found, was "aware that there was significantly more evidence pointing away from the defendant's identity as the perpetrator of the crimes than there was pointing towards it," but he "failed to present any of this exculpatory evidence." The court concluded that O'Connor's "deception" of the grand jury was "indisputably deliberate." It dismissed the case.

10.     This lawsuit seeks to hold Detective Moscoso liable for malicious prosecution and for withholding exculpatory evidence. It seeks to hold Moscoso and O'Connor liable for causing Plaintiff to be convicted, in violation of his constitutional right to a fair trial, based upon manufactured evidence. In addition, it seeks to hold the Defendant City of New York responsible because the actions of ADA O'Connor foreseeably resulted from the deliberate indifference of policymakers for the Queens County District Attorney's Office ("D.A.'s Office" or "QCDAO")—a New York City agency—to patterns of similar constitutional violations, committed over many years, by its employees. Absent a finding of liability, the types of misconduct that occurred in this case will continue to flourish.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

11.     This action arises under 42 U.S.C. §§ 1983 and 1988 and under the common law of the State of New York.

12.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 and under the principles of pendent jurisdiction.

13.     Venue is proper under 28 U.S.C. § 1391.

14.     This action has been commenced within the applicable period for each claim.

15.     On or about December 1, 2017, Plaintiff served the City of New York timely notice of the present claims, in accordance with N.Y. Gen. Mun. Law § 50-e.

16.     On May 16, 2018, a hearing was held, in accordance with N.Y. Gen. Mun. Law § 50-h.

17.     Plaintiff has duly complied with all conditions precedent to the commencement of this action.

## THE PARTIES

18.     Plaintiff JULIO NEGRON is a citizen and resident of the State of New York and of the United States. He resides within the Eastern District of New York.

19.     Defendant PATRICK O'CONNOR was at all relevant times an assistant district attorney employed by the D.A.'s Office, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

20.     Defendant ROBERT MOSCOSO, shield no. 7539, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

21.     Defendant CITY OF NEW YORK ("City") is a municipal corporation of the State of New York and is a resident of the Eastern District of New York.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Shooting and Investigation

22.     Just before 4 a.m. on February 6, 2005, Mervin Fevrier was driving a car down Woodward Avenue in Queens, New York.

23.     His friend Elliot Miley was in the front passenger seat.

24.     Around the intersection of Woodward Avenue and Menahan Street, Fevrier and the driver of another car got into a traffic-related dispute.

25.     Fevrier and Miley got out of their car and the other driver got out of his.

26.     The other driver shot Fevrier in the leg.

27.     Fevrier and Miley returned to their car and drove away from the scene.

28.     Shortly thereafter, they flagged down a police car.

29.     Fevrier and Miley described the shooter as:

   a.     A young Hispanic man, 20-25 years of age;

   b.     With a beard and mustache;

   c.     Who drove a dark blue, four-door sedan.

30.     Accordingly, a contemporaneous NYPD radio run described the shooter as having a mustache and driving a dark blue, four-door sedan.

31.     Police officers recovered three spent .45-caliber shell casings at the scene of the shooting.

32.     The shooting happened near the apartment of Plaintiff Julio Negron's girlfriend, at 583 Woodward Avenue.

33.     Negron was in bed asleep in this apartment when the shooting occurred.

6

34.    Negron, while Hispanic, had no facial hair at the time of the shooting, and was 38 years of age.

35.    He didn't drive a dark blue, four-door sedan but rather a green, two-door coupe.

36.    Later the morning of the shooting, NYPD detectives, including Defendant Moscoso, rang the doorbell to Negron's girlfriend's apartment.

37.    Negron answered the door.

38.    Moscoso and the other detectives took Negron to the local precinct.

39.    At the precinct, Moscoso and the other detectives locked Negron in a caged detention area.

40.    Moscoso and the other detectives did not have probable cause to detain or arrest Negron.

41.    Moscoso and the other detectives asked Negron for his consent to search his car.

42.    From his cell, Negron gave Moscoso and the other detectives permission to search his car and handed them his car keys.

43.    Police searched Negron's car and found no incriminating evidence.

44.    Moscoso and the other detectives also asked Negron for his consent to search his girlfriend's apartment.

45.    From his cell, Negron gave Moscoso and the other detectives permission to search his girlfriend's apartment.

46.    Police searched the apartment and found no incriminating evidence.

47.     The same day, the police brought Zoryana Ivaniv to the precinct.

48.     Ivaniv had been sitting in a parked car on the block where the shooting happened and had witnessed the shooting.

49.     Ivaniv lived in the area of the shooting and told police that she had recognized the shooter from seeing him on previous occasions.

50.     Moscoso and O'Connor brought Ivaniv to Negron's holding cell and displayed Negron to Ivaniv.

51.     This stationhouse "showup" procedure was so inherently suggestive that it was banned by New York State law unless the witness already knew the suspect so well that there was no possibility that such a suggestive presentation would influence the witness to misidentify the suspect.

52.     Ivaniv told Moscoso and O'Connor that Negron was *not* the shooter.

53.     The next day, February 7, Moscoso, still holding Negron in custody and still investigating for evidence to tie Negron to the shooting, prepared a lineup containing Negron and five fillers.

54.     He was assisted in the lineup process by Sgt. Ryan and Defendant O'Connor.

55.     Moscoso picked up shooting victim Fevrier and brought him to the precinct to view the lineup, improperly telling Fevrier that the police suspect in the shooting would be in the lineup.

56.     At Moscoso's direction, three other eyewitnesses were also brought to the precinct to view the lineup: Miley, Dmitriy Khavko, and Andriy Vintonyak.

8

57.     Khavko and Vintonyak had been in the parked car with Ivaniv and had witnessed the shooting.

58.     Negron's defense lawyer was present for the lineup, and Negron had the constitutional right to have him observe the lineup to help ensure it was conducted fairly and without improper suggestion.

59.     The first eyewitness to view the lineup, shooting victim Fevrier, speaking with a tone of uncertainty, said with regard to number five, who was Negron, "I think it's him? I believe it's him." Moscoso then placed before Fevrier a "Line-Up Report," which Moscoso had filled out by hand, describing number five as the "SUSPECT"; wrote the numeral "5" in the field marked "Number of Person Identified"; and asked Fevrier to sign the report, which Fevrier did after reading it. Moscoso made no record of Fevrier's statement at the lineup indicating uncertainty.

60.     The second witness, Miley, did not recognize Negron as the shooter but instead selected a filler.

61.     The third witness, Vintonyak, did not recognize Negron as the shooter either and made no identification.

62.     The final witness to view the lineup, Khavko, did not recognize Negron as the shooter but instead selected a filler.

63.     The filler Khavko selected had a mustache, which was consistent with the eyewitness descriptions of a shooter with facial hair.

64.     Negron and the other fillers did not have facial hair at the time of the lineup.

65.     Recognizing there was no probable cause to arrest or prosecute Negron, O'Connor told Negron's counsel he was going to authorize Negron's release.

66.     However, O'Connor, Moscoso, and Ryan then took Fevrier into a private room for approximately 15 to 20 minutes and pressured him to say he was "sure" that number five was the shooter.

67.     They improperly excluded Negron's attorney from the room.

68.     When O'Connor emerged from the room, he told Negron's attorney that he was not going to authorize Negron's release after all but, rather, was going to proceed with Negron's prosecution.

69.     Before O'Connor decided to proceed with Negron's prosecution, Moscoso, knowing that Negron's car was green and had two doors, told O'Connor that Fevrier had provided that very description of the shooter's car, when in fact Fevrier had told the police that the shooter's car was dark and had four doors.

70.     But for the misconduct of Defendants O'Connor and Moscoso, as well as Sgt. Ryan, there would have been no "probable cause" for Negron's prosecution.

## The Arrest of Fernando Caban

71.     At the time of the shooting, Negron's girlfriend lived in the second-floor apartment of 583 Woodward Avenue.

72.     At about 8 p.m. on the day of the shooting, NYPD officers gathered outside 583 Woodward Avenue to search Negron's girlfriend's apartment, having obtained Negron's consent to do so.

73.     Before police entered the building, a neighbor living in a connected building two doors down, 587 Woodward Avenue, alerted the officers that a man and a woman had just forced their way into her apartment building, directed her to lock the outside door, demanded access to the roof, directed her to leave the door to the roof unlocked, and, when she locked the roof door anyway, banged on the door to be let back inside.

74.     This neighbor and her mother later identified Fernando Caban and Monica Guartan as the two people who had entered their apartment building.

75.     Caban and Guartan lived below Negron's girlfriend on the first floor of 583 Woodward Avenue.

76.     Caban's physical appearance at the time was similar to Negron's, except Caban, more closely matching the description given by eyewitnesses of the shooter, wore facial hair, whereas Negron did not.

77.     After the neighbors from 587 Woodward notified the police that Caban had forced his way into the building, officers searched the roof of 587 Woodward.

78.     There they found numerous plastic trash bags filled with weapons, armor, ammunition, counterfeit money, and identification cards with Caban's photograph on them.

79.     A closer examination of the contents of the bags revealed, among other items, fifty rounds of .45-caliber ammunition.

80.     These were similar to the .45-caliber shell casings recovered from the scene of the shooting.

11

81.     Evidently, Caban had thought the police investigating the shooting were at 583 Woodward Avenue to search or arrest him.

82.     Caban was subsequently arrested and charged with several crimes based on the contents of the trash bags.

## **The Grand Jury**

83.     O'Connor presented the shooting case against Negron to a grand jury.

84.     O'Connor elicited testimony from Fevrier that Fevrier had viewed a lineup and identified person number five as the shooter.

85.     O'Connor then elicited testimony from Moscoso that Negron was person number five in the lineup.

86.     However, O'Connor and Moscoso withheld from the grand jury that Fevrier initially expressed uncertainty about number five and said he was sure number five was the shooter only after they and Ryan had pressured him to do so.

87.     Both O'Connor and Moscoso further withheld that Ivaniv had exonerated Negron, whereas three other witnesses had not recognized him as the shooter.

88.     Indeed, Moscoso, questioned by O'Connor, misled the grand jury by testifying only that Fevrier had viewed the lineup.

89.     Negron exercised his right to testify before the grand jury.

90.     He attempted to explain that Defendant O'Connor had initially authorized his release because none of the witnesses who viewed the lineup could unequivocally identify him.

91.     However, O'Connor stopped Negron and refused to let him give such testimony.

92.     A grand juror asked Negron whether the police had found anything in his apartment when they searched it.

93.     O'Connor refused to let Negron answer this question.

94.     Knowing that the police had found nothing incriminating in the apartment, O'Connor did not present this evidence to the grand jury in any form.

95.     Defendants O'Connor and Moscoso further withheld from the grand jury evidence that tended to suggest that Caban was the shooter, including but not limited to:

a.      the circumstances of Caban's flight, jettisoning of incriminating evidence, and arrest;

b.      the eyewitness descriptions of the shooter as a Hispanic man with facial hair, a description that better fit Caban than Negron; and

c.      witness descriptions of the car used by the shooter as a blue four-door sedan, while Negron's car was a green two-door coupe.

96.     Based on this false, fraudulent, and misleading presentation of evidence, the grand jury indicted Negron on one count each of attempted murder in the second degree, assault in the first degree, reckless endangerment in the first degree, and criminal possession of a weapon in the second degree, and two counts of criminal possession of a weapon in the third degree.

## The Trial

97.     Before Fevrier testified at trial, Defendant O'Connor took him into the courtroom and allowed him to view Negron sitting at the defense table.

98.    Fevrier then made an in-court identification of Negron as the shooter.

99.    Fevrier testified that the shooter had driven a four-door sedan.

100.    Ivaniv testified that she had viewed Negron in a show-up at the police precinct and told police he was not the shooter.

101.    Khavko and Miley testified that they had picked fillers out of the lineup containing Negron.

102.    Vintonyak testified that he had not recognized anyone in the lineup.

103.    Negron's attorney sought the court's permission to introduce evidence that Fernando Caban was guilty of the shooting.

104.    Negron's attorney knew only that Caban resembled the physical description of the shooter, that Caban lived in the same building as Negron's girlfriend, and that Caban had been arrested for possession of a cache of weapons found on a rooftop connected to that building.

105.    Negron's attorney did not know, among other information tending to suggest Caban was the shooter, the following:

a.    Caban had forced his way into 587 Woodward Avenue and attempted to hide or discard his weapons cache as police investigating the shooting gathered outside his building, thereby revealing an apparent consciousness of his own guilt in the shooting;

b.    two occupants of 587 Woodward had testified in the grand jury as to Caban's aggressive behavior in forcing his way into the building;

c.    the items Caban had disposed of included .45-caliber ammunition, the same type of ammunition used in the shooting of Fevrier;

d.    when Caban was arrested, he was wearing clothing similar to Khavko's description of the shooter's clothing; and

14

    e.    Caban had a previous state felony conviction for assault with a deadly weapon and a federal felony conviction for illegal firearms dealing involving his possession of 26 machine guns he had assembled without serial numbers and a silencer.

106.    Defendant O'Connor not only was Negron's prosecutor but also was in charge of Caban's prosecution.

107.    O'Connor knew all the above information about Caban, and other information tending to suggest Caban was the shooter, that Negron's attorney did not.

108.    Nevertheless, O'Connor withheld this information from the defense and from the court, and he also withheld a "beeper duty report" he had prepared which contained, among other things, inconsistent statements of the prosecution's trial witnesses.

109.    While withholding the evidence further linking Caban to the shooting case, O'Connor argued that Caban's connection to the shooting was too "tenuous" to allow the admission of evidence of Caban's possible culpability.

110.    As a result of O'Connor's misleading argument, the court precluded the defense from introducing any evidence of Caban's possible culpability.

111.    In summation, O'Connor exploited his success in keeping this evidence hidden.

112.    He argued that it would be unreasonable for the jury to believe someone else had committed the shooting, saying:

> The person who comes out of the car just happens to look like the defendant. The person who comes out of this car, that man just happens to go into the defendant's house. Does that make any sense

> to you?  Does that sound like a reasonable coincidence, or does it
> sound completely and utterly unreasonable and not worthy of belief?

113.    O'Connor made this argument even though he knew, among other things, that Caban lived in the same house as Negron, that Caban more closely resembled the shooter than Negron did, and that Caban, on the same day as the shooting, had acted in a manner suggesting he knew he was guilty of the shooting.

114.    O'Connor also falsely told the jury that "everything was done by the book with this case, nothing is being hidden from you."

115.    In reality, as O'Connor well knew, he had hidden from the jury the evidence of Caban's culpability, and also he and Moscoso had inappropriately influenced Fevrier's in-court identification testimony using a highly irregular, suggestive procedure that was anything but "by the book."

116.    Indeed, O'Connor exploited his success in manufacturing Fevrier's lineup identification of Negron.

117.    O'Connor asked the jury rhetorically:  "[D]o you think for a moment that Mervin [Fevrier] would forget ever, ever in his life what this person looks like[?] . . . I submit to you that that is completely unreasonable to believe, and if something is unreasonable to believe, it cannot be the basis for a reasonable doubt."

118.    O'Connor argued this even though he knew the truth was that Fevrier had originally been uncertain about whether Negron was the shooter.

16

119.    In addition, O'Connor, violating fundamental rules of advocacy and due process, improperly argued facts not in evidence and personally vouched for the credibility of the prosecution's witnesses.

120.    Discussing Fevrier, O'Connor said, "*I am sure*, beyond a reasonable doubt he got an excellent view of the defendant's face, excellent enough to identify him" (emphasis added).

121.    Discussing Miley, he said, "He is a graduate student, he is very articulate and he came across very articulate, *I believe*, to you" (emphasis added).

122.    After the defense objected to this remark, the court instructed O'Connor, "Don't vouch for your witness," but O'Connor, disregarding the court's ruling, continued to vouch, saying, "The evidence shows, *I believe, I believe*, he came across very articulate, very educated. He is a smart man" (emphasis added).

123.    Finally, O'Connor, again in violation of fundamental rules of advocacy and due process, made an improper attack on Negron's character and purported criminal "propensity."

124.    Characterizing Negron's trial testimony as "adversarial" toward O'Connor, O'Connor said:  "What does that tell you about him *as a person*? . . . What does it tell you about his *propensity to commit this crime*? . . . Didn't he seem like *the kind of person* who would do something like this[?]" (emphasis added).

125.    The jury convicted Negron of one count each of attempted murder in the second degree, assault in the first degree, reckless endangerment in the first degree,

criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree.

126.    Negron was sentenced to twelve years in prison.

## Plaintiff's Post-Conviction Efforts and the Eventual Reversal of His Conviction

127.    The Appellate Division affirmed Negron's conviction and sentence on June 26, 2007, *People v. Negron*, 41 A.D.3d 865 (2d Dep't 2007), and the Court of Appeals denied leave to appeal on September 24, 2007, *People v. Negron*, 9 N.Y.3d 924 (2007).

128.    In June 2008, Negron filed a request under New York's Freedom of Information Law ("FOIL") for information about the QCDAO's prosecution of Caban.

129.    On December 1, 2008, Negron filed a *pro se* motion to vacate his conviction under N.Y. Crim. Proc. Law § 440.10.

130.    Negron argued, among other things, that the prosecution had suppressed evidence pointing to Caban as the person who shot Mervin Fevrier, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

131.    The D.A.'s Office opposed Negron's motion.

132.    With respect to Negron's *Brady* argument, the D.A.'s Office argued that there was no violation, since "the People made defendant aware of the arrest of Mr. Caban, his neighbor, for possessing a stash of firearms."

133.    The D.A.'s Office made no mention of the additional information inculpating Caban that Defendant O'Connor had failed to disclose to the court and to Negron at trial.

18

134.    The court denied Negron's § 440.10 motion on March 17, 2009, without a hearing.

135.    On April 30, 2009, Negron filed a *pro se* motion for reconsideration of his § 440.10 motion.

136.    Meanwhile, on September 10, 2009, the Appellate Division denied Negron leave to appeal the denial of his § 440.10 motion.

137.    On September 15, 2009, Negron filed a *pro se* habeas corpus petition in the United States District Court for the Eastern District of New York.

138.    The D.A.'s Office opposed this petition.

139.    On July 16, 2010, Negron, after more than two years, finally received a response to his FOIL request.

140.    Among the documents he received was a sworn affirmation by Defendant O'Connor from the Caban prosecution, opposing a motion by Caban to dismiss his indictment.

141.    Negron also obtained, from a court reporter, a transcript of a pretrial hearing from the Caban case that was conducted by Defendant O'Connor.

142.    From the affirmation and the transcript, Negron learned, for the first time, of Caban's frantic efforts to dispose of the trash bags, that the bags contained the same type of ammunition used to shoot Fevrier, and other details tending to suggest Caban was the shooter.

143.    On January 27, 2011, Negron presented this evidence in another *pro se* motion for the state court to reconsider his § 440.10 motion.

19

144.    While that motion was pending, Eastern District Judge Dora Irizarry appointed *pro bono* counsel for Negron, then stayed proceedings in the Eastern District so that the state courts could consider Negron's new evidence regarding Caban.

145.    On April 20, 2012, Negron, now represented by counsel, presented his new evidence in another § 440.10 motion.

146.    The D.A.'s Office opposed this motion.

147.    The court denied the motion on September 26, 2012.

148.    The Appellate Division affirmed this decision on December 11, 2013. *People v. Negron*, 112 A.D.3d 741 (2d Dep't 2013).

149.    However, the Court of Appeals granted leave to further appeal.

150.    On November 23, 2015, the Court of Appeals vacated Negron's conviction. *See People v. Negron*, 26 N.Y.3d 262 (2015).

151.    The Court agreed with Negron that Defendant O'Connor had "actively misle[d] the court as to the potential merit of defendant's third-party culpability defense." *Id.* at 267.

152.    The Court found that O'Connor "was quite familiar with the circumstances of [Caban's] arrest," yet had withheld evidence about Caban that was "plainly favorable to the defense." *Id.* at 269.

153.    The Court further found that O'Connor compounded this misconduct when, "in addressing defendant's third-party culpability application [he] characterized Caban's arrest as 'irrelevant' and his connection with the shooting as 'tenuous at best.'" *Id.*

20

154.    The Court concluded that O'Connor's misconduct had deprived Negron of a fair trial and ordered a new trial. *Id.* at 270.

155.    The QCDAO's opposition to Negron's January 2011 motion presenting the Caban documents prolonged Negron's imprisonment by nearly five years.

156.    Before the Court of Appeals vacated Negron's conviction, Negron was already scheduled to be released from prison on December 29, 2015, based on allowances he had received for good time and limited-credit time.

157.    After the Court vacated Negron's conviction, he was transferred from state prison to the custody of the New York City Department of Correction.

158.    On January 5, 2016, the trial court released Negron on his own recognizance.

159.    However, the D.A.'s Office announced that it would retry Negron.

160.    Negron's counsel moved to dismiss the indictment against Negron in September 2016.

161.    The D.A.'s Office opposed this motion, denying that QCDAO prosecutors had done anything wrong.

162.    On September 6, 2017, the State Supreme Court, Queens County (Lasak, J.S.C.), granted Negron's motion.

163.    The court held that Defendant O'Connor had impaired the integrity of the grand jury by omitting "a plethora of exculpatory evidence" and by "the utterly misleading manner in which Mr. Fevrier's identification was submitted."

21

164.    The court detailed how O'Connor had presented Fevrier's identification of

Negron as unequivocal when, in fact, "a positive identification was made only after *he*

*himself* [i.e., O'Connor] took the complainant out of the lineup room and, along with

detectives, had a 15 minute conversation with the complainant outside the presence of

defense counsel" (emphasis in original).

165.    The court found that O'Connor's "deception" was "indisputably deliberate"

and was "merely the tip of the iceberg."

166.    The court went on to explain how O'Connor had "violated his obligation of

fair dealing to the accused" by failing to inform the grand jury that:

   a.    A witness who "lived on the same block as" Negron and "recognized
         the shooter from prior occasions" had "stated that [Negron] was not
         the perpetrator"; and

   b.    The three other witnesses to view the lineup had either identified a
         filler as the shooter or not recognized anyone as the shooter.

167.    The court concluded:

   When the prosecutor put this case in the Grand Jury, he was aware
   that there was significantly more evidence pointing away from the
   defendant's identity as the perpetrator of the crimes than there was
   pointing towards it. In spite of that, he not only failed to present any
   of this exculpatory evidence, but he chose to present the only piece
   of evidence that he did have to connect the defendant to the crime in
   an incomplete way, which created the impression that the
   complainant's identification of the defendant was stronger than it
   actually was.

## FIRST CAUSE OF ACTION

### State-law malicious prosecution. Defendant Moscoso.

168.   Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

169.   Defendant Moscoso, individually and in concert with others, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Plaintiff without probable cause.

170.   The proceedings terminated in Plaintiff's favor.

171.   Defendant City of New York is liable for Plaintiff's malicious prosecution under the principle of *respondeat superior*.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983. Malicious prosecution in violation of the Fourth, Fifth, and Fourteenth Amendments. Defendant Moscoso.

172.   Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

173.   Defendant Moscoso, individually and in concert with others, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Plaintiff without probable cause to believe Plaintiff was guilty of any crime or could be successfully prosecuted, and to deprive him of his liberty, in violation of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

174.   The proceedings terminated in Plaintiff's favor.

175. Defendant Moscoso is liable for his violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION

**42 U.S.C. § 1983. Evidence fabrication in violation of the
Fourth, Fifth, Sixth, and Fourteenth Amendments.
Defendants O'Connor and Moscoso.**

176. Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

177. Defendants O'Connor and Moscoso (collectively, the "Individual Defendants"), individually and in concert with other investigators, acted deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, to cause the manufacturing of Fevrier's unequivocal lineup identification of Plaintiff and other evidence.

178. They did so for the purpose of causing criminal charges to be approved, and criminal proceedings to be initiated and continued, against Plaintiff.

179. The Individual Defendants, in their investigative capacity, forwarded the fabricated evidence to prosecutors for use against Plaintiff during a criminal prosecution.

180. The Individual Defendants knew that the fabricated evidence would be likely to influence a jury's decision at trial.

181. As a result of the Individual Defendants' forwarding of evidence they had fabricated to prosecutors, the D.A.'s Office initiated a prosecution of Plaintiff and his liberty was infringed or curtailed.

24

182.    The Individual Defendants' misconduct violated Plaintiff's right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment to the United States Constitution, and his rights to procedural and substantive due process and a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

183.    Alternatively, O'Connor and/or Moscoso had an affirmative duty to Plaintiff to protect his above-mentioned constitutional rights from infringement by other government officials.

184.    Each of them knew that Plaintiff's constitutional rights would be violated if another government official present at the lineup were to cause Fevrier to unequivocally identify Plaintiff after Fevrier had been unable to do so.

185.    Each of them had reasonable opportunities to intervene to prevent such infringement of Plaintiff's constitutional rights.

186.    Nevertheless, each of them deliberately, willfully, recklessly, and/or with deliberate indifference to the truth failed to take reasonable steps to intervene.

187.    As a result of their failure to intervene, the Individual Defendants caused false identification evidence to be manufactured and forwarded to prosecutors, the D.A.'s Office to initiate a prosecution of Plaintiff, and Plaintiff's liberty to be infringed or curtailed.

188.    In failing to intervene, the Individual Defendants proximately caused the violation of Plaintiff's right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment to the United States Constitution, and his rights to procedural and

substantive due process and a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and his resulting injuries.

189.    The above misconduct by the Individual Defendants was outrageous and shocking to the conscience.

190.    By virtue of the foregoing, the Individual Defendants are liable to Plaintiff under 42 U.S.C. § 1983.

### FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983. Evidence fabrication in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments. Defendants O'Connor and Moscoso. Manufacturing of identification evidence used at trial.**

191.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

192.    The Individual Defendants, individually and in concert with others, acted deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, to cause Fevrier, who had been uncertain, to falsely conclude that Plaintiff was definitely the person who had shot him.

193.    The Individual Defendants, in their investigative capacity, forwarded Fevrier's manufactured identification of Plaintiff to prosecutors for use against Plaintiff during a criminal prosecution.

194.    The Individual Defendants knew that influencing Fevrier into believing that Plaintiff definitely was the shooter would be likely to result in Fevrier making a false or unreliable identification of Plaintiff at trial and to influence the jury's verdict.

26

195.    But for the Individual Defendants' deliberate corruption of Fevrier's recollection, Fevrier would not have unequivocally identified Plaintiff as the shooter at trial and Plaintiff would not have been convicted.

196.    The above misconduct by O'Connor, Moscoso, and others with whom they acted in concert:

    a.    was a substantial, foreseeable, and proximate cause of Plaintiff's conviction, his subsequent incarceration and other curtailment of his liberty, and other consequential damages; and

    b.    violated Plaintiff's right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment to the United States Constitution, and his rights to procedural and substantive due process and a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

197.    Alternatively, Moscoso and/or O'Connor had an affirmative duty to Plaintiff to protect his above-mentioned constitutional rights from infringement by other government officials.

198.    Each of them knew that Plaintiff's constitutional rights would be violated if another government official present at the lineup were to cause Fevrier to believe that Plaintiff was the person who shot him after Fevrier had been unable to unequivocally identify him.

199.    Each of them had reasonable opportunities to intervene to prevent such infringement of Plaintiff's constitutional rights.

200.    Nevertheless, each of them deliberately, willfully, recklessly, and/or with deliberate indifference to the truth failed to take reasonable steps to intervene.

201.    As a result of their failure to intervene, Fevrier falsely identified Negron at trial and Negron was convicted, imprisoned for almost 10 years, and deprived of his liberty after his conviction was vacated but before the indictment against him was dismissed.

202.    The Individual Defendants proximately caused the violation of Plaintiff's right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment to the United States Constitution, and his rights to procedural and substantive due process and to a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and his resulting injuries.

203.    The above misconduct by the Individual Defendants was outrageous and shocking to the conscience.

204.    By virtue of the foregoing, the Individual Defendants are liable to Plaintiff under 42 U.S.C. § 1983.

### FIFTH CAUSE OF ACTION

**State-law negligent hiring, training, and supervision.
Defendant City of New York based on misconduct by
employees of the NYPD.**

205.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

206.    During all times material to this Complaint, Defendant City of New York, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately

indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

207.    Defendant City of New York is liable to Plaintiff because of its negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees employed by the NYPD with regard to their aforementioned duties, and because such negligence was a substantial and foreseeable cause of the injuries Plaintiff suffered.

## SIXTH CAUSE OF ACTION

**42 U.S.C. § 1983 and *Monell*. Municipal liability for the conduct of prosecutors in the D.A.'s Office. Defendant City of New York.**

208.    Plaintiff repeats and realleges each allegation contained in ¶¶ 1-167 and 176-204 as if fully set forth herein.

209.    Before and during Plaintiff's trial, Defendant O'Connor knew that the defense wanted to show that there was reasonable doubt as to whether Negron was the shooter because of evidence incriminating Fernando Caban.

210.    As set forth above, O'Connor knew of evidence that pointed to Caban as the actual shooter but failed to disclose this information to Plaintiff or his attorney despite an obligation to do so under *Brady v. Maryland*. *See* ¶¶ 103-109, *supra*.

211.   Knowing of this additional evidence that he had withheld, O'Connor misled the court into ruling that there was insufficient proof to support a third-party culpability defense. *See* ¶ 110, *supra*.

212.   O'Connor's withholding of crucial evidence pointing to Caban's guilt and his misleading of the court violated Plaintiff's rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

213.   In addition to the above violations of Plaintiff's constitutional rights, O'Connor further infringed Plaintiff's constitutional rights to due process and a fair trial, and to be free from unreasonable seizure, by, among other things:

a.   in violation of *Brady*, withholding from the defense, and even from the D.A.'s case file, the "beeper duty report" that O'Connor had prepared during the early stages of the Negron and Caban investigations, *see* ¶ 108, *supra*;

b.   improperly causing Fevrier to falsely identify Plaintiff following the lineup, in the grand jury, and at trial, *see* ¶¶ 53-70, 84-85, 97, 176-204, *supra*;

c.   in violation of *Brady*, withholding from the defense, and from the court at a pretrial independent-source hearing after Fevrier's lineup identification had been suppressed, the manner in which Moscoso and O'Connor had individually and collectively pressured Fevrier to say he was sure that number five was the shooter, *see* ¶¶ 53-70, *supra*, when disclosure of such information would have required the hearing court to disallow Fevrier's in-court identification of Negron at trial as being improperly influenced by Moscoso and O'Connor rather than attributable to Fevrier's own independent observations and memory;

d.   using false and misleading testimony to deceive the grand jury to indict Plaintiff, *see* ¶¶ 83-96, *supra*;

e.   causing Ivaniv, Miley, Vintonyak, and Khavko—all of whom had told police either that Negron was not the shooter or that they did not

recognize him as the shooter—to give trial testimony that falsely minimized their observations of the shooter; and

f.    during his summation, making false or misleading arguments, arguing "facts" not in evidence, improperly vouching for the prosecution's case, improperly attacking Plaintiff's character and alleged criminal propensity, and violating other fundamental rules of conduct intended to ensure the fairness of the trial, *see* ¶¶ 111-124, *supra*.

214.    Following Plaintiff's unlawful conviction, O'Connor and other prosecutors continued to suppress the evidence pointing to Caban despite Plaintiff's numerous efforts to obtain it and consistently resisted Plaintiff's efforts to overturn his conviction, resulting in his serving almost ten years in prison.

215.    Individually and collectively, the violations by O'Connor and other D.A.'s Office personnel of Plaintiff's constitutional rights and their prolonging of Plaintiff's injuries were directly, foreseeably, proximately, and/or substantially caused by conduct chargeable to Defendant City of New York amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to investigation and prosecution by the D.A.'s Office under the leadership of the Queens County District Attorney ("D.A.").

216.    The D.A. and his authorized delegates at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the management of personnel employed by or assigned to the D.A.'s Office.

217.    The County of Queens is a subdivision of Defendant City of New York.

218.    The D.A., at all relevant times, was and is an elected officer of Queens County, and the D.A.'s Office was and is funded out of the City's budget.

31

219.    The D.A. was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2.

220.    The D.A. and his assistant district attorneys are agents and employees of Defendant City of New York.

221.    The State of New York has provided by statute that Defendant City's constituent counties (including Queens County), and hence Defendant City itself, are liable for torts committed by County officers and employees, such as the D.A. and his assistants. *See* N.Y. County Law §§ 53, 941.

222.    The City represents such officers and employees in judicial proceedings and indemnifies them because they are City officials.

223.    Under the principles of municipal liability for federal civil rights violations, the D.A. or his authorized delegates have final managerial responsibility for training, instructing, supervising, and disciplining attorneys and other employees of the D.A.'s Office regarding their conduct in the prosecution of criminal matters, including, but not limited to:

      a.    their constitutional obligation not to create or to otherwise use false, misleading, or unreliable evidence, testimony, statements, or argument during criminal proceedings, including but not limited to manufactured lineup identifications and in-court identification testimony;

      b.    their constitutional obligation to correct evidence, testimony, statements, and argument that they know or should know is false, inaccurate, incomplete, misleading, or unreliable, when it is presented or thereafter; and

    c.    their continuing constitutional obligation to timely and fully disclose material evidence and information favorable to the defense as set forth in *Brady*, *Giglio*, and their progeny.

224.    The D.A. or his authorized delegates maintained a policy, custom, or practice of deliberate indifference to past violations by QCDAO employees of these constitutional obligations, to the risk of future such violations by QCDAO employees, and to the obvious need to train, supervise, and discipline QCDAO employees with respect to these obligations.

225.    The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs, including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto, were implemented or tolerated by policymaking officials for Defendant City, including, but not limited to, the D.A. and his delegates, who knew:

    a.    to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

    b.    that such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

    c.    that employees facing such issues have strong incentives to make the wrong choices, especially given the pressure the D.A.'s Office places on prosecutors to win convictions at any cost;

    d.    that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of the accused and cause him constitutional injury; and

    e.    that employees of the D.A.'s Office had a history of making wrong choices in such matters.

226.    The aforementioned policymaking officials had the knowledge and the

notice alleged in the preceding paragraph based upon:

    a.    numerous credible allegations, many substantiated by judicial
decisions (some of which are listed in Exhibit A, which is
incorporated herein by reference) that Queens County ADAs had:

        i.    participated in the manufacturing of false testimony or
evidence, including identification evidence;

        ii.    presented or failed to correct false or misleading testimony
and argument;

        iii.    failed to disclose information favorable to the defense that
was required to be disclosed by the constitutions and the laws
of the United States and of the State of New York; and

        iv.    made arguments at trial that were so false, misleading, or
otherwise improper that they deprived the defendant of due
process and a fair trial; and

    b.    the inherent obviousness of the need to train, supervise, and/or
discipline ADAs in the aforementioned constitutional obligations to
counteract the pressure that the D.A.'s Office applied to prosecutors
to obtain convictions.

227.    During all times material to this complaint, the City, through its

policymaker, the D.A., owed a duty to the public at large and to Plaintiff to implement

policies, procedures, customs, and practices sufficient to prevent, deter, and avoid

conduct by subordinates that violate the constitutional rights of criminal suspects or

defendants and of other members of the public.

228.    However, the D.A. and his designees, as policymakers for the City,

knowingly and intentionally breached, or were deliberately indifferent to, this duty.

229.    Current Queens D.A. Richard Brown served as a justice of the Appellate

Division, Second Department, from March 1981 until 1991, when he became D.A.

34

230.    There were numerous decisions by the Appellate Division during the period preceding his initial term as D.A., when Brown was a justice of the same court, excoriating ADAs for violating the aforementioned fair trial rights of criminal defendants.

231.    Thirty-three of these decisions, from the period 1985 through 1990, are listed in Exhibit A, which is incorporated herein by reference.

232.    These decisions were so numerous and so strongly worded that they suggested the existence of an anything-goes culture and practice aimed at obtaining convictions no matter the cost to criminal defendants' constitutional rights.

233.    Nevertheless, upon becoming D.A. himself in 1991, Brown, through his deliberate indifference, permitted this culture to continue.

234.    He did so by failing to conduct internal disciplinary investigations or to discipline the prosecutors who were known to commit such violations, failing to refer such individuals for possible discipline by the Appellate Division's Disciplinary or Grievance Committees, and failing to ensure they were properly trained and supervised.

235.    Instead of disciplining prosecutors who were found to have violated the constitutional right of criminal defendants to a fair trial, the D.A.'s policy, custom, or practice was to give these prosecutors raises, promotions, and commendations, based in part on their record of winning at trial and extracting guilty pleas, even in weak cases, while ignoring or discounting judicial findings of misconduct by these prosecutors.

236.    Among the acts of serious misconduct found by courts and known to D.A. Brown during his tenure were 84 court decisions listed and summarized in Exhibit A (numbers 34-117).

237.    These decisions found that Queens prosecutors, as in Plaintiff's case, had wrongfully withheld favorable information from the defense, used or failed to correct improper, false, or misleading evidence or argument in the grand jury, at pretrial hearings, or at trial, or engaged in misconduct, often pervasive, during summations.

238.    Upon information and belief, none of the prosecutors responsible for the wrongdoing that occurred in these cases were meaningfully disciplined, if they were disciplined at all, by the D.A. or his designees.

239.    The D.A.'s failure to take any reasonable measures to discipline prosecutors responsible for these and other constitutional violations incentivized them and their colleagues to continue to violate the constitutional rights of criminal defendants.

240.    Prosecutors knew they were likely to be rewarded for winning but would suffer no negative personal consequence in the unlikely event their misconduct was exposed.

241.    Further encouraging prosecutors to win at any cost, including violating the constitutional rights of the accused, was their knowledge that the D.A., due to his indifference, had not promulgated or published any employee handbook or other office-wide publication setting forth either rules of behavior for prosecutors in handling criminal investigations or prosecutions, or procedures for disciplining prosecutors who violated established rules of behavior.

36

242.    The D.A.'s indifference to compliance with *Brady* disclosure obligations was further communicated to line prosecutors by the QCDAO's establishment of its self-styled "Chinese Wall" policy, which flagrantly violated constitutional requirements.

243.    Under the United States and New York State Constitutions, it was clearly established that the D.A.'s Office as an entity had the obligation to disclose evidence favorable to the defense, without regard to the individual knowledge or intent of any individual prosecutor.

244.    Nevertheless, under the "Chinese Wall" policy, prosecutors assigned to try criminal cases were kept in the dark, and encouraged not to inquire, about promises or benefits that their cooperating witnesses received from other prosecutorial personnel to induce them to testify favorably for the D.A.'s Office.

245.    The predictable result of this policy was that the defense and the jury wouldn't learn about circumstances known to the D.A.'s Office that potentially affected such witnesses' truthfulness and that false testimony by such witnesses denying receipt of promises and benefits would go uncorrected.

246.    Prosecutors were trained in this policy, and D.A. Brown permitted it to continue long after a trial judge, the New York Appellate Division, and then the New York Court of Appeals each condemned it as a flagrant violation of the constitutional rights of the accused.

247.    At the joint trial of co-defendants Gary Steadman and Raymond Blair in 1990, a key prosecution witness, Tony Malloy, testified to certain benefits he had received from the D.A.'s Office but denied that prosecutors had promised him leniency

with respect to several pending felonies that could result in a lengthy period of imprisonment.

248.    Later in the trial, the defense learned that his testimony was false; in fact, a senior prosecutor in the D.A.'s Office had promised Malloy's attorney that, in exchange for favorable testimony, Malloy could avoid prison altogether.

249.    Steadman and Blair were convicted of manslaughter and related offenses.

250.    Ruling on the defense's motion for a mistrial or dismissal based on this late revelation of *Brady* material, the trial court found that the deal was "deliberately not communicated from the executive level of the Queens District Attorney's Office to the trial attorneys." The court denounced the "Chinese Wall" policy and directed that it be discontinued:

> [T]his court cannot adequately express in words its disgust that the trial was impacted by a shabbily structured cooperation charade. . . .
>
> Any reasonable interpretation of what happened here must conclude that . . . the executive level of the of the Queens District Attorney's Office improperly attempted to shield a witness from "*Brady*" evidence disclosure . . . . *It is hoped that this . . . will never again be attempted . . . .* [emphasis added]

251.    The trial court nevertheless denied the defense motion since the jury had eventually learned of the promises to Malloy.

252.    The Appellate Division "share[d] the trial court's condemnation of the tactics employed" by the D.A.'s Office but affirmed the conviction for the same reason. *People v. Blair*, 186 A.D.2d 665, 668 (2d Dep't 1992), *rev'd sub nom. People v. Steadman*, 82 N.Y.2d 1 (1993).

253.    The Court of Appeals, however, ordered a new trial, ruling that "the scheme employed by the District Attorney's office," which revealed "a determined effort . . . to avoid" its *Brady* obligations, "undermine[d] the purposes of the *Brady* and [related state] rules" and "cannot be condoned." *Steadman*, 82 N.Y.2d at 6-7.

254.    Two years after the trial court in the Blair and Steadman case excoriated the D.A.'s Office for the "Chinese Wall" policy and expressed its expectation that the practice would be halted, the same policy was still in effect.

255.    At the attempted murder trial of Shih Wei Su in 1992, a crucial prosecution witness falsely denied, under questioning by the prosecutor, that he had received any leniency in exchange for his testimony, the prosecutor failed to correct this false testimony, and the prosecutor falsely vouched for the truthfulness of this testimony in her summation.

256.    This prosecutor, as she later testified under oath, had been trained in the "Chinese Wall" policy.

257.    Years later, a judge, over the D.A.'s vigorous opposition, directed the disclosure of a sealed plea transcript which, as it turned out, showed that the witness had received an explicit deal for leniency in a robbery case in exchange for his cooperation in testifying against Su.

258.    For years, the D.A.'s Office resisted Su's efforts to overturn his fraudulently-obtained conviction.

259.    Finally, after Su had served 12 years in prison, the United States Court of
Appeals for the Second Circuit ordered a rare grant of a federal writ of habeas corpus,
overturning Su's conviction and directing his retrial or release.

260.    The court condemned Su's prosecutor for having "knowingly elicited false
testimony from a crucial witness," *Su v. Filion*, 335 F.3d 119, 121 (2d Cir. 2003), whose
"credibility could not help but be central to the deliberations of any reasonable jury," *id.*
at 129, and then "bolster[ing that witness's] credibility" in a false summation, *id.* at 125.

261.    Subsequently, the D.A.'s Office, knowing it lacked any witness to testify
against Su, threatened him with a retrial and the potential of many more years in prison if
he did not plead guilty to a reduced charge.

262.    When Su insisted on his right to a new trial, the prosecutor suddenly
dismissed the case on the scheduled trial date.

263.    Policymakers at the Queens D.A.'s Office were not the least bit disturbed
by the prosecutor's behavior or the Second Circuit's condemnation of it.

264.    After learning of the Second Circuit's opinion, Su's prosecutor, Linda
Rosero, spoke with D.A. Brown's second-in-command, ADA John Ryan, to complain
that no one had warned her of the decision.

265.    ADA Ryan told her, "you are just going to have a bad day, that's all."

266.    Another high-level prosecutor in the office told her, "Don't worry, you're a
good attorney. Everything will work out."

267.    Petros Bedi was convicted of murder in 2000 after a key alleged eyewitness identified him as the shooter while denying the D.A.'s Office had paid him any financial benefits in exchange for this testimony.

268.    It took 12 years before Bedi finally succeeded in compelling the D.A.'s office, through a FOIL lawsuit, and over its resistance, to reveal its witness relocation file for this witness.

269.    Contrary to the witness's false testimony, he had received approximately $23,000 in relocation benefits, including numerous cash payments totaling thousands of dollars, even though his identity hadn't been revealed and there couldn't possibly have been any threat to his safety.

270.    The records showed that, after his identity was revealed at trial and, for the first time, he had a theoretical reason to fear for his safety, the payments stopped—he had literally been secretly bribed.

271.    When Bedi then brought a motion, in August 2012, to vacate his conviction, the D.A.'s Office resisted.

272.    It defended the prosecutor, Debra Lynn Pomodore, on the basis that, under the "Chinese Wall" policy, she did not have actual possession or knowledge of the documents or the payments.

273.    The court, pointing out that this was no defense to Pomodore's violation of the *D.A.'s Office*'s disclosure obligations, vacated the conviction.

274.    Upon information and belief, the D.A.'s Office unlawfully obtained numerous additional convictions through exploitation of its "Chinese Wall" policy and through other *Brady* violations.

275.    Another practice followed under D.A. Brown that signaled to ADAs that the QCDAO's leadership was indifferent to *Brady* violations and the manufacturing of false or coerced testimony was the systematic abuse of material witness warrants.

276.    The material witness statute requires that prosecutors bring recalcitrant witnesses arrested on material witness warrants "forthwith" to court where they have the right to be advised by lawyers and to request release from custody.

277.    In flagrant violation of the statute and of the limitations in court orders authorizing the arrest of material witnesses, the D.A.'s Office followed a practice of secretly bringing such witnesses to their offices, or to a remote location, instead of to court, where they would be isolated and detained until they agreed to cooperate.

278.    Then, after the witnesses had been unlawfully compelled to testify, the D.A.'s Office would conceal from the defense its use of such coercive tactics to elicit favorable testimony from the witnesses—evidence that *Brady* required to be disclosed.

279.    Further leading to the manufacturing and use of coerced or unreliable evidence was the D.A.'s Office's practice, as in Plaintiff's case, of improperly influencing lineup identifications and knowingly using unlawfully obtained lineup "evidence" in criminal proceedings.

280.    During the 1994 lineup involving a murder suspect, Kareem Bellamy, an eyewitness failed to positively identify Bellamy.

281.    A Queens ADA, Stephen Antignani, was present at the lineup to supervise it and, in theory, to ensure it was conducted fairly.

282.    Knowing that, without a positive identification, there would be an insufficient basis to obtain an indictment, Antignani permitted a detective to take the witness into a private room, where the two talked privately.

283.    After the witness and the detective emerged from the room, the witness suddenly claimed to be able to positively identify Bellamy.

284.    ADA Antignani used this manufactured "identification" in the grand jury to obtain an indictment.

285.    He did so, as the prosecutor also did in Plaintiff's case, by misleading the grand jury into believing the eyewitness had made a positive identification while not revealing the witness's initial uncertainty and the process by which an uncertain identification had been transformed into a positive one.

286.    Bellamy was convicted, and spent 14 years in prison, before his conviction was overturned based upon newly-discovered evidence of innocence.

287.    Similarly, in the Ricardo Benitez case, in 2009, a prosecutor attending a lineup to ensure its fairness, Tina Grillo, knew the lineup was grossly suggestive but allowed it to go forward.

288.    While the suspect was in his 50s and appeared gaunt, sickly, and disheveled, the fillers were all clean-cut, lighter-skinned policemen who were 15 to 20 years younger.

289.   Even though records of the D.A.'s Office described the lineup as "terrible," a prosecutor still used it to obtain an indictment.

290.   The grand jury was informed only of the identification, not of the extraordinarily suggestive and unlawful circumstances by which it was obtained.

291.   Thereafter, a prosecutor misled a hearing judge into allowing an in-court identification at trial by introducing untrue testimony from the witness that her initial observation of the suspect had lasted five minutes, when a surveillance video showed it had really lasted a matter of seconds.

292.   Benitez was convicted and spent almost six years in prison before his conviction was reversed and he was acquitted at a retrial.

293.   Upon information and belief, employees of the D.A.'s Office caused numerous additional false arrests, prosecutions, and convictions by improperly influencing lineup identifications and knowingly using unlawfully obtained lineup "evidence" in criminal proceedings.

294.   Further contributing to the anything-goes atmosphere was the knowledge among prosecutors that the D.A.'s Office, rather than discipline ADAs who were found by a court to have engaged in misconduct, instead would personally attack judges who made unfavorable decisions, try to get the judges transferred out of criminal court, or try to block the judges' reappointment.

295.   The D.A.'s policy of deliberate indifference to misconduct included a history of indifference to misconduct by Defendant O'Connor himself.

296.    Despite his misconduct in the prosecution of Plaintiff, O'Connor was given the QCDAO's Eugene J. Kelly, Jr. Award for Outstanding Assistant District Attorney of the Year during the same year he obtained Negron's conviction.

297.    In 2010, O'Connor was the prosecutor in the murder trial of Antoine Singleton and a co-defendant. Both men were convicted.

298.    In 2013, the Appellate Division vacated Singleton's conviction based on extensive misconduct by O'Connor. *See People v. Singleton*, 111 A.D.3d 769 (2d Dep't 2013).[2]

299.    Before trial, the trial judge ruled that O'Connor must redact a statement by the co-defendant, in accordance with *Bruton v. United States*, 391 U.S. 123 (1968), because Singleton would not be able to cross-examine his co-defendant about it.

300.    However, according to the appellate decision, "during opening statements, [O'Connor] told the jury that, after the nontestifying codefendant was arrested, the police learned of the involvement in the crime of" Singleton, thus "improperly impl[ying] that the codefendant implicated the defendant in the crime," in violation of *Bruton*. *Singleton*, 111 A.D.3d at 769-70.

301.    Although the trial court admonished O'Connor, the Appellate Division noted,

> in summation, the prosecutor again implied that the codefendant had implicated the defendant. Specifically, he unequivocally suggested that the unnamed accomplice referred to . . . was the defendant.

---

[2] *See also* Charisma L. Miller, *Brooklyn Appellate Court orders new trial for murder defendant*, Brooklyn Daily Eagle, Nov. 14, 2013, http://www.brooklyneagle.com/articles /brooklyn-appellate-court-orders-new-trial-murder-defendant-2013-11-14-190000.

> Further, the prosecutor projected for the jury, on a video screen, a copy of the codefendant's statement, with the word "we" highlighted in red, and directly suggested that the jury should draw the inference that "we" in the codefendant's statement referred to the codefendant and the defendant. Under the circumstances of this case, this conduct constituted "an unjustifiable circumvention" of the *Bruton* rule . . . , and deliberate defiance of the pretrial order.

*Id.* at 770.

302.    The Appellate Division then admonished O'Connor for additional

misconduct at the same trial:

> We further take this opportunity to note that these two examples of the prosecutor's defiance of a court ruling were not isolated in this trial. For example, upon being told by the court to take down the video projection of the codefendant's statement, the prosecutor continued his summation without doing so, requiring further comment from defense counsel. Additionally, during the prosecutor's opening statement, after an objection was sustained to his line of argument that "justice [was] what's on this [i.e., the prosecutor's] side of the room," the prosecutor continued with that line of argument. Similarly, during the prosecutor's closing statement, an objection was sustained to the prosecutor's effective instruction to the jury on the law, but the prosecutor nonetheless persisted in that effective instruction, requiring a second objection by defense counsel.

*Id.* at 770.

303.    Upon information and belief, O'Connor was never disciplined for the above

misconduct.

304.    The D.A.'s policy, custom, and/or practice of approval, ratification of, or

deliberate indifference to, violations by Queens prosecutors of their constitutional

obligations to afford criminal defendants a fair trial foreseeably encouraged such

violations to continue and was a substantial cause of Defendant O'Connor's violations of

Plaintiff's constitutional rights before and during Plaintiff's trial, of Plaintiff's wrongful

conviction, and of the continuation thereafter of his wrongful imprisonment and

prosecution.

305.   The aforesaid policies, procedures, regulations, practices, and/or customs of

Defendant City were collectively and individually a substantial factor in bringing about

the aforesaid violations of Plaintiff's rights under the Constitution and laws of the United

States and in causing his damages.

306.   By virtue of the foregoing, Defendant City is liable for having substantially

caused the foregoing violations of Plaintiff's constitutional rights and his resultant

injuries.

## SEVENTH CAUSE OF ACTION

**State-law negligent hiring, training, and supervision.
Defendant City of New York based on misconduct by
employees of the D.A.'s Office.**

307.   Plaintiff repeats and realleges each allegation contained in ¶¶ 1-167, 176-

204, and 208-306 as if fully set forth herein.

308.   During all times material to this Complaint, Defendant City of New York,

through its policymakers, owed a duty to the public at large and to Plaintiff, which such

policymakers knowingly and intentionally breached, or to which they were deliberately

indifferent, to implement policies, procedures, customs, and practices sufficient to

prevent, deter, and avoid conduct by their subordinates violating the aforementioned

constitutional rights of criminal suspects or defendants and other members of the public.

47

309.    Defendant City of New York is liable to Plaintiff because of its negligent failure to adequately hire, train, supervise, and discipline its agents, servants, and/or employees of the D.A.'s Office with regard to their aforementioned duties, and because such negligence was a substantial and foreseeable cause of the injuries Plaintiff suffered.

## EIGHTH CAUSE OF ACTION

**42 U.S.C. § 1983. Withholding of evidence in violation of due process and the right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments. Defendant Moscoso.**

310.    Plaintiff repeats and realleges each allegation contained in ¶¶ 1-167 as if fully set forth herein.

311.    At all relevant times, Plaintiff had a clearly-established right, pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; *Brady v. Maryland*, 363 U.S. 83 (1963); and *Giglio v. United States*, 405 U.S. 150 (1972), to timely disclosure of all material information that was favorable to the defense, including evidence that tended to show his innocence or to impeach the credibility of the prosecution's witnesses against him.

312.    Moscoso knew that:

a.      Moscoso had improperly told Fevrier, before Fevrier viewed the lineup in which Plaintiff was present, that the police suspect in the shooting would be present in the lineup, *see* ¶ 55, *supra*; and

b.      Immediately after Fevrier viewed the lineup and expressed his uncertainty about whether number five (Negron) had committed the shooting, Moscoso improperly had Fevrier read and sign a document in which Moscoso had identified number five as the "SUSPECT," thereby informing Fevrier whom the police believed had committed the shooting, and

48

  c.  Moscoso, in the same document he had Fevrier sign, had written falsely that Fevrier had identified number five as the shooter when in fact Fevrier had indicated he was uncertain, *see* ¶ 59, *supra*.

313. Moscoso failed to inform the D.A.'s Office of the above information.

314. As a result of Moscoso's failure to disclose the above information, the information was never disclosed to the defense or to the court before or during a pretrial "independent source" hearing that was held after Fevrier's lineup identification had been suppressed, nor was it disclosed to the defense or to the court before or during Plaintiff's trial.

315. The information that Moscoso withheld from the prosecution, and thus from the defense and the court, was favorable to the defense in that it:

  a.  Would have required the court, at the pretrial independent-source hearing, to disallow Fevrier's in-court identification of Negron at trial as being improperly influenced by Moscoso rather than attributable to Fevrier's own independent observations and memory, or

  b.  It would have showed at trial that Fevrier's identification of Negron had resulted from police pressure and not genuine recognition and was unreliable.

316. Since Fevrier was the only witness to identify Negron at trial, this information was material to the outcome of the prosecution that led to Plaintiff's conviction.

317. Moscoso had a constitutional obligation to promptly disclose such information to the prosecutor.

318. In withholding the aforementioned information favorable to Plaintiff, Moscoso acted deliberately, intentionally, willfully, recklessly, negligently, and/or with

deliberate indifference to Plaintiff's constitutional right to due process and a fair trial or to the effect of such misconduct upon Plaintiff's constitutional rights.

319.   But for Moscoso's withholding of the above information favorable to Plaintiff, there is a reasonable likelihood that Plaintiff's prosecution would have been dropped or dismissed or he would have been acquitted at trial.

320.   Moscoso's actions in withholding the favorable information were a foreseeable, substantial, and proximate cause of Plaintiff's conviction and subsequent deprivation of liberty and other damages.

321.   By virtue of the foregoing, Moscoso is liable to Plaintiff under 42 U.S.C. § 1983.

## DEMAND FOR DAMAGES

322.   At the time of Plaintiff's arrest, he was employed as a custodian engineer for the New York City Department of Education, earning a substantial salary.

323.   Due to his conviction, Plaintiff was terminated from this position.

324.   As a result of Plaintiff's wrongful arrest, prosecution, and conviction, which was caused by Defendants, Plaintiff suffered lost wages and benefits, and permanent diminution of his earning potential of not less than $2,000,000.

325.   Plaintiff also incurred legal fees of approximately $100,000 for trial and appellate counsel to defend against the false charges.

326.   As a result of his wrongful prosecution, conviction, and imprisonment, Plaintiff suffered, among other things, physical assault in prison; severe mental anguish,

including the fear of further assaults and the witnessing of brutal assaults against other prisoners; the loss of virtually all privacy and autonomy; constant humiliation, indignities, embarrassment, and degradation; and severe restrictions on his personal liberty and freedom, including but not limited to diet, sleep, personal contact, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

327.  Plaintiff's wrongful prosecution, conviction, and incarceration caused him mental and emotional suffering, and permanent mental and emotional harm that continues to this day, including, but not limited to, stress, anxiety, depression, sleep deprivation, nightmares, and fear of police.

328.  Plaintiff's wrongful imprisonment caused him loss of consortium with his wife, his mother, his siblings, and other family members and friends, and resulted in the loss or impairment of his relationships with his daughter and other family members.

329.  WHEREFORE, Plaintiff Julio Negron demands judgment against the Defendants as follows:

a.  damages for lost past and future income and benefits of not less than $2,000,000;

b.  damages for legal fees of not less than $100,000;

c.  additional compensatory damages of not less than $20,000,000;

d.  punitive damages against Defendants Moscoso and O'Connor of not less than $10,000,000;

e.  reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988 and the inherent powers of this Court;

f.  pre-judgment interest as allowed by law; and

g.      such other and further relief as this Court may deem just and proper.

/s/ Joel B. Rudin
_____
JOEL B. RUDIN
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com

*Attorney for Plaintiff*

Dated:      New York, New York
            March 10, 2021

## EXHIBIT A

1. *People v. Roopchand*, 107 A.D.2d 35 (2d Dep't 1985): Affirming conviction but unequivocally condemning trial prosecutor for making inflammatory summation argument intended to elicit sympathy for the complainant and arouse animosity against the defendant and warning the prosecutor that future infractions may lead to disciplinary action, and that the court expected the Queens County D.A. to issue an appropriate internal admonition.

2. *People v. Jones*, 108 A.D.2d 824 (2d Dep't 1985): Reversing robbery conviction where, among other things, the prosecutor improperly elicited that the defendant had previously hit a woman with a bat, and then suggested on summation that the jury could never believe a man who had done this.

3. *People v. Valdivia*, 108 A.D.2d 885 (2d Dep't 1985): Affirming conviction but "strongly condemn[ing]" prosecutor for improperly cross-examining alibi witness regarding his taking an affirmation instead of an oath and revisiting the matter in summation, and for characterizing defendant's testimony as "an out and out series of lies."

4. *People v. Hooks*, 110 A.D.2d 909 (2d Dep't 1985): Reversing conviction for rape, robbery, and burglary where prosecutor cross-examined defendant on his prior conviction in such a way as to improperly create the inference that because defendant had previously committed a burglary, he had also committed the instant offenses.

5. *People v. Brown*, 111 A.D.2d 248 (2d Dep't 1985): In reversing conviction on other grounds, reprimanding prosecutor for making comments during summation that characterized defendant as lying while characterizing the prosecution as "on the side of truth," and implying that the jury should convict even if not convinced beyond a reasonable doubt, so long as it believed its verdict represented the "truth."

6. *People v. Torres*, 111 A.D.2d 885 (2d Dep't 1985): Reversing, in part, because prosecutor repeatedly cross-examined alibi witness on why the witness did not contact the police, improperly implying witness was obligated to come forward, and because prosecutor consistently implied during summation that defense had concocted alibi, and improperly suggested that the jury would be subject to derision if they acquitted defendant.

7. *People v. Williams,* 112 A.D.2d 177 (2d Dep't 1985): In reversing, reprimanding trial prosecutor for intimating to jury during summation that they were required to find that the complainant had lied in order to acquit defendant, and improperly bolstering by injecting his integrity and the integrity of his office into the case.

8.   *People v. Hines,* 112 A.D.2d 316 (2d Dep't 1985): Reversing in part because the prosecutor, during his summation, made inappropriate comments about the defendant, and emphasized the other "police procedures" which led to the selection of defendant as a suspect, clearly inviting the jury to infer that there was other evidence against defendant, of which they had not been told.

9.   *People v. La Rosa,* 112 A.D.2d 954 (2d Dep't 1985): Reversing conviction where the prosecutor, in summation, improperly vouched for his own case, denigrated the defense, misrepresented material facts, and misquoted testimony.

10.  *People v. Reyes*, 119 A.D.2d 596 (2d Dep't 1986): Affirming conviction but noting that prosecutor improperly told jury that "contrary to what the Defense Counsel would have you believe, a trial is not a search for reasonable doubt. Plainly simply a trial is a search for truth. Not supposed to be sitting here trying to pick reasonable doubt out from everything that goes on [sic]."

11.  *People v. Mercado*, 120 A.D.2d 619, 502 N.Y.S.2d 87 (2d Dep't 1986): Ordering new trial where, among other errors, court allowed prosecutor to admit photograph of defendant posing with handguns for no other purpose than to arouse jurors' emotions, and inflammatory nature of photographs was made worse when prosecutor, in summation, commented on jury having seen defendant in his "Al Capone get-up."

12.  *People v. Pascullo*, 120 A.D.2d 687 (2d Dep't 1986): Reversing conviction in part because prosecutor suggested improper inferences of racial motivation and informed the jury that an acquittal would be a condonation of racism.

13.  *People v. Beaman*, 122 A.D.2d 848 (2d Dep't 1986): Reversing conviction because prosecutor called witness to stand knowing he would refuse to testify, and improperly commenting on this refusal during summation, thereby inviting jury to speculate that witness had been threatened and refused to testify out of fear.

14.  *People v. Ciervo*, 123 A.D.2d 393 (2d Dep't 1986): Reversing conviction in part because of prosecutor's improper summation comments implying that a conviction was warranted based solely upon the defendant's character, and repeated characterizations of the defense case as a "con."

15.  *People v. Roudabush*, 123 A.D.2d 649 (2d Dep't 1986): Affirming conviction but "condemn[ing]" prosecutor's misconduct during summation and noting that court made its position on this misconduct "quite clear" during oral argument.

16.  *People v. Anderson*, 123 A.D.2d 770 (2d Dep't 1986): Reversing conviction because prosecutor re-called witness (who had originally been a codefendant in the case) to the stand, even though prosecutor knew the witness was going to

2

invoke his privilege against self-incrimination, and improperly commented several times on this invocation of privilege during summation, thus inviting jury to draw an unwarranted inference against the defendant.

17. *People v. Brown*, 125 A.D.2d 321, 510 N.Y.S.2d 135 (2d Dep't 1986): Reversing conviction because prosecutor improperly bolstered victim's testimony by implying that the defendant's stipulation that the victim had been raped and sodomized was a stipulation that the victim had told the truth, and by telling the jury something was "terribly wrong" with them if they did not believe the victim.

18. *People v. Montalvo*, 125 A.D.2d 338 (2d Dep't 1986): Reversing conviction where prosecutor, in his summation, improperly commented upon the defendant's failure to testify and to call witnesses on his own behalf.

19. *People v. Napoli*, 126 A.D.2d 674 (2d Dep't 1987): Affirming conviction but noting that prosecutor "went beyond the four corners of the evidence" in summation.

20. *People v. Faison*, 126 A.D.2d 739 (2d Dep't 1987): Ordering new trial where prosecutor improperly cross-examined accused (1) on his failure to disclose alibi to police after being given *Miranda* warnings, and (2) on his failure to produce records indicating that he was at work at time of robbery, which suggested that defendant bore burden of proving alibi defense.

21. *People v. Memminger*, 126 A.D.2d 752 (2d Dep't 1987): Ordering new trial on various grounds and "admonish[ing]" prosecutor "to remain within the bounds of fair comment during summation and to refrain from inappropriate and inflammatory remarks."

22. *People v. Perez*, 127 A.D.2d 707 (2d Dep't 1987): Ordering new trial where, among other things, prosecutor improperly implied on cross-examination of accused that he was involved in previous criminal activity.

23. *People v. Simms*, 130 A.D.2d 525 (2d Dep't 1987): Ordering new trial because of "numerous instances of prosecutorial misconduct which occurred throughout the course of the trial," including prosecutor's (1) eliciting of testimony that had been suppressed, (2) referring to that same evidence during summation, (3) repeatedly referring to facts not in evidence, (4) calling defendant's summation a "fairy tale," and (5) vouching for witnesses' credibility.

24. *People v. Scoon*, 130 A.D.2d 597 (2d Dep't 1987): Ordering new trial where prosecutor improperly (1) argued in summation that witness was not involved in crimes of dishonesty when he knew that the witness had a youthful-offender adjudication for grand larceny, and (2) repeatedly commented on matters not in

3

evidence during summation.

25. *People v. Torriente*, 131 A.D.2d 793 (2d Dep't 1987): Ordering new trial where prosecutor improperly (1) cross-examined shooting victim about drug use, (2) cross-examined defendant on whether he had entered country illegally, (3) called police officer to introduce irrelevant testimony about defendant's place of residence, and (4) made prejudicial statements in summation about defense counsel's summation and witnesses' testimony.

26. *People v. Romain*, 137 A.D.2d 848 (2d Dep't 1988): Ordering new trial in part based on prosecutor's "gross distortion" in summation of defendant's testimony, implying that he had admitted guilt when in fact he had not.

27. *People v. Chin*, 138 A.D.2d 389 (2d Dep't 1988): Ordering new trial where prosecutor improperly made unwarranted inferences in summation that defendant accused of rape against young girl planned to commit similar offenses with one of his character witnesses.

28. *People v. Dunlap*, 138 A.D.2d 393 (2d Dep't 1988): Reversing conviction based on prosecutorial misconduct even though proof of defendants' guilt was overwhelming, where prosecutor in summation diverted jury's attention from witnesses' inconsistencies with elaborate depiction of defendants as sharks hunting prey. *See also People v. Williams*, 162 A.D.2d 488 (2d Dep't 1990) (reversing codefendant's conviction on same ground).

29. *People v. Stewart*, 153 A.D.2d 706 (2d Dep't 1989): Vacating conviction where the "trial was marked by the prosecutor's efforts, even over sustained objections, to characterize the defendant as an individual predisposed to commit the crime charged."

30. *People v. Langford*, 153 A.D.2d 908 (2d Dep't 1989): Ordering new trial where prosecutor suggested, with no evidence, that defendant's alibi witness used drugs and was involved in charged robbery, and made several improper remarks in summation, including denigrating defense counsel and defense witnesses, and suggesting to the jury that, in order to acquit, they would have to find that a witness had lied.

31. *People v. Durham*, 154 A.D.2d 615 (2d Dep't 1989): Ordering new trial in part based on prosecutor's misconduct in summation, which included vouching for prosecution witnesses and referring pejoratively to defendant.

32. *People v. Gomez*, 156 A.D.2d 462 (2d Dep't 1989): New trial ordered where prosecutor (1) defied court's order limiting cross-examination of witness on pending criminal case, prompting court to accuse prosecutor of bad faith, (2)

4

cross-examined witness on his supposed communications with defendant, even though he knew the two were incarcerated and not free to converse, prompting court again to accuse prosecutor of bad faith, and (3) in summation, attempted to inflame the jury, vouched for witnesses' credibility, denigrated the defense, and shifted the burden of proof.

33. *People v. Pinkas*, 156 A.D.2d 485 (2d Dep't 1989): Ordering new trial where court ordered counsel not to commingle discrete allegations, but prosecutor "repeatedly sought to join the two incidents during her summation in spite of the direction by the Trial Judge to desist."

34. *People v. Rivera*, 170 A.D.2d 544 (2d Dep't 1991): Reversing rape conviction because the prosecutor failed to disclose police reports that were "in direct conflict" with the complainant's rape allegation.

35. *People v. Gaskins*, 171 A.D.2d 272 (2d Dep't 1991): Reversing conviction where the prosecutor failed to disclose the videotape of an interview of the alleged child victim.

36. *People v. Stevens*, 174 A.D.2d 640 (2d Dep't 1991): Reversing conviction in part based on prosecutor's statement in summation that "if this defendant wasn't charged with sodomy . . . he should have been."

37. *People v. Delace*, 174 A.D.2d 688 (2d Dep't 1991): Reversing robbery conviction where the prosecutor failed to disclose witness statements.

38. *People v. Gunther*, 175 A.D.2d 262 (2d Dep't 1991): Reversing conviction where prosecutor improperly attempted to show defendant's propensity to commit the charged crime of dealing cocaine by extensively cross-examining him on past convictions for dealing marijuana.

39. *People v. Wilkens*, 177 A.D.2d 678 (2d Dep't 1991): Reversing convictions where, despite court order that defendant's use of aliases could be used only for identification purposes, prosecutor cross-examined defendant on the same topic for impeachment purposes and then argued on summation that defendant was not to be believed because he "hides behind three names."

40. *People v. Parker*, 178 A.D.2d 665 (2d Dep't 1991): Ordering new trial in part based on prosecutor's misconduct in summation, including improperly suggesting that defendant's daughter's unfazed demeanor on witness stand indicated that defendant had exposed her to drug dealing; trying to mislead the jury into finding defendant guilty by association; and announcing in open court that defendant's daughter was wearing T-shirt that court had refused to admit in evidence.

41. *People v. Baba-Ali*, 179 A.D.2d 725 (2d Dep't 1992): Reversing a rape conviction

5

involving a four-year-old child where, despite a court order, the prosecutor failed until the eve of trial to disclose medical records finding no signs of sexual abuse.

42. *People v. Mack*, 180 A.D.2d 824 (2d Dep't 1992): Reversing conviction where prosecutor failed to turn over notes that could have been used to impeach witness.

43. *People v. Figueroa*, 181 A.D.2d 690 (2d Dep't 1992): Ordering new trial where prosecutor's summation "went well beyond the bounds of fair advocacy" by calling defendant's alibi witness untruthful, by suggesting that defendant was selling drugs on the night of his arrest for a crime he was alleged to have committed on another day, and by suggesting that defendant's alibi was concocted after the witness met with defense counsel.

44. *People v. Clausell*, 182 A.D.2d 132 (2d Dep't 1992): Reversing a narcotics conviction where the prosecutor repeatedly denied the existence of a "buy report," which turned out to include a description of the buyer wholly at odds with the description the arresting officer had said he received and matched to the defendant.

45. *People v. James*, 184 A.D.2d 582 (2d Dep't 1992): Reversing conviction where prosecutor represented that People would not introduce unfairly prejudicial evidence of defendant's prior possession of drugs but then cross-examined police officer extensively on that very evidence and emphasized it in summation.

46. *People v. Andre*, 185 A.D.2d 276 (2d Dep't 1992): Reversing conviction where, among other things, prosecutor in summation improperly called People's key witness a "brave young girl" and asked jury not "to let her down."

47. *People v. Campbell*, 186 A.D.2d 212, 587 N.Y.S.2d 751 (2d Dep't 1992): Reversing a robbery conviction because the prosecutor withheld hospital records which contained statements of the complainant contradicting her trial testimony.

48. *People v. Nieves*, 186 A.D.2d 276 (2d Dep't 1992): Reversing conviction where prosecutor cross-examined accused on psychiatric history and then commented on the matter in summation even though there was no relevance whatsoever to the defendant's psychiatric history or condition.

49. *People v. Odle*, 187 A.D.2d 536 (2d Dep't 1992): New trial ordered where prosecutor repeatedly elicited evidence of uncharged crimes against accused in order to show his criminal propensity and bad character, attempted to paint him as guilty by association, and committed summation misconduct.

50. *People v. Banch*, 80 N.Y.2d 610 (1992): Reversing manslaughter conviction where the prosecutor "mistakenly" gave the defense the wrong police memo book, withheld prior affidavits of a People's witness, and falsely represented that a report by another People's witness contained no information required to be disclosed.

51. *People v. Robinson*, 191 A.D.2d 595 (2d Dep't 1993): Ordering new trial where prosecutor "engaged in a series of improper remarks and tactics," including eliciting testimony about defendant's post-arrest silence and stressing the point in both his opening and summation; eliciting improper expert testimony and mischaracterizing the issue in summation; and, also in summation, referring to defense counsel's summation as a "con job," vouching for the complainant's truthfulness, and "derisive[ly]" commenting on the presumption of innocence and defendant's right to remain silence.

52. *People v. Hill*, 193 A.D.2d 619 (2d Dep't 1993): Ordering new trial where prosecutor cross-examined defendant in a manner intended to improperly to show defendant's criminal propensity and then focused on this line of argument in summation.

53. *People v. Davis*, 196 A.D.2d 597 (2d Dep't 1993): Reversing a rape and robbery conviction where the prosecutor had refused to disclose the basis for the People's expert's conclusion that defendant's DNA matched that found on the victim.

54. *People v. Steadman/Blair*, 82 N.Y.2d 1 (1993): Reversing a defendant's manslaughter conviction where the District Attorney's Office made a "determined effort" to avoid its obligations to disclose exculpatory evidence and to correct false testimony, by employing a "scheme" under which a supervisor in the Office would make a cooperation agreement with a witness's attorney, but not reveal the agreement to the prosecutors handling the defendant's case at trial, and not correct the witness's false testimony denying such an agreement. *See also People v. Blair*, 186 A.D.2d 665 (2d Dep't 1992) (noting that the scheme operated at "the executive level of the District Attorney's Office").

55. *People v. Gaines*, 199 A.D.2d 335 (2d Dep't 1993): Reversing manslaughter conviction where the District Attorney's Office employed the same scheme condemned in *Steadman*, i.e., withholding a cooperation agreement made between the trial assistants' superior and the principal prosecution witness's attorney.

56. *People v. Torres*, 199 A.D.2d 442 (2d Dep't 1993): Ordering new trial based in part on prosecutor's persisting in lines of cross-examination over sustained objections, including questioning a defense witness excessively about his drug use, questioning defendant about irrelevant matter of whether he thought drugs were a problem in schools, and accusing defendant of tailoring his testimony after hearing other witnesses testify.

57. *People v. Fearnot*, 200 A.D.2d 583 (2d Dep't 1994): Reversing robbery conviction where the prosecutor withheld prior statements of the complainant describing the robbery, suggested, without evidentiary support, that the defendant was a prostitute, and tried to inflame the jury by citing the AIDS epidemic.

7

58.  *People v. Kirchner*, 200 A.D.2d 766 (2d Dep't 1994): Reversing assault conviction where the prosecution failed to disclose witness statements.

59.  *People v. Baxley*, 84 N.Y.2d 208 (1994): Remitting a CPL 440 motion challenging a murder conviction for a hearing to determine the truth and materiality of a witness's affidavit, which stated that before trial he had informed the prosecutor that he and a People's witness had been induced by police to fabricate a jail-house confession, evidence the Court of Appeals deemed "crucial" to the People's case.

60.  *People v. Elder*, 207 A.D.2d 498 (2d Dep't 1994): Reversing conviction in part based on prosecutor's unspecified improper comments in summation regarding two defense witnesses and a prosecution witness.

61.  *People v. Giersz*, 212 A.D.2d 805 (2d Dep't 1995): Reversing conviction where prosecutor's summation "exceeded the broad bounds of rhetorical comment permissible in closing arguments."

62.  *People v. Spinelli*, 214 A.D.2d 135 (2d Dep't 1995): Reversing conviction where prosecutor failed to cross-examine defendant on his post-arrest silence then attacked the defendant's credibility on that ground during summation, thus unfairly depriving defendant of chance to explain the silence.

63.  *People v. Moss*, 215 A.D.2d 594 (2d Dep't 1995): Reversing conviction in part based on prosecutor's disregard of court's *Sandoval* ruling when cross-examining defendant, repeated references to defendant as a violent person, cross-examination questions calculated to compare defendant to Hannibal Lecter in *Silence of the Lambs*, remarks inviting jurors to put themselves in the shoes of victims being threatened by defendant, and waiving of a knife in front of the jury during summation.

64.  *People v. Leuthner*, 216 A.D.2d 327 (2d Dep't 1995): Reversing conviction where prosecutor asked defendant whether the complainant was lying, asked defendant's character witness about her personal knowledge of the facts underlying defendant's past conviction, failed to establish a good-faith basis for questioning about a threat made by the defendant's father, and failed to stay within the four corners of the evidence during summation.

65.  *People v. Scott*, 217 A.D.2d 564 (2d Dep't 1995): Ordering new trial based on "flagrant" and "pervasive" summation misconduct, where prosecutor (1) repeatedly referred to defendant as convicted felon, in an attempt to get the jury to convict defendant based on criminal propensity, (2) denigrated defendant, including by suggesting that defendant thought jurors just "fell off the stupid truck," and (3) attempted to shift the burden of proof.

8

66. *People v. James*, 218 A.D.2d 709 (2d Dep't 1995): Ordering new trial on other grounds but noting "some unacceptable practices engaged in by the prosecutor" — namely, the "repeatedly condemned tactic" of suggesting during cross-examination and summation that the complainant, in identifying the defendant, was either correct or lying, and excessive references to the defendant's criminal record.

67. *People v. Shim*, 218 A.D.2d 757 (2d Dep't 1995): New trial ordered where prosecutor failed to disclose police officer's notes.

68. *People v. Ferrara*, 220 A.D.2d 612 (2d Dep't 1995): Affirming conviction but noting that prosecutor "committed several instances of misconduct during the course of his summation" by commenting, without proper foundation, on a defense witness's failure to provide the police with information; suggesting that defense counsel's objections had deprived jury of hearing certain testimony; and telling the jury that it should take only 10 to 15 minutes to decide the case.

69. *People v. Torres*, 223 A.D.2d 741 (2d Dep't 1996): Reversing conviction where prosecutor made personal attacks on defense counsel and argued that there was no evidence that defendant was somewhere other than the scene of the robbery, which improperly shifted the burden of proof to the accused.

70. *People v. Brown*, 224 A.D.2d 539 (2d Dep't 1996): New trial ordered where prosecutor failed to disclose firearms report that contained substantially different information than that given by People's witness at trial, which prejudiced defense by depriving it of the opportunity "to cross-examine the [witness] and test his credibility."

71. *People v. Moustakis*, 226 A.D.2d 401 (2d Dep't 1996): Reversing conviction where the prosecutor presented a cooperating witness who "forgot" the details of his past crimes, but withheld 16 pages of interview notes detailing these crimes for the District Attorney's Office.

72. *People v. May*, 228 A.D.2d 523 (2d Dep't 1996): Reversing a murder conviction where the prosecutor failed to disclose a cooperation agreement with its star witness and failed to correct his false testimony that no such agreement existed.

73. *People v. Croons*, 231 A.D.2d 585 (2d Dep't 1996): Reversing robbery conviction where the prosecution wrongfully withheld prior statements of a key witness, the complainant.

74. *People v. Bonnen*, 236 A.D.2d 479 (2d Dep't 1997): Reversing conviction based in part on prosecutor's failure to present evidence he had promised in opening that defendant had shot an additional victim, and then admitting at end of trial that he

had "no information" as to that victim's whereabouts, prompting court to call prosecutor's representation in his opening statement "disingenuous."

75. *People v. Ying*, 236 A.D.2d 630 (2d Dep't 1997): Reversing robbery conviction on other grounds, while condemning the prosecutor's withholding of the terms of a cooperation agreement with a People's witness.

76. *People v. Brown*, 241 A.D.2d 460, 663 N.Y.S.2d 975 (2d Dep't 1997): Ordering new trial where People agreed that prosecution's failure to disclose prior statements of arresting officer was prejudicial and mandated reversal.

77. *People v. Lippolis*, 246 A.D.2d 557 (2d Dep't 1998): Ordering new trial where prosecutor in his opening statement, among other things, improperly called the defendant a "parasite" and told the jury that "citizens like [them]selves indicted this defendant"; during direct examination of the arresting officer, elicited that defendant had remained silent after his arrest; and during summation, again referred to defendant's postarrest silence.

78. *People v. Mackey*, 249 A.D.2d 329 (2d Dep't 1998): Reversing robbery conviction where the prosecutor "deliberately" set a trap for the defense at trial by withholding critical information required to be disclosed earlier.

79. *People v. Walters*, 251 A.D.2d 433 (2d Dep't 1998): Ordering new trial where prosecutor repeatedly made inflammatory remarks designed to appeal to the jury's sympathy, such as commenting that the victim "was probably going to be a brilliant artist"; shifted the burden of proof by noting that the defendant did not call additional witnesses; stated that "the only real evidence is the People's evidence"; accused the defendant of tailoring his testimony after hearing the prosecution witnesses; described the defendant's testimony as "continued lies on top of lies, on top of lies," and "tales and lies, back and forth, back and forth"; gave his personal opinion on the truth and falsity of witnesses' testimony; vouched for the victim's credibility; and, "most egregious[ly]," insinuated that a gun recovered from defendant two weeks after the crime may have been used in the charged shooting, even though the prosecutor knew that a ballistics test had conclusively established otherwise.

80. *People v. Anderson*, 256 A.D.2d 413 (2d Dep't 1998): Ordering new trial where prosecutor (1) brought out only inculpatory portion of statement at trial and, thanks to trial court error, succeeding in blocking defendant's attempt to bring out exculpatory portion, and (2) compounded misconduct by telling jury in summation that accused had not made any exculpatory statement.

81. *People v. Brown*, 256 A.D.2d 414 (2d Dep't 1998): Reversing conviction on evidentiary grounds but noting as independent ground for reversal the prosecutor's

improper comment on defendant's declining to testify, his misstatements of the evidence, and his references to matters not in evidence.

82.   *People v. Rivera*, 259 A.D.2d 570, 684 N.Y.S.2d 896 (2d Dep't 1999): Affirming conviction but "deplor[ing] the continuous failure of the Assistant District Attorney to follow the admonitions of the trial court regarding his improper summation comments."

83.   *People v. Alfaro*, 260 A.D.2d 495 (2d Dep't 1999): Reversing conviction on evidentiary grounds and noting "clear impropriety" of prosecutor's remarks in summation that the presumption of innocence was "gone" or "vanquished"; that while the court would instruct the jury that the defendant had "a lot of rights," they should also consider the victim's rights; and that the jury should infer the defendant's guilt based on his having had a lawyer with him when he surrendered to police.

84.   *People v. Robinson*, 260 A.D.2d 508 (2d Dep't 1999): Ordering new trial based on prosecutor's summation misconduct where prosecutor improperly vouched for complainant's truthfulness, appealed to the jury's sympathies and fears by describing the elderly complainant as a person who would be a "classic victim anywhere in this city," accused the defense of manufacturing evidence and putting on perjurious witnesses who were "more full of crap than a Christmas turkey," said he was "ticked off" that members of defendant's family were in the courtroom when a defense witness testified, and ended by telling jury that "[t]he only way this defendant walks out of the courtroom is if you let him."

85.   *People v. Lewis*, 262 A.D.2d 584 (2d Dep't 1999): Ordering new trial in part based on prosecutor improperly asking a witness whether defense counsel offered him money or drugs in return for his testimony, and admonishing that such misconduct "is not to be repeated at any subsequent trial."

86.   *People v. Washington*, 278 A.D.2d 517 (2d Dep't 2000): Reversing conviction on other grounds but noting impropriety of prosecutor's arguments in summation that defendant's testimony was "a lie" and "a pile of crock," and was "fabricate[d]" after having had "the benefit of counsel," and that the defense's version of events was "patently absurd" and that the jury should not be "fooled" by it.

87.   *Farakesh v. Artuz*, No 99-CV-3945 (JG), 2000 WL 1480896 (E.D.N.Y. Oct. 3, 2000): Granting habeas petition because prosecutor impermissibly elicited extensive testimony from detectives about defendant's post-arrest silence, and repeatedly used this testimony in summation as evidence of defendant's guilty state of mind, and to impeach defendant.

88.   *People v. Smith*, 288 A.D.2d 496 (2d Dep't 2001): Ordering new trial where

11

prosecutor "repeatedly stated unqualified pronouncements of the defendant's guilt, often inappropriately injecting her personal views," such as the remark, "of course he did it. This isn't an issue of who did it"; vouched for witnesses' credibility; appealed to the sympathy of the jury by commenting that the victim was "courageous" for going to the police and for "coming before you" and that the victim was "ill" but still came to court; referred to evidence as "uncontroverted," which was a veiled (and improper) reference to defendant's declining to testify; and implied that a witness who could not speak and therefore did not testify would have fully corroborated the complaining witness.

89. *People v. Leavy*, 290 A.D.2d 516 (2d Dep't 2002): Prosecutor improperly withheld *Brady* material such as promises of leniency given to cooperating witness, but court upheld conviction because defense had meaningful opportunity to cross-examine witness about it.

90. *People v. Ni*, 293 A.D.2d 552 (2d Dep't 2002): Reversing assault conviction where the prosecutor's flagrantly improper comments during opening and closing statements shifted the burden of proof, inflamed the jury, and denigrated the defense.

91. *Jenkins v. Artuz*, 294 F.3d 284 (2d Cir. 2002): Affirming grant of writ of habeas corpus where first prosecutor caused a mistrial by withholding a crucial witness's cooperation agreement until the day of his testimony, then second prosecutor, on retrial, allowed same witness to falsely deny the existence of the agreement, objected to the defense's efforts to bring it out, reinforced the witness's false denial on redirect, and bolstered the false testimony in summation.

92. *People v. Lauderdale*, 295 A.D.2d 539 (2d Dep't 2002): Ordering new trial based in part on prosecutor's 31 references to defendant's highly prejudicial nickname, "Homicide."

93. *People v. Bhupsingh*, 297 A.D.2d 386 (2d Dep't 2002): Reversing on other grounds, but noting that prosecutor's misconduct could have served as additional basis for reversal, where prosecutor persistently questioned defendant about collateral matters in a manner intended to denigrate him, continually asked leading questions of prosecution witnesses, placed inadmissible hearsay before the jury, improperly elicited evidence of prior consistent statements made by the complainant, and made inflammatory comments in summation that denigrated the defense and appealed to the sympathy of the jury.

94. *People v. Ramashwar*, 299 A.D.2d 496 (2d Dep't 2002): Reversing conviction because prosecutor put her own credibility at issue by seeking to impeach two defense witnesses with their inconsistent prior statements to her, and by commenting upon the inconsistencies in summation.

95.   *People v. Jones*, 305 A.D.2d 698 (2d Dep't 2003): Reversing robbery conviction where the prosecutor deliberately elicited police testimony in a manner that created the unfair impression that the codefendant had implicated the defendant to police, and where the trial court erroneously precluded the defense from cross-examining the complainant, who was the sole eyewitness, regarding the length of time it took him to identify the defendant at a lineup.

96.   *People v. Jamal*, 307 A.D.2d 267 (2d Dep't 2003): Ordering new trial where prosecutor inappropriately told jury in summation that certain evidence was kept from them for "legal reasons"; argued that indictment was evidence of defendant's guilt; repeatedly gave his personal opinion as to the truth of prosecution witnesses' testimony and as to defendant's guilt; and shifted the burden of proof by referring to the People's evidence as "undisputed" and "[u]ncontroverted," while stating that defendant had "no explanation" and "no rational defense" and asking rhetorically, "[w]hat is the defense, ladies and gentlemen?"

97.   *People v. Milligan*, 309 A.D.2d 950 (2d Dep't 2003): Ordering new trial in part based on prosecutor's improper vouching for witnesses' credibility.

98.   *Su v. Filion*, 335 F.3d 119 (2d Cir. 2003): Granting habeas corpus relief in a murder case where the prosecutor failed to disclose a crucial witness's cooperation agreement, knowingly presented the witness's perjured testimony denying the existence of such an agreement and lying about his criminal conduct, and improperly bolstered the witness's false testimony on summation.

99.   *People v. Thomas*, 8 A.D.3d 303 (2d Dep't 2004): Conviction set aside by trial judge after verdict based on *Brady* violations, but verdict re-instated by Appellate Division because issue was not preserved.

100.   *Turner v. Schriver*, 327 F.Supp.2d 174 (E.D.N.Y. 2004): Granting federal habeas corpus relief in a robbery case where the prosecutor failed to investigate and disclose the criminal record of the People's only witness to the crime, elicited false testimony from the witness that he had no record, and gave false summation on the witness' absence of a criminal record to bolster the witness' credibility.

101.   *People v. Mitchell*, 14 A.D.3d 579 (2d Dep't 2005): Reversing conviction where prosecution withheld police reports, causing substantial prejudice to the defendant.

102.   *People v. Brown*, 30 A.D.3d 609 (2d Dep't 2006): Reversing conviction based on jury-instruction error, but citing as independent ground for reversal misconduct by the prosecutor during cross-examination and summation, including "presenting himself as an unsworn witness at trial, suggesting that the defense counsel did not

believe his own client, making public safety arguments, and implying that certain key evidence had been kept from the jury due to legal technicalities."

103. *People v. Knight*, 18 Misc.3d 1129(A) (Sup. Ct. Queens Cty. 2007): Setting aside verdict after defense discovered that prosecutor failed to disclose significant *Brady* material concerning one of the homicide victims and related to defendant's legitimate self-defense claim.

104. *People v. Bennett*, 40 A.D.3d 653 (2d Dep't 2007): Ordering new trial where prosecutor ambushed defense by representing that he would not call witness and that no *Rosario* existed, but then turning over *Rosario* material and calling witness, and capitalizing on these unfair tactics in summation.

105. *People v. Frantz*, 57 A.D.3d 692 (2d Dep't 2008): Ordering 440 hearing in murder conviction where prosecutor failed to disclose prior inconsistent statements of cooperating witness, who was the only witness to testify that the defendant committed the crime, concerning such witness's alleged observations of the defendant.

106. *People v. Sayers*, 64 A.D.3d 728 (2d Dep't 2009): Ordering new trial in part based on prosecutor's improper comments in opening and summation regarding evidence of defendant's uncharged crimes.

107. *People v. Spann*, 82 A.D.3d 1013 (2d Dep't 2011): Reversing conviction where prosecutor improperly commented on the defendant's medical evidence, presented to explain his perspiration and rapid heartbeat during traffic stop, by referring to it as a "distraction," a "smokescreen," and "smoke and mirrors"; impermissibly shifted the burden of proof by telling jurors that if they did not find the defendant's testimony "reasonable," they could not "form the basis of reasonable doubt"; and stated 14 times that police had recovered a handgun from under the passenger seat of the car, where defendant was sitting, although no evidence was presented at trial to support that claim.

108. *People v. Anderson*, 83 A.D.3d 854 (2d Dep't 2011): Ordering new trial where prosecutor defied court's *Sandoval* ruling to ask "a series of irrelevant and prejudicial questions" concerning defendant's prior narcotics conviction, and in summation vouched for witnesses' credibility, denigrated the defense, and mischaracterized defendant's testimony.

109. *People v. Robinson*, 34 Misc.3d 1217(A) (Crim. Ct. Queens Cty. 2011): Ordering a hearing where prosecutor's delay in *Brady* disclosure was a "clear and unequivocal breach" of that prosecutor's responsibility.

110. *People v. Bedi*, Ind. No. 4107/96 (Sup. Ct. Queens Cty. March 13, 2013) (Griffin,

14

A.J.S.C.): Setting aside murder conviction where prosecutor violated *Brady* by failing to disclose payments made to a key witness, and by failing to correct witness's false testimony that he did not receive such benefits.

111. *People v. Joyner*, 126 A.D.3d 1002 (2d Dep't 2015): Reversing weapon possession conviction where prosecutor's summation deprived defendant of a fair trial by accusing him, without evidence, of uncharged crimes, and making statements implying guilt by association.

112. *People v. Singh*, 128 A.D.3d 860 (2d Dep't 2015): Reversing rape conviction where prosecutor, during summation, acted as an unsworn witness, improperly invited the jury to speculate as to certain matters, denigrated the defense while vouching for the complainant's credibility, and shifted the burden of proof.

113. *People v. Negron,* 26 N.Y.3d 262 (2015): Setting aside attempted murder conviction where prosecutor failed to disclose evidence pointing to a third party as the alleged shooter and then successfully precluded a third-party culpability defense by arguing lack of such evidence.

114. *People v. Cantoni*, 140 A.D.3d 782 (2d Dep't 2016): Reversing conviction where prosecutor repeatedly shifted the burden of proof to the defendant, told the jurors that they would have to find the People's witnesses had lied in order to believe the defense, vouched for the credibility of police witnesses, and denigrated the defense.

115. *People v. Redd*, 141 A.D.3d 546 (2d Dep't 2016): Reversing conviction for "pervasive prosecutorial misconduct" where prosecutor, in opening and summation, misstated the evidence, vouched for the credibility of witnesses, called for speculation by the jury, made inflammatory statements, and improperly denigrated the defense.

116. *People v. Brisco*, 145 A.D.3d 1028 (2d Dep't 2016): Reversing conviction because prosecutor, in summation, attacked defense counsel's integrity, improperly referenced facts not in evidence, misstated critical witness testimony, and made inflammatory "safe streets" arguments.

117. *People v. Davis*, 147 A.D.3d 1077 (2d Dep't 2017): Reversing conviction on other grounds but noting that prosecutor "made improper summation comments regarding the failure of the defendant to communicate certain information to the police at the time of his apprehension."